934 A.2d 1059

John Allen MUHAMMAD

v.

STATE of Maryland.

No. 0986, Sept. Term, 2006.

Court of Special Appeals of Maryland.

Nov. 5, 2007.

194

Nancy S. Forster, Public Defender and Brian M. Saccenti, Baltimore, for Appellant.

Kathryn G. Graeff and Diane E. Keller (Douglas F. Gansler, Atty. Gen. on the brief), Baltimore, for Appellee.

Panel: MURPHY, C.J., BARBERA, and CHARLES E. MOYLAN, JR., (retired, specially assigned), JJ.

CHARLES E. MOYLAN, Jr., Judge, retired, specially assigned.

For 22 days in October of 2002, Montgomery County, Maryland, was gripped by a paroxysm of fear, a fear as paralyzing as that which froze the London district of Whitechapel in 1888. In Whitechapel, however, the terror came only at night. In Montgomery County, it struck at any hour of the night or day. In Whitechapel, all of the victims were prostitutes. In Montgomery County, every man, woman, and child was a likely target. The body count in Whitechapel was five; in Montgomery County the death toll reached six. The name of the Whitechapel terrorist has never been discovered. In Montgomery County, their names are John Allen Muhammad and Lee Boyd Malvo.

After a month-long trial in May of 2006, a Montgomery County jury, presided over by Judge James L. Ryan, convicted the appellant, John Allen Muhammad, of 1) the October 2, 2002, first-degree murder of James Martin; 2) the October 3 first-degree murder of James Buchanan; 3) the October 3

first-degree murder of Premkumar Walekar; 4) the October 3 first-degree murder of Maria Sarah Ramos; 5) the October 3 first-degree murder of Lori Lewis Rivera; and 6) the October 22 first-degree murder of Conrad Johnson. Judge Ryan sentenced John Muhammad to six terms of life imprisonment without the possibility of parole, to be served consecutively with each other and to be served consecutively with any previously imposed sentences in other jurisdictions (including a death sentence in Virginia) for crimes committed in the course of the same murder spree.

Ironically, it is John Muhammad who is aggrieved at the way he was treated by Montgomery County, as he now complains

1. that Judge Ryan erroneously failed to comply with Maryland Rule 4–215, when he permitted the appellant to discharge counsel and to proceed *pro se;*

2. that Judge Ryan erroneously conducted a competency hearing and erroneously found the appellant to be competent to stand trial;

3. that Judge Ryan erroneously denied him a fair trial by refusing to permit him to call a number of witnesses in his defense;

4. that Judge Ryan erroneously permitted the State to present the prior recorded testimony of Dr. Emily Ward;

5. that Judge Ryan erroneously refused to remove the trial from Montgomery County;

6. that Judge Ryan erroneously refused to question the jury venire about a possibly disqualifying conversation reportedly overheard by one prospective juror;

7. that Judge Ryan erroneously allowed the State to cross-examine an officer about compliance with the discovery requirements and erroneously instructed the jury with respect to such compliance;

8. that Judge Ryan erroneously refused to allow the appellant to recross-examine a State's witness; and

9. that the cumulative effect of all of the above denied the appellant a fair trial.

## The Epicenter of Montgomery County

Although the reign of terror perpetrated by Muhammad and Malvo ultimately spread over seven separate jurisdictions and involved 10 murders and 3 attempted murders, the epicenter was unquestionably Montgomery County. Six of the ten murders were committed in Montgomery County. The terror began in Montgomery County on Wednesday evening, October 2, 2002. The terror ended in Montgomery County on Tuesday evening, October 22, 2002.

Seized with epidemic apprehension of random and sudden violence, people were afraid to stop for gasoline, because a number of the shootings had occurred at gas stations. Schools were placed on lock-down status. On one occasion, Interstate 95 was closed in an effort to apprehend the sniper. A multi-jurisdictional state and federal task force was formed to cope with the crisis. "Hot lines" to receive tips were created by both the Montgomery County Police Department and the Federal Bureau of Investigation. Over 60,000 tips were ultimately received. The sense of dread that hovered over the entire community was immeasurable. The six lives that were taken were but a part of an incalculable toll.

### 1. James Martin

James Martin was a systems analyst for the National Ocean and Atmospheric Administration. At just after 6 P.M. on October 2, 2002, he was standing in the parking lot of a Shoppers Food Warehouse in Wheaton. Three witnesses heard a "loud bang" as Martin clutched his chest, gave a cry for help, and collapsed to the ground. He died almost immediately from a bullet fired into his back.

It was determined that the shot had been fired from the rear of the parking lot. There was later recovered from Muhammad and Malvo, on October 24, a Bushmaster XM–15 semiautomatic .223–caliber rifle with a muzzle velocity of approximately 3,000 feet per second. The autopsy of Martin showed that his injuries were consistent with those inflicted by a .223–caliber bullet fired from a Bushmaster rifle. The

medical examiner testified that a .223–caliber bullet fired by a high velocity weapon leaves a distinctive and extremely devastating injury, as it did to Martin, because the bullet fragments when it hits the body, causing "a tremendous amount of damage."

When Muhammad and Malvo were apprehended on October 24, they were in a dark colored 1990 Chevrolet Caprice with New Jersey license tag number NDA 21Z. At about 10:50 A.M. on the day that Martin was killed, an officer on patrol near Aspen Hill took note of the Caprice and its New Jersey tags stopped in a traffic lane. It was occupied by two black males. A records check showed that it was registered to John Allen Muhammad. Because there were no outstanding warrants, the officer did nothing further. At about 10 P.M. that night, four hours after Martin's killing at the Wheaton Shoppers Food Warehouse, a police detective, checking the White Flint Mall parking lot because of a rash of car thefts that had occurred there, noted the presence of Muhammad's car with the New Jersey tags on the lot. The security guard spoke with John Muhammad on the parking lot. He was not wearing any shoes and the guard suspected that he was homeless. Muhammad stated that he was traveling with his son and he pointed to an old, dark blue car with New Jersey license tags. The guard told him that he had to move the car before the parking lot was locked up for the night. The guard ran a check on the tags, found no improprieties, and did nothing further. When she returned to the area around midnight, Muhammad and the car were gone. The encounter had no special significance for her at the time.

## 2. James Buchanan

The senseless killing of October 2 escalated into a murderous rampage by the morning of October 3. James Buchanan, who owned and operated a landscaping business, was mowing the lawn at the Fitzgerald Auto Store near the White Flint Mall at about 7:45 A.M. Gary Huss, an employee at the auto store, heard a "loud bang" but looked around and saw nothing. A minute or two later, another employee rushed into his office and said that "someone was dead on the parking lot." Anoth-

er employee had also heard a "loud shotgun blast" and saw Buchanan grab his chest, stumble toward the gate, and fall. Buchanan lay dead with a "huge wound" to his chest. The post-mortem examination revealed that a single bullet had entered Buchanan's body from the back. The wound was consistent with one caused by a .223 rifle shot fired by a high velocity weapon.

### 3. Premkumar Walekar

No more than 40 minutes after Buchanan was killed, Premkumar Walekar, a taxi driver, was filling his car with gasoline at a nearby Mobil station. Dr. Caroline Namrow was also at the gas station when she heard a "very loud bang" and then saw Walekar walk toward her, pleading, "Call an ambulance." Walekar collapsed to the ground and Dr. Namrow called 911 on her cell phone. She then attempted to administer CPR, but to no avail. Walekar was pronounced dead en route to the hospital.

The autopsy revealed that the fatal wound was from a long-range shooting. The examiner described a wound showing a "lead snowstorm" effect inside Walekar's chest, consistent with the firing of a high velocity rifle, such as a .223 rifle. After the October 24 arrest of Muhammad and Malvo, a ballistics examination showed that the lead fragments found in Walekar's chest had definitely been fired from the Bushmaster rifle recovered from Muhammad's car.

### 4. Maria Sarah Ramos

Less than 30 minutes later, Maria Sarah Ramos, a 32–year-old wife and mother who worked as a housecleaner, was shot through the head and died instantly. She was sitting on a bench at Leisure World Plaza, waiting for her employer to pick her up. A resident of a nearby retirement community was walking to the mailbox when he heard a "huge explosion" and saw Mrs. Ramos "slump over" with blood "pouring from her head."

The autopsy revealed that she had been shot at long range by a high velocity rifle. Officer Cynthia Martin discovered a

bullet hole in the window of the Crisp and Juicy Restaurant just behind the bench where Mrs. Ramos had been sitting. A detective recovered a bullet fragment lying on the restaurant floor. The ballistics examination confirmed that the bullet fragment had been fired from Muhammad's Bushmaster rifle.

Kerry Turner worked for a doctor just across from where Maria Ramos had been sitting on the bench. As Ms. Turner parked her car that morning, she saw a dark blue Chevrolet Caprice, which she described as "beat up," as the only other car on the lot. She noted Mrs. Ramos sitting on the nearby bench. From inside her office, she subsequently looked out the window and saw Mrs. Ramos slump over with blood pouring from her head. Ms. Turner subsequently identified Muhammad's car as the one she had seen on the parking lot on the morning Mrs. Ramos was shot.

### 5. Lori Lewis Rivera

Lori Lewis Rivera was a 25-year-old nanny who was vacuuming her mini-van at a Shell station when she was fatally shot in the back a few minutes after 10 A.M. that same day. Maria Welsh had been loading groceries into her car on the parking lot of a Safeway store just behind the Shell station on Connecticut Avenue when she heard a "loud bang." As she drove away from the Safeway, she saw a woman lying on the ground near the vacuum cleaner at the nearby Shell station. The woman was calling for help, and Ms. Welsh called 911. When help arrived, Ms. Rivera had no pulse.

The autopsy revealed a gunshot wound to the back with no exit wound. The wound was consistent with one inflicted by a high velocity rifle. The ballistics examination revealed that the bullet taken from Ms. Rivera had been fired from John Muhammad's Bushmaster rifle.

At about the same time that Ms. Rivera was shot, Fred Lofberg, an accountant, was leaving his office to go to a 10 A.M. appointment in Kensington. As he drove past the Shell station where the shooting occurred, he noted, in the center lane of traffic, a blue Chevrolet in "stock condition" with

original paint, tires, and hubcaps. He also noticed an odd rust spot on the back, dark tinted windows, and a New Jersey license tag. His observation took on significance to him when, as he returned home, he heard helicopters overhead and then heard a television report about the shooting at the Shell station.

## 6. Conrad Johnson

By the night of October 3, the vortex of carnage had moved beyond Montgomery County into 1) the District of Columbia; 2) Prince George's County, Maryland; and 3) four separate counties in northern Virginia. For the last of the 13 shootings and 10 murders, however, the scene of the crime, on October 22, returned to Montgomery County. At just before six A.M., Conrad Johnson, a husband and father of two sons and a bus driver, was shot while stepping out of his bus. A police officer found Johnson lying on the floor of the bus, bleeding from his chest but still conscious. Doctors were unable to control the extensive hemorrhaging and Johnson died on the operating table. The ballistics examination confirmed that the bullet that killed him had been fired by John Muhammad's Bushmaster rifle.

The officers who responded to the scene of the shooting searched a nearby wooded area. They found a black duffel bag, a single left-handed brown glove, and a note which had been placed inside two plastic ziplock bags and attached to a tree. What turned out to be Malvo's DNA was found on one of the ziplock bags and on the glove. Muhammad could not be excluded as the source of DNA extracted from a hair found on the duffel bag. The note declared, as had two earlier notes in Prince George's County and in Ashland, Virginia, "For you, Mr. Police, call me God." The note also taunted the police for their "incompetence" and warned that "Your children are not safe. Can you hear us now? Do not play these childish games with us. You know our demands. Thank you." The note concluded, "Next person, your choice."

One police witness placed Muhammad's car, with the tinted windows and the New Jersey tags, in the Aspen Hill area at

6:30 P.M. that evening. When the tags checked out, however, the officer concluded that he had no reason to stop the car. Another witness placed both Muhammad and Malvo at a YMCA in Silver Spring at 11 A.M. on the morning that Johnson was shot.

The Outback Steak House is located one-quarter of a mile away from where Johnson was shot. Monica Schiffman, an employee of the steak house, served and had a conversation with John Muhammad at the Outback on the night before the shooting. Muhammad was sitting at a table with a lap top computer. He told Ms. Schiffman that the food he had just eaten there had made him sick and that he just wanted to sit for a while. Ms. Schiffman refunded the price of the meal. He left at about 11:30 P.M. Ms. Schiffman watched as he got into his car, which she described as a four-door, dark blue car with tinted windows. Muhammad's picture was recorded by a surveillance tape over the door of the steak house.

When the Chevrolet Caprice was searched following the arrest of Muhammad and Malvo on October 24, the police recovered a glove matching the one that was found near the scene of Johnson's murder and a receipt for the duffel bag found at the same location. Also recovered was a lap top computer, which contained, in an "Allah 8" file created on October 10, such language as, "To whom it may concern, call me God. We are offering you a way out. These are our terms," followed by a demand for five million dollars to stop the killings. Several maps had been saved on the computer, including two marked with skull and crossbones push pins at the locations where James Martin and James Buchanan had been killed. A handwritten note in the glove compartment included the phrase, "Call me God." There were also recovered ziplock bags similar to those containing the note that was attached to a tree near the scene of the Johnson murder.

## The Killing Zone Expands

### 1. District of Columbia

By the night of October 3, the senseless rampage of killing had spilled over the Montgomery County line into the District

of Columbia. At approximately 9:20 P.M., Pascal Charlot, a 72–year–old carpenter from Haiti, was shot and killed as he was crossing the street near the corner of Georgia and Kalmia Avenues. A witness, washing clothes at a nearby laundromat, heard a "loud pop" and then saw a man with a "big hole in his throat" lying on the ground. The autopsy described a single gunshot wound to the chest exhibiting the "lead snowstorm" attributes of a shooting with a high powered, high velocity rifle. The ballistics examination showed that the bullet that killed Pascal Charlot had been fired from John Muhammad's Bushmaster rifle.

Two hours before Charlot was killed, an officer had stopped the Chevrolet Caprice in the District of Columbia for running a stop sign. Muhammad was identified as the driver. No one else was visible in the car. When the license check revealed no improprieties, Muhammad was issued a verbal warning and that was it.

At about the time that Charlot was shot, Karl Largie was working at the nearby Tropicana Restaurant. He noticed a car parked on the side of the restaurant that appeared to him to be "out of place" and "creepy." It was a Chevrolet Caprice with all original parts and dark tinted windows. Largie heard what he believed to be a "tire pop," a sound which he described as "loud but muffled." Largie then observed the car move off the parking lot very slowly with its lights turned off. In court, he identified the car in which Muhammad and Malvo were arrested as the same car he had observed on the night of Charlot's murder.

## 2. Fredericksburg, Virginia

By the next afternoon, that of October 4, the snipers had moved south into Virginia. At about 2:30 P.M., Caroline Seawell, a part-time substitute teacher, was shot outside a Michael's Craft Store in Fredericksburg as she was placing her purchases inside her car. As she was closing the car door, she felt a pain in her back and heard something hit her car. She realized that she had been shot and fell to the ground. A

bullet had pierced her lung, diaphragm, and liver, but she survived. She was hospitalized for four days. The ballistics examination showed that the bullet that was removed from her body had been fired from John Muhammad's Bushmaster rifle.

Alex Jones was on the parking lot when Caroline Seawell was shot. He heard a "pop" and saw Ms. Seawell fall to the ground. He went to check on her and she told him, "I've been shot." Fearing that he might also be a target, he got back in his car and started driving around the lot in a "zigzag" pattern. He got stuck behind a car that was moving very slowly. He noticed that it was a Chevrolet Caprice with tinted windows and a New Jersey license tag.

### 3. Prince George's County, Maryland

Thirteen-year-old Iran Brown was dropped off by his aunt at the Benjamin Tasker Middle School in Prince George's County, Maryland, at approximately 8 A.M. on October 7. As he waited in front of the school for the doors to be opened, he heard a loud bang and felt a sharp and sudden pain in his chest. He remembered nothing further until he woke up in the Children's Hospital one week later. His aunt testified that just after she dropped Iran off, she heard him screaming her name and saw him lying on the ground. She rushed him to the clinic just around the corner and called 911. Iran remained hospitalized for approximately two months. He suffered damage to many of his internal organs; he lost his spleen, parts of his pancreas and liver, and 80% of his stomach. The ballistics examination revealed that the bullet that pierced his body had been fired from John Muhammad's Bushmaster rifle.

Roger Polk, Jr., testified that a Chevrolet Caprice was parked on his apartment house parking lot, across from the Benjamin Tasker Middle School, throughout the night before Iran Brown was shot. At his mother's urging, he wrote down the number of the New Jersey license tag—NDA 21Z.

After the shooting, the police searched a nearby woods and found a Tarot card with the handwritten message, "For you, Mr. Police. Code: Call me God. Do not release to the press." Also recovered was a Bic pen with no ink cartridge and a shell casing. DNA matching that of Malvo was found on the Tarot card. Muhammad was deemed to be a potential contributor of the DNA found on the Bic pen.

### 4. Manassas, Virginia

Two days later, on October 9, the killers were back in Virginia. Dean Harold Meyers, a 53–year–old engineer, left his job in Manassas at about 8 P.M. He stopped at a Sunoco station in Manassas on his way home to Maryland. He was shot through the head and killed instantly. The ballistics examination established that the bullet that killed him, entering behind his left ear and then fragmenting, came from John Muhammad's Bushmaster rifle. The wound was consistent with a bullet fired from a high velocity rifle.

Officer Steven Bailey responded to a Bob Evans Restaurant across the street from the shooting and began stopping cars as they left the parking lot in order to question the occupants. He stopped a Chevrolet Caprice with tinted windows and asked the occupant, whom he later identified as John Muhammad, if he had heard or seen anything. Muhammad responded that he had not seen anything, and the officer let him proceed on his way. On that parking lot, the police found an ADC map of Baltimore. The fingerprints of both Muhammad and Malvo were found on that map.

One hour before Dean Meyers was shot, Linda Thompson, who works at a bank near the Sunoco station, left work. She saw an old Chevrolet parked in the very far right corner of the bank parking lot. She testified that the car was blue and had New Jersey license tags. She saw a young Afro–American male get into the car, while another Afro–American male was walking across the parking lot. At trial, she identified the younger man as Malvo and the older man as Muhammad.

Concerned about security at the bank, Ms. Thompson actually spoke with Muhammad.

It was for this murder of Dean Meyers that Muhammad was tried and convicted by a jury in Virginia Beach on November 17, 2003. He was sentenced to death on March 9, 2004. The conviction and the sentence were affirmed by the Supreme Court of Virginia on April 22, 2005. *Muhammad v. Commonwealth*, 269 Va. 451, 619 S.E.2d 16 (2005), *cert. denied*, 547 U.S. ——, 126 S.Ct. 2035, 164 L.Ed.2d 794 (2006).

### 5. Fredericksburg, Virginia

Two days later, on October 11, Kenneth Bridges stopped at an Exxon station just off Interstate 95 near Fredericksburg at 9:15 A.M. Virginia Police Officer David Gray was nearby, investigating an automobile accident, when he heard a "pop" and knew it was a gunshot. He heard on his scanner that someone had just been shot at the Exxon station. He responded immediately and found Kenneth Bridges lying dead on the ground.

The autopsy showed that Bridges had died from a gunshot wound to his back and that the wound was consistent with a shot having come from a high velocity weapon. The ballistics examination established that the lethal bullet had been fired from John Muhammad's Bushmaster rifle.

Shortly before Bridges was shot, Christine Goodwin noticed a dark car with heavily tinted windows and New Jersey license tags backing into a parking space near the Exxon station "at an odd angle." Also observing the car was Patricia Bradshaw, who was having breakfast with her husband at the Waffle House near the Exxon station. She saw a "funky blue" car with dark tinted windows drive past the Exxon station very slowly. The car turned into the parking lot of a nearby Ramada Inn, backing into a parking spot. Moments later, she yelled for her husband to "get down" because there had been a shooting at the Exxon station. She could see Kenneth Bridges lying on the ground. She gave the police a description of the car she had observed.

## 6. Falls Church, Virginia

Three days later, on October 14, Linda Franklin, a 47–year-old F.B.I. intelligence analyst, had finished shopping at a Home Depot just outside Falls Church at approximately 9:15 P.M. She was killed immediately when the top of her skull was blown away by a sniper's bullet. The police arrived to find her husband crouched over her body, wailing. The autopsy revealed that the wound was consistent with one caused by a shot from a high velocity weapon. The ballistics test showed that the fatal bullet had been fired from John Muhammad's Bushmaster rifle.

## 7. Ashland, Virginia

Five days went by before the next shooting. On October 19 at about 8 P.M., Jeffrey and Stephanie Hopper were leaving the Ponderosa Steak House in Ashland, a few miles north of Richmond on Interstate 95. They were traveling south from Pennsylvania and had deliberately avoided stopping for gas in the Washington, D.C. area because of the rash of sniper shootings. As the two walked to their car, Jeffrey Hopper heard an "enormous explosion" and realized that he had been shot in the stomach. After extended hospitalization, he survived, but he lost most of his stomach and a part of his pancreas. The ballistics examination revealed that the bullet taken from his stomach had been fired from John Muhammad's Bushmaster rifle.

In a wooded area across from the Ponderosa, the police recovered a shell casing and a Cinna Rasin bag. Both Malvo's fingerprints and Malvo's DNA were found on the Cinna Rasin bag. Tacked to a tree was a ziploc bag with a note inside. Malvo's DNA was on the ziploc bag. The note bore the words, "For you, Mr. Police. Call me God. Do not release to the press." On the back was a further note which referred to phone calls that had been placed to the police and to a priest in Ashland. Those calls had demanded ten million dollars in ransom money in order for the killings to stop. That note

concluded, "P.S. your children are not safe anywhere at any time."

\* \* \*

With the murder of Conrad Johnson in Montgomery County three days later, the killings in the Washington suburbs came to an end. Its toll consisted of ten deaths, three grievous woundings, and a metropolitan area of approximately four million people who had been subjected to three weeks of inexpressible terror.

### The Alabama Connection

Between October 15 and October 21, four telephone calls were received by the police and one by a Catholic priest that threw light on this case. On October 15, a call was received by Amy Lefkoff, a dispatcher for the Rockville, Maryland police. A tape of the call was played for the jury. The message was: "Good morning. Don't say anything, but (unintelligible) the killers in your area. Look at the tarot card. (Unintelligible). Do not (unintelligible). We have called you two times before trying to negotiate. We've got no response. People are dying." The caller hung up and never called back. The call came from a 703 exchange. The day before the call, on October 14 at 9:15 P.M., Linda Franklin had been murdered in Falls Church. The Falls Church area is within the 703 exchange.

Jumping ahead to the fifth and final call, the notes found in the woods after the shooting of Jeffrey Hopper on October 19 led the police to believe that the sniper might attempt to contact them at the Ponderosa Steak House. An F.B.I. agent arranged to reroute and monitor any such call. A call was received at 7:57 A.M. on October 21. The caller said "Hello" twice, and it then sounded as if a tape recorded message were being played. The message referred to earlier demands, the terms of which were non-negotiable. The message again concluded with the warning, "Your children are not safe."

It was the second, third, and fourth calls that established the Alabama connection. In his testimony as a State's wit-

ness, to be discussed more fully *infra,* Lee Malvo stated that he and Muhammad had decided to place the calls because prior attempts to contact the police had been unsuccessful and because Muhammad "wanted to be taken seriously."

A call on October 18 was received by Officer Derek Baliles at the Montgomery County media center. The caller was described as a male in his late teens. The call came from the number 804–752–2931. The 804 area code covers the Richmond area, including Ashland, where Jeffrey Hopper would be shot the next evening.

The caller began by telling its recipient to "just shut up and listen." The caller claimed to have information about "snipers" but wanted Baliles to authenticate something first. The caller wanted Baliles to verify information regarding a shooting at a liquor store. Baliles was given the name of Police Sergeant Martino and a telephone number to contact him. The caller told Baliles that a shooting happened "somewhere on Ann Street," that two people had been shot, and that one of them died. At that point an operator interrupted to say that more money had to be deposited. The line went dead.

Some time went by before the caller called back at 5:40 P.M., asking for "Officer Derek." Officer Baliles told the caller that he had, in the meantime, confirmed the information previously given by the caller by contacting police authorities in Alabama. The caller then explained that he needed to get more coins to stay on the line. The line again went dead and there was no further contact.

The fourth call was placed at 9:00 P.M. that night to Father William Sullivan in Ashland, Virginia. The male caller made reference to "all these killings" and stated that "this lady didn't have to die." The victim killed four days earlier had been Linda Franklin. The caller told Father Sullivan to "write this down" and he then spoke of the "robbery of a liquor store in Montgomery, Alabama." The caller then concluded, "Mr. Police, I am God. Do not talk to the press."

Officer Baliles had telephoned the number that had been given to him by the anonymous caller and found that he was

connected to Sergeant Martino of the Montgomery, Alabama Police Department. Sergeant Martino confirmed that on September 21, 2002, there had been a robbery of an ABC Liquor Store on Ann Street in Montgomery, in the course of which two women had been shot. A young black male had been seen running from the scene. There was a police chase but the suspect got away. Lieutenant James Graboys, who participated in that chase, made a positive in-court identification of Malvo as the man he chased. In the chase, moreover, the fugitive dropped a magazine, which was a gun catalog called "Armor Light." It subsequently developed that Malvo's fingerprints were on that gun catalog. Malvo himself testified that Muhammad and he had committed the liquor store robbery in Montgomery. Muhammad did the shooting of the two victims from the trunk of the Caprice, and Malvo ran up to rob the fallen victims.

One of the shooting victims, Claudine Parker, died that night from her wound. A bullet had entered her back, transected her spinal cord, and passed through her lung. The report of the medical examiner established that the wound showed a "snowstorm effect," which is indicative of a shot from a high powered rifle. A subsequent ballistics examination showed that projectile fragments taken from the body of Claudine Parker had been fired from John Muhammad's Bushmaster rifle. Kelly Adams survived and described the man who ran past her after she was shot as an Afro–American with a thin build and very hairy legs. The bullet that broke her jaw in half, shattered her face and teeth, and paralyzed her left vocal cord had also been fired from John Muhammad's Bushmaster rifle.

### A Fortuitous Breakthrough

The three-week siege of the Washington area had attracted nationwide attention. On October 17, 2002, Sergeant Roger Thomson of the Montgomery County Police Department received a call from Tacoma, Washington. The caller said that a John Williams had been involved in a divorce, that Williams had changed his name to John Muhammad, and that his ex-

wife lived in the Washington, D.C. area. The caller also stated that Muhammad was regularly in the company of a "teenage boy" whom Muhammad referred to as "the sniper."

When on October 23 the police learned that the fingerprints contained on the gun catalog left at the scene of the robbery and murder in Alabama were those of Lee Malvo, they forwarded a photograph of Malvo to their tipster in Tacoma. The tipster identified Malvo as the person whom John Muhammad had called "the sniper."

A check with the national Crime Information Center computer files showed that Muhammad owned a 1990 Chevrolet Caprice with the New Jersey license tag NDA 21Z. A lookout for that automobile was broadcast by the press later on that evening of October 23. The end game was afoot.

### The Capture

Once the description of the Chevrolet Caprice with the New Jersey license tags went out over the air waves, it was just a matter of hours. One of those who heard the report was Whitney Donahue, a refrigerator repairman who worked in the Virginia/D.C. area. He stopped at a rest area on Interstate 70 west of Frederick at 11:30 that night and spotted on the parking lot a car matching the description that had been broadcast. He immediately called 911 and the police arrived within ten minutes.

Because the darkly tinted windows made it impossible to determine whether the occupants of the car were asleep, the final assault was carefully planned. Numerous F.B.I. agents assisted in the arrest. At 1:30 A.M. on October 24, teams of agents and police, wearing protective gear, charged across the open parking lot and smashed out the side windows of the Caprice. Muhammad and Malvo were taken into custody, and the Washington metropolitan area breathed a long-withheld sigh of relief.

### The "Killing Machine"

Muhammad and Malvo were arrested in the blue 1990 Chevrolet Caprice sedan that had New Jersey license tags

NDA 21Z. Christopher Okiupski, the owner of the Sure Shot Auto Sales Company dealing in used cars in Trenton, New Jersey, testified that Muhammad purchased the Caprice from him on September 9, 2002. (The first of the shootings that occurred in this case took place in Montgomery, Alabama, on September 21, 2002.) Okiupski identified a photograph of the Caprice and he made an in-court identification of Muhammad as the man who purchased it. Ultimately, sixteen separate witnesses identified the Caprice as the vehicle they had seen at or near one of the shooting scenes at approximately the time of the shooting.

Muhammad made three trips to the Sure Shot Auto Sales Company before closing the deal on the third visit. The car had formerly been a police car. On the second visit, Muhammad and a male companion (not Malvo) took the car for a test drive, listened to the motor, opened and closed the doors, and generally checked everything out. The actual salesman who was with Muhammad and his companion came into the office to describe to Okiupski how the two had removed the back seat and then laid down in the trunk. Okiupski himself looked out and saw Muhammad "kind of lying inside" the trunk. On the third visit the deal for the car was closed.

After the purchase, Muhammad transformed the Caprice into what the prosecuting attorney, in closing argument, described as a "killing machine." A hole that had not been there before was cut into the lid of the trunk, just above the license plate, through which a rifle barrel could be projected. The side and rear windows of the Caprice were heavily tinted, which they had not been before. The inside of the trunk lid, which at the time of the car's purchase had been white, was repainted dark blue, making it less visible when opened. Most significantly, the backrest of the rear seat had been modified so as to permit easy access into the trunk from inside the car. The backrest was split into two sections and each could be rotated outward to permit entry into the gunport that had been created in the trunk.

### The Bushmaster

When the police team broke into the car on the early morning of October 24, Muhammad was found sitting on the back bench seat, which was partially rotated out from its normal position. Behind the other section of the rear seat, attached by a bungee cord for quick removal, was the Bushmaster rifle, with a live round in the chamber and live rounds in the magazine. A tripod was mounted on the muzzle end of the barrel. A right-handed brown glove was stuffed in the hole that had been cut in the trunk lid. It matched the left-handed glove that had been found at the site of the Conrad Johnson killing. An ATF firearms examiner testified that the Bushmaster was in good working order.

Also recovered from the Caprice was a rifle scope, hidden inside a sock; two boxes of .338 caliber magnum ammunition; and earplugs. There was testimony that the firing of a Bushmaster rifle, particularly in a closed area such as the trunk of an automobile, would be very painful to the ears of the shooter unless they were protected. Malvo's fingerprints and DNA were found on the Bushmaster. Muhammad's DNA was found on the rifle scope.

The ballistics examination ultimately revealed that the Bushmaster had fired the shells involved in four of the six killings in Montgomery County, in the Prince George's County shooting, in the District of Columbia murder, in all five shootings in Virginia, and in the murder in Montgomery, Alabama. In the other two Montgomery County murders, the lead fragments from James Martin's body and from James Buchanan's clothing had no identifiable characteristics.

Other incriminating evidence was recovered in the search of the Caprice. There was a wallet containing an AT & T calling card, which had been used near various crime scenes; two identification cards from different states with different names but both bearing the photograph of Muhammad; two walkie talkies; maps with both Bethesda and Silver Spring circled; a GPS device; and a note recording the task force tip line

number and other phone numbers connected to the sniper murders.

In the Caprice at the time of the capture were various incriminating notations. A document examiner found "writing indentations" on the car manual found in the glove compartment. The indentations revealed the words "Call me God." A voice recorder found in the Caprice contained the undeleted message, "We have given you a way out. You know our requests. You know our demands. And you know that it can be done. My advice to you is to take it because we will not deviate from what we told you to do. Thank you." The voice on the tape was identified as the voice of John Muhammad.

A digital evidence expert from the F.B.I. laboratory was able to retrieve data that had been deleted from the seized laptop computer. That retrieved data included such phrases as "the truth of the Muhammad assassinations," "people to die later," "Officer Derek is dead," and "priest called at 8." In the hard drive were the words "To whom it may concern. Call me God." There was also retrieved "Streets and Trips" software, which had been installed on September 29, 2002. On it were "skulls and crossbones" and "push pins" at various locations linked to specific sniper shootings.

### Lee Boyd Malvo

At the time of this reign of terror in the Washington, D.C. metropolitan area, John Allen Muhammad was 41 years of age and Lee Boyd Malvo was 17. With respect to the six murders that occurred in Montgomery County between October 2 and October 22, 2002, Malvo entered a guilty plea to first-degree murder in each case. He was sentenced to six consecutive life sentences without the possibility of parole. Malvo had earlier entered guilty pleas in Virginia to the crimes that had been committed in Virginia.

He agreed to testify voluntarily as to all of the shootings that occurred in Maryland (including Prince George's County) and in Virginia. With respect to the crimes occurring in other jurisdictions, to wit, in the District of Columbia and in Ala-

bama, he indicated that he would initially assert his Fifth Amendment right not to incriminate himself but that he would then testify when ordered to do so by the trial judge. Malvo testified for the major part of two full trial days. His testimony is transcribed on 468 pages of the trial transcript.

Malvo, who was born in Jamaica, was 15 years of age and was living with his mother on the island of Antigua when he first met John Muhammad. Malvo and Muhammad became close friends, with Muhammad frequently referring to Malvo as his "son." Malvo felt that Muhammad "understood" him. Malvo soon began living with Muhammad and studying the teachings of the Nation of Islam. When shortly thereafter, Muhammad moved to Fort Lauderdale, Florida, Malvo moved with him and lived with Muhammad and Muhammad's three children.

For a short time Malvo rejoined his mother in Fort Meyers, Florida, but he and Muhammad stayed in close touch by telephone. Muhammad had, in the meantime, moved to Washington State. Malvo ultimately decided to leave his mother and to take a Greyhound bus to Washington State and to live again with Muhammad. It was there that Muhammad introduced Malvo to Earl Dancy. The three men often went to a rifle range, where Malvo was taught to fire an AK47, a 270 rifle, and a 306 rifle. According to Malvo, "I absorbed everything [Muhammad] taught me." Malvo's time on the rifle range soon began to be focused exclusively on high powered rifles. Muhammad taught Malvo marksmanship and sniper tactics. Muhammad explained to Malvo that a .223–caliber hollow point bullet would create a "chainsaw reaction," ricocheting and cutting everything in a victim's body.

It was during their stay in Washington State that Muhammad became increasingly angry over the fact that his wife had left and, with a court order, had taken the children. In July of 2002, Muhammad learned that his wife and the children were living in Clinton, Maryland. He announced to Malvo that the two of them were going to Washington, D.C. "to terrorize these people." Muhammad asserted that, notwith-

standing a court order awarding custody to the wife, "no white man in a black world is going to tell him when and where and why he cannot see his children." It was shortly before their departure that Muhammad and Malvo stole the Bushmaster rifle from the Bull's Eye Gun Shop in Washington State. Muhammad explained that it was a good choice o f a weapon because the "chances are if you get hit, you were going to die."

Malvo described how the two then traveled to the east coast in August 2002, where they first conducted a surveillance of the home of Muhammad's wife and children. They then traveled to Trenton, New Jersey, where Muhammad purchased the Caprice. Muhammad had gotten the ideas for modifying the rear of the vehicle in order to turn it into an effective gunport for a sniper from an IRA manual. The two then traveled to Montgomery, Alabama, in order to test out the success of their modifications to the Caprice. It was at the scene of the September 21, 2002 shootings in Montgomery that Malvo, while fleeing the scene, dropped the IRA manual that contained his fingerprints.

The two then traveled to Montgomery County, Maryland, chosen as "the perfect area to terrorize" because "it was lower to upper middle class, well-off, mostly whites." The two of them initially scouted out particularly effective spots for the shootings, measuring distances, and looking for areas that were populated, were without surveillance cameras, and with hiding places where shots could be fired without witnesses.

Malvo further elaborated as to the several stage strategy that Muhammad had devised. The first stage of the plan was to create general chaos by committing "six slayings a day for 30 days." The second stage of the grand strategy, which they were preparing to put into operation at the time of their apprehension, was to "create more damage by using explosives with ball bearings or nails aimed at schools, school buses, and hospitals, especially children's hospitals." The plan also included the use of explosives to kill police officers. The initial target for the second stage was to have been the City of Baltimore.

Malvo elaborated with respect to the plan to kill police officers:

Baltimore was going to be the main center of phase two. Essentially what was going to happen is *you would kill one police officer with a different weapon* and it wouldn't be linked to the shootings, *then dozens probably of officers would go to the funeral and then you would have improvised explosives.*

Q. You would have what?

A. Improvised explosives.

Q. Improvised explosives?

A. Yes.

Q. And what does that mean?

A. *It would be a mixture of C4 and some other stuff with ball bearings and nails.* The first would be blow, it would blow and *the projectiles would kill everyone at the scene. Then there would be secondary devices which would be for when ambulances came.*

(Emphasis supplied).

Indeed, Muhammad and Malvo had reconnoitered Baltimore. At approximately 12:30 A.M. on the morning of October 8, Officer James Snyder of the Baltimore City Police Department was on patrol when he noticed a blue Chevrolet Caprice parked at a Mobil station. He saw no one inside. He returned to the area at about 2:30 A.M. and saw the car still parked there. The car had New Jersey license tags. The officer found Muhammad sleeping on the front seat. He removed Muhammad from the car, asked for identification, and asked what Muhammad was doing there. Muhammad explained that he had just come from Virginia on his way to see his father in New Jersey and was tired. When the license check came back clean, the officer allowed Muhammad to leave the scene. Malvo, who at the time was a short distance away with the rifle, had it trained on the officer. He testified that he was prepared to shoot the officer if the officer attempted to arrest Muhammad.

Looking ahead to the second subcontention of the appellant's third contention, it behooves us to note, at this point in our summary of Lee Malvo's testimony, that all of the information thus far recounted came exclusively from Malvo. None of it was known to the police until Malvo informed them of it. The defense contention, therefore, that Malvo was "fed" this information by his first interrogator, Detective June Boyle, self-evidently could not apply to this portion of Malvo's testimony. We can, to this extent, at least trim down the subcontention.

Malvo then proceeded to testify, in thorough detail, about each of the six murders that were committed in Montgomery County. He testified as well about the murder of Pascal Charlot in the District of Columbia and about the shooting of Iran Brown in Prince George's County. He also described fully the three murders and two other shootings that took place in northern Virginia. Malvo also described in detail the September 21 robbery of the liquor store in Montgomery, Alabama, resulting in the murder of Claudine Parker and the serious wounding of Kelly Adams. Malvo also testified in complete detail abut the various efforts by Muhammad and himself to communicate with the police through telephone calls and through written messages left tacked to trees near various shooting sites.

The only inconsistency in Malvo's statements that ever surfaced concerned the detail of whether he or Muhammad had been the actual triggerman on various occasions. In his trial testimony, Malvo stated that he had been the actual shooter of Iran Brown in Prince George's County and of Conrad Johnson in Montgomery County. He stated that Muhammad had been the actual triggerman on all other occasions. Malvo acknowledged that he had made a prior inconsistent statement in that regard shortly after he was arrested, when he was questioned by Detective June Boyle in Virginia. On that occasion, Malvo claimed to have been the triggerman for all of the shootings. At the present trial, he explained why he had made that statement in Virginia. It was to save Muhammad from capital punishment, available only for

triggermen. Malvo himself faced no threat of capital punishment because of his tender age. At trial, Malvo testified about the arrangement that he and Muhammad had agreed upon.

Q And when you spoke with Detective Boyle, did you tell her the entire truth?

A No.

Q Now, why not?

A Muhammad and I had spoke earlier, and him being my, as I thought then, my father, I, it was said that I could die. And *I'm a child,* and if *I say I'm the triggerman and take the responsibility for all these shootings, he said chances are I will not die. This is if you go to Virginia. If you're in the feds, don't say anything.*

Once I got to Virginia and I saw June Boyle, she introduced herself, I said "Where am I?" She said "You're in Fairfax, Virginia." I said thank you. We went upstairs, and she asked me, she says "Can I speak to you." I said yes, and from thereon on, I just showboated on everything.

Q Who, *when you were speaking with Detective June Boyle, who did you say had actually pulled the trigger in all of these shootings.*

A *I told her I pulled the trigger in all the shootings.*

Q *Was that true?*

A *No.*

(Emphasis supplied).

In the present case, of course, we are not dealing with a death sentence, and it makes no difference which of the two was the actual triggerman on any particular occasion. In Virginia, it might have mattered. In this case, it is a distinction without a difference.

### Defense and No Defense

The only defense mounted by John Muhammad was to offer six witnesses in an effort to drag several red herrings across the prosecutorial trail. In view of the fact that 60,000 tips

were received by the police during the course of the killings, inevitably many of those were false leads. It is those that Muhammad sought to exploit.

One of his witnesses testified that after Sarah Ramos was shot, he observed a white truck take off "really fast." A second stated that after Pascal Charlot was shot, a red car, sitting next to her waiting for a light, took off and ran the red light. A third witness had seen a white box van near the place where one of the sniper shootings was reported, and a fourth had seen a white box truck near the place where Premkumar Walekar had been shot. A fifth witness noticed two men, one Caucasian and one Asian, near the Benjamin Tasker Middle School two days before Iran Brown was shot. The common denominator purpose was to suggest that someone else committed those crimes.

The sixth witness was Officer Ralph Daigneau, who had, pursuant to a tip following the Dean Meyers shooting, executed a search warrant for a residence in Virginia that turned up a cache of guns and ammunition. The officer explained, however, that both residents of the searched premises were absolutely eliminated as suspects in the Dean Meyers murder. The weapons, moreover, were submitted to the Alcohol, Tax and Firearm Division experts for examination, and none of them was connected in any way to the murders in this case.

John Muhammad himself did not take the stand to offer any defense. He was not, of course, required to do so. He was, on the other hand, permitted to do so. In any event, he chose not to do so.

### A Juggernaut of Evidence

The appellant raises nine contentions of allegedly reversible error. Some of those contentions, moreover, consist of two or more subcontentions. We find no reversible error in any of those contentions or subcontentions. Were there occasional lapses or glitches? Of course there were, as inevitably would be expected in any trial of this length, complexity, and intensity. There were, however, no lapses or glitches of any major

consequence in what was, in the last analysis, a meticulously prepared and superbly conducted trial.

Our judicial system has such a massive investment in a trial of this length and complexity, however, that it behooves us to support our decision in every way that it is possible to do so. Although our primary holdings will be that there was no error established by any of the respective contentions or subcontentions, there are also available a series of alternative holdings to support our affirmation of the judgments that we would be remiss in neglecting. With respect to each of the contentions and subcontentions, even if we were, purely for the sake of argument, to hypothesize error as to any one of them, we would nonetheless, in each and every instance, be persuaded beyond a reasonable doubt that such error was harmless. *Fields v. State*, 395 Md. 758, 763–64, 912 A.2d 637 (2006); *State v. Logan*, 394 Md. 378, 388, 906 A.2d 374 (2006); *Brown v. State*, 364 Md. 37, 42, 770 A.2d 679 (2001); *Rubin v. State*, 325 Md. 552, 578–79, 602 A.2d 677 (1992); *Dorsey v. State*, 276 Md. 638, 659, 350 A.2d 665 (1976).

At this point in the opinion, as we conclude our summary of the evidence, it is appropriate to take note of the absolutely inundating sweep of the State's evidence. The guilt of the appellant was so massively and overwhelmingly established, in a dozen different ways, by the tidal wave of inculpatory evidence that it is inconceivable to us that the elimination of any hypothesized error, or series of hypothesized errors, could have made any difference whatsoever to the jury verdicts in this case.

As we take up each contention and subcontention, one by one, we will conclude each particular analysis by making brief reference to this alternative holding of "harmless error." We may, on each such occasion, take note of the relative inconsequence of that particularized hypothesized error. As we look to the other pan of the balance scale, however, we will find no need to make further reference to the juggernaut of the State's case of guilt. For that purpose, our preceding summary will suffice and need not be repeated.

## Contention I:

### The Constitutional Right To Represent Oneself

██ The first two contentions are inextricably intertwined. The first concerns Muhammad's assertion of his constitutional right to represent himself, pursuant to *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). The second concerns the scheduling of a hearing on Muhammad's competency to stand trial. It was an irresolvable conflict over the issue of competence that caused the final rift between Muhammad and the two attorneys from the Office of the Public Defender who had been representing him during the pretrial stages of the case.

Before Judge Ryan scheduled an emergency pretrial hearing on March 31, 2006, he had received a letter from Muhammad in which Muhammad asserted his intention to defend himself:

Your Honor,

I'm informing the court, from this time on I enter [sic] on representing mine [sic] self in this case. I'm asking the court, please, may I have stand-by counsel to assistance [sic] me in mine [sic] defense *"only."*

At the hearing on March 29, Muhammad clearly explained his position.

I would not, *I would not give up my rights to represent myself.* I don't care what [counsel from the OPD] and them are saying. I am not incompetent. I have no problem with logical reasoning. *I have no problem with understanding what is going on in the courtroom.* I've asked [counsel] from day one, Your Honor, I mean from day one I've asked [counsel], I should say [counsel] specifically. When [counsel] came to visit me on death row [1] with Mr. Shapiro, John Shapiro introduced me to [counsel]. And at that moment, *before I allowed [counsel] to speak, I said "[Counsel], I want you to know right now when I come to Maryland it is*

---

**1.** Muhammad had been convicted of murder in Virginia and had been sentenced to death.

*my intention to represent myself, and if you have a problem with that, being stand-by counsel, you need to let me know that right now." ... It's no one that they have ever brought to me that I have not made that clear to. It is my intention to represent myself.*

(Emphasis supplied).

Muhammad made it very clear that if he did not represent himself, then nobody in the courtroom would be advocating the position that he wished to maintain.

MR. MUHAMMAD: *And I'm supposed to help [counsel] to convince the jury that I was insane* when I committed these crimes that I had nothing to do with, *so I can go to jail for the rest of my life.* Your Honor, *if I do that I would be insane.* But *unless I speak in the courtroom, there would be nobody in the courtroom trying to prove to the jury that I am sane* and I had nothing to do with these crimes. *That's insanity, Your Honor.*

(Emphasis supplied).

Judge Ryan first determined that Muhammad was competent to stand trial, an issue we will consider in fuller detail when we turn to the second contention. Although counsel had been representing Muhammad with respect to various pretrial matters—a scheduling conference on September 2, 2005; another scheduling conference on September 23, 2005; and a motions hearing on March 6, 2006, regarding 1) access to discovery, 2) severance, and 3) the admissibility of "other crimes" evidence—it was only immediately before the March 31 hearing that they filed a suggestion that Muhammad be declared incompetent to stand trial. That suggestion was filed over the strenuous objection of Muhammad himself. He alleged that the suggestion was nothing but a stratagem to "trump" his asserted intention to defend himself, a decision with which counsel vigorously disagreed.

[W]hen these people are [claiming] that Muhammad doesn't have the capability to use logic or reason to understand what is going on in a trial is, it doesn't make any sense, because *[counsel] have tried* tremendously to get me, *to compel me to give up my rights to defend myself.*

And when they decide that that couldn't work, then they bring this doctor in here, who in Virginia I had a problem with....

And [counsel] *now when they've realized that they cannot compel me to give up my rights to represent myself, all of a sudden they're going to get this person whom they've known has a preconceived notion that Muhammad should not be representing himself* because she feels that I'm guilty. And the *more I tell her that I'm innocent, the more she look at me like I just came off a spaceship from another planet.*

Your Honor, *I am not incompetent. This is [counsel's] way of trying to circumvent my rights over the decision for me to represent myself.*

(Emphasis supplied).

It was clear that the decision to represent himself was no spur-of-the-moment impulse but the fully formed determination of Muhammad from the outset of the proceedings against him.

Paul [DeWolfe] and them mind is made up simply because *I said that I want to defend myself. They thought apparently that I was just speaking words and that eventually they was going to compel me to say okay,* you all go ahead and take the responsibility of defending me. *I never hinted in any other direction [than] that it is my intention to represent myself.* Paul and them assumed that I was just speaking words. But now when I've expressed it to you, they have been trying to keep it away from you for months. Now *that I've expressed it to you, all of a sudden Muhammad is incompetent,* Muhammad is crazy. Your Honor, that's an insult to my family. It's insult to everything that I know and love. It's an insult to the military. It's an insult to everything that I've did in my life. Because Your Honor, *if I'm incompetent now, I've been incompetent from the day I was born.*

(Emphasis supplied).

As Judge Ryan examined Muhammad's decision to represent himself, the extended exchange between them revealed a

solid understanding on Muhammad's part of what was involved in such an undertaking.

THE COURT: ... I want to explain to you, *you have an absolute constitutional right to be represented by attorneys to defend you* in these charges. *You understand that.*

MR. MUHAMMAD: *Yes, Your Honor.*

THE COURT: And *you also have a constitutional right to represent yourself. Do you understand that?*

MR. MUHAMMAD: *Yes, Your Honor.*

THE COURT: But *the two are what we call mutually exclusive.*

MR. MUHAMMAD: *I understand, Your Honor.*

THE COURT: *You can't have both.*

MR. MUHAMMAD: I understand. Your Honor, *I was never asking for a hybrid lawyer. I was never asking for a hybrid law situation.*[2]

THE COURT: And *where did you hear about that word hybrid?* Because I was going to ask you about that.

MR. MUHAMMAD: Your Honor, *I've done a lot more than just sit in a hole and watch four walls. I've asked for stand-by counsel.*

(Emphasis supplied).

Muhammad understood the difficulties inherent in calling and in examining witnesses.

THE COURT: Lawyers have skill in cross-examining witnesses, you understand that?

MR. MUHAMMAD: Yes, Your Honor.

THE COURT: And figuring out even what witnesses to call, if any.

MR. MUHAMMAD: Yes, Your Honor.

THE COURT: And they, lawyers particularly in criminal cases, serious ones like yours particularly, have an opportunity that you don't have to access to the State's Attorney's

---

2. See *Parren v. State,* 309 Md. 260, 523 A.2d 597 (1987).

Office. Not that you couldn't speak to the State's Attorney, but they could just call them on the telephone pretty much any time they wanted, to talk about what evidence would be presented or witnesses. And you don't really have that ability, do you understand that?

MR. MUHAMMAD: Yes, Your Honor.

THE COURT: You have a right of trial through the representation of lawyers, and even, and by yourself if you want. But one of the rights that, or some of the rights that defendants have in criminal cases is the right to call witnesses. I already told you that. The right to confront the witnesses, cross-examine them, right to issue subpoenas on your behalf to require people to come to court to testify. The right to insist that the prosecution proves its case beyond a reasonable doubt is the burden that the State has. That's what lawyers do for defendants. And you understand that?

MR. MUHAMMAD: Yes, Your Honor.

THE COURT: *And you don't want these lawyers to represent you, to help you do that?*

MR. MUHAMMAD: *Not in the courtroom, Your Honor, no.* Your Honor, *I've asked [counsel] to give me the different rules and laws pertaining* to stand-by counsel *so I can know my rights* that I have as far as stand-by counsel is concerned. *I've asked for that almost from day one.*

THE COURT: Okay. Well, you understand *if you do represent yourself at trial, it could hurt you.* I mean *you understand that, do you?*

MR. MUHAMMAD: *Yes, Your Honor.*

(Emphasis supplied).

Muhammad fully appreciated that acting as his own *pro se* lawyer, he would be required to follow the rulings of the trial judge.

THE COURT: Okay. *And you understand if you represent yourself you have to comply with all of the rules of court?*

MR. MUHAMMAD: *That's why I've been asking for all the rules of evidence. I've asked for them repeatedly from day one as well.*

THE COURT: And I'm not suggesting you would, but *if there came a time during the trial where you were difficult to handle and weren't complying with the rules, I wouldn't let you continue to represent yourself.*

MR. MUHAMMAD: *Your Honor, this is your house. I understand.* Yes. *That makes sense.*

THE COURT: All right. So *do you still want to represent yourself?*

MR. MUHAMMAD: *Yes, Your Honor.*

(Emphasis supplied).

Muhammad also professed to have an understanding of the *voir dire* process.

THE COURT: Oh, yes, I forgot to ask you. That's one of the things I wanted to talk about today anyway. *This is a jury trial, and we're going to pick a jury.* You have a right to assist in the selection of jurors, and lawyers are really valuable in that process, give you, help you decide who to strike, who might be helpful. *Do you understand that?*

MR.. MUHAMMAD: Yes, Your Honor. I mean *I don't have a problem in the lawyers assisting me in doing that.* I really don't. *And I understand the voir dire process.* I shouldn't say process, but *I understand voir dire.*

(Emphasis supplied).

Judge Ryan cautioned Muhammad against representing himself, but recognized his unassailable right to do so.

THE COURT: So Mr. Muhammad, I understand you want to represent yourself, but *I'm trying to tell you that's not a good idea.* I said that at the beginning. *There are a lot more disadvantages than advantages. If I permit you to discharge [counsel], do you understand that I'm not going to postpone the trial?*

MR. MUHAMMAD: *Yes, I understand that, Your Honor*

. . . .

. . . .

THE COURT:—I want you to understand that I understand you want to represent yourself because you want to represent yourself.

MR. MUHAMMAD: Yes, Your Honor.

THE COURT: And not because you don't understand that lawyers can be very helpful to you, and that *you're, in my opinion, making a bad decision.*

MR. MUHAMMAD: *I understand what you're saying, Your Honor.*

THE COURT: Okay. *Okay, then I'm going to grant your motion and permit you to represent yourself.*

(Emphasis supplied).

Muhammad asserted that he was ready and willing to abide by the law of evidence and by the rulings of the court.

MR. MUHAMMAD: Your Honor, I don't want any special rules to change. I don't want nothing to change, because I mean from what you've told me *I'm sure that you would continue to tell me that rules of evidence will apply in your courtroom. I expect to abide by those rules of evidence* and I expect for those rules of evidence not to change simply because Muhammad is in your courtroom.

(Emphasis supplied).

As we assess the intertwined issues of Muhammad's competence not only to stand trial but to represent himself at that trial, we cannot help but take note of his quickness and sharpness in spotting a slip of the tongue on the part of others.

THE COURT: Okay, let me talk to you some more. . . . [O]riginally today was set for me to deal with the matters you raised in your letter, which basically was that you want to represent yourself. Since I got that, you, Mr. *DeWolfe and Mr. Shefferman, filed this suggestion of bankruptcy.*

MR. MUHAMMAD: *I wish it was bankruptcy.*

THE COURT: *Sorry about that. Incompetency.*
(Emphasis supplied).

Muhammad also demonstrated some understanding of both what stand-by counsel might be able to do by way of assisting him and also what limitations there might be on the role of stand-by counsel.

MR. MUHAMMAD: Well, I was trying to get the understanding of what it means in Maryland. That's why I asked [counsel] to give me anything pertaining to it. But from what I understand thus far, *a stand-by counsel can help me pertaining to any procedures outside of the courtroom. They can help me in the courtroom as well, as long as I ask them,* you know, *for questions. But they can't solicit any type of tactic or statement* or anything pertaining to the questions I need to ask the witness or anything like that. I was just trying to get more detail on it pertaining to Maryland. And that's why I asked for the rules of, the procedure on having stand-by counsel.

THE COURT: Okay. Well, you mentioned this hybrid representation, but there is some discretion on the part of a judge, in this case, me. I would have some discretion, and it would really go toward just the flow of the case, if you will, just to keep the right order and just keep thing on track. It may be that some type of hybrid would be permitted by me. We'll just have to wait and see. Did you understand what I said?

MR. MUHAMMAD: Yes, Your Honor.
(Emphasis supplied).

Muhammad fully understood that the public defenders he had been working with might not be able to serve as stand-by counsel.

THE COURT: ... *What's going to happen if the Public Defenders Office tells these lawyers they can't act as stand-by lawyers? You'll be here all by yourself.*

MR. MUHAMMAD: *Your Honor, I came out of my mother's womb all by myself.*

THE COURT: Yes, but that, look, and I don't mean to be disrespectful to what you just said, that's all. *That's different than being in here on trial, charged with six murders.*

MR. MUHAMMAD: *I understand that, Your Honor.*

THE COURT: So that answer is not sufficient.

MR. MUHAMMAD: *Your Honor, if they choose to say no, then it's* fine, Your Honor, if they choose to say no. *That's why I asked them initially, tell me now, and if it's no then it's okay.*

(Emphasis supplied).

Muhammad exhibited an understanding of the charges against him and of the possible penalties.

A Your Honor, I understand that I'm here because *these people have accused me of killing six people,* okay, and *there's an assortment of other people they have accused me of killing as well, or attempted to kill,* okay. I understand that *there's specifically six counts that I'm brought up on here in Maryland,* but there's other ones that's added to it to show me leading up to committing these crimes. *I understand the penalty if I'm found guilty.*

Q What is the penalty?

A Well, thus far from what I've learned *they have dropped it, capital, as far as the death penalty, and now it's life in prison.*

(Emphasis supplied). A later exchange supplemented that knowledge of the possible penalties by adding to the list life imprisonment without the possibility of parole.

THE COURT: Okay. Now we talked about this earlier, *but you understand that you're charged with six separate counts of first-degree murder.*

MR. MUHAMMAD: *Yes, Your Honor.*

THE COURT: And each of those charges carries with it a possible penalty, punishment of up to life in prison.

MR. MUHAMMAD: Yes, Your Honor.

. . . .

THE COURT: ... *What Ms. Winfree's just reminded me of is the State* has put you on notice that it's asking that any, if you're found guilty, that the *sentence of life be that without possibility of parole.* Do you understand that? Did you know that before?

MR. MUHAMMAD: *Yes, Your Honor. Yes*

(Emphasis supplied).

When Judge Ryan pointed out that the State would be using scientific evidence, Muhammad responded:

A Yes, I understand that, too. Yes. *I understand the DNA. I understand the ballistics. I understand the doctors' reports. I understand the experts' analysis pertaining to reconstruction. I understand all of that,* Your Honor.

(Emphasis supplied).

Muhammad protested again his competence to defend himself.

A Your Honor, *if I felt that I was not up to the task to handle myself in a courtroom, I would have informed you. If I don't know how to do something,* Your Honor, if I don't know how to present myself in a manner, *I would seek guidance* and I would seek assistance. *If I felt that I should not be doing this without the assistance of counsel, I would have informed you of that, Your Honor* ... *There's no reason at all why I should be denied my rights* by allowing people to circumvent my rights *because I won't give them up freely* ....

Your Honor, it really, it makes me upset to even think that it's on the record by my name that I have some type of mental disorder. *If I have a mental disorder,* Your Honor, *then Rosa Parks had a mental disorder because she didn't get up off that seat.*

(Emphasis supplied).

When probed by Judge Ryan as to why he wanted to represent himself, Muhammad emphatically insisted that it was because "I can best present my case."

THE COURT: But I understand your request to be that you want to represent yourself; it didn't matter who your lawyers were.

MR. MUHAMMAD: Yes. Yes.

THE COURT: You just, *you want to represent yourself.*

MR. MUHAMMAD: *Yes, Your Honor. Because I feel that I can best present my case.*

THE COURT: Okay. Well, *tell me why.*

MR. MUHAMMAD: *Because,* Your Honor, *I've learned in Virginia the more and more I would tell my lawyers to do something, they go in a totally opposite direction.* Whenever I tell them or ask them to ask a certain question or to present a certain piece of evidence, they feel it's not appropriate for it to be presented. Yet the State have already presented it, and I asked to them expound on it more, and they won't do it. And Paul and Brian and them have expressed the same type of characteristics as Peter and John have.

But even if they haven't, Your Honor, *I still have made it very clear before any of this have even arose at all, it is my intention to represent myself. So none of this has anything to do with me not cooperating with Paul* .... I've always decided. *I told Peter and John that from the beginning that it's my intention to represent* ...

Your Honor, *I know me and I know my capabilities, and I know my limitation.* And *if I felt that I was limited in any kind of way in adequately representing myself in the trial, I would have informed you of that. It is not my intention to lose.* It is not my intention to do anything except abide by the Court's rules and abide by the evidence and rules of evidence.

(Emphasis supplied).

Judge Ryan disagreed with Muhammad's decision but acknowledged that Muhammad had made a knowing, wilful, and intelligent decision to represent himself.

THE COURT: Well, Mr. Muhammad, let me say this, that your, *in my judgment your dissatisfaction with [coun-*

*sel] doesn't really have much merit* to it. I have ruled that you, I haven't said the words yet, but that *you are competent,* I have said that, and that *I believe you're knowingly and willfully and intelligently deciding to represent yourself.*

I'm going to permit you to represent yourself. But I don't think it's the right decision, and it isn't because you're not getting good representation. And I believe [counsel] are very competent lawyers, and have represented you competently.

(Emphasis supplied).

### *Faretta v. California*

The hearing of March 29, 2006, consuming an entire day, was devoted exclusively to resolving the intertwined issues of 1) Muhammad's competence to stand trial and 2) Muhammad's constitutional entitlement to represent himself. During the course of that hearing, there was no mention of Maryland Rule 4–215. Although ardently opposing Muhammad's decision to discharge them and to represent himself, former defense counsel never once alluded to the Maryland rule. Neither did the prosecutors nor the trial judge nor the appellant himself.

At this juncture, however, defense counsel choose to pose their primary contention on this appeal not in terms of Muhammad's constitutional right to *pro se* representation and to the steps required to effectuate that right; they rely instead exclusively on the alleged failure of the trial court, *sua sponte,* to satisfy every jot and title of the Maryland rule. We believe, on the other hand, that casting the contention in constitutional terms will provide a clearer focus on the fundamental and overriding principles that are in play.

The Sixth Amendment to the Constitution of the United States grants to every criminally accused the right to the assistance of counsel. Although no mention has been made of the counterpart provision of the Maryland Declaration of Rights, Article 21 thereof has always been interpreted *in pari*

*materia* with the Sixth Amendment. *State v. Campbell,* 385 Md. 616, 626 n. 3, 870 A.2d 217 (2005); *Fowlkes v. State,* 311 Md. 586, 589, 536 A.2d 1149 (1988); *Parren v. State,* 309 Md. 260, 262–63 n. 1, 523 A.2d 597 (1987); *Leonard v. State,* 302 Md. 111, 119 n. 1, 486 A.2d 163 (1985); *Sites v. State,* 300 Md. 702, 712 n. 3, 481 A.2d 192 (1984).

The coexistence of 1) the right to counsel and 2) the "correlative right" to dispense with counsel and represent oneself was first alluded to by Justice Frankfurter for the Supreme Court in *Adams v. United States ex rel. McCann,* 317 U.S. 269, 279, 63 S.Ct. 236, 87 L.Ed. 268 (1942).

> *The right to assistance of counsel and the correlative right to dispense with a lawyer's help are not legal formalisms.* They rest on considerations that go to the substance of an accused's position before the law.... *[T]he Constitution does not force a lawyer upon a defendant. He may waive his Constitutional right* to assistance of counsel *if he knows what he is doing and his choice is made with eyes open.*

(Emphasis supplied). Cautioning against the excessive protection of one aspect of a right at the expense of a correlative aspect of the right, the Supreme Court admonished that we must be careful not "to imprison a man in his privileges and call it the Constitution." 317 U.S. at 280, 63 S.Ct. 236.

*Faretta v. California,* 422 U.S. 806, 807, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), posed the question squarely of whether there is a constitutional right to pro se representation and then answered that question in the affirmative.

> *The question before us now is whether a defendant in a state criminal trial has a constitutional right to proceed without counsel when he voluntarily and intelligently elects to do so.* Stated another way, *the question is whether a State may constitutionally hale a person into its criminal courts and there force a lawyer upon him, even when he insists that he wants to conduct his own defense.* It is not

an easy question, but we have concluded that a *State may not constitutionally do so.*

(Emphasis supplied).

Justice Stewart's opinion for the Court stressed that the paramount consideration is judicial deference to the defendant's choice.

*The Sixth Amendment* does not provide merely that a defense shall be made for the accused; it *grants to the accused personally the right to make his defense.* It is the accused, not counsel, who must be "informed of the nature and cause of the accusation," who must be "confronted with the witnesses against him," and who must be accorded "compulsory process for obtaining witnesses in his favor." Although not stated in the Amendment in so many words, *the right to self-representation—to make one's own defense personally—is thus necessarily implied by the structure of the Amendment. The right to defend is given directly to the accused;* for it is he who suffers the consequences if the defense fails.

422 U.S. at 819, 95 S.Ct. 2525 (emphasis supplied).

The Supreme Court further observed that the right of self-representation is not to be "considered inferior to the right of assistance of counsel."

In sum, *there is no evidence that* the colonists and *the Framers ever doubted the right of self-representation, or imagined that this right might be considered inferior to the right of assistance of counsel.* To the contrary, the colonists and *the Framers, as well as their English ancestors, always conceived of the right to counsel as an "assistance" for the accused, to be used at his option,* in defending himself. *The Framers selected in the Sixth Amendment a form of words that necessarily implies the right of self-representation.* That conclusion is supported by centuries of consistent history.

*Id.* at 832, 95 S.Ct. 2525 (emphasis supplied).

 A state, no matter how nobly motivated, simply may not "compel a defendant to accept a lawyer he does not want."

*[I]t is one thing to hold that every defendant, rich or poor, has the right to the assistance of counsel, and quite another to say that a State may compel a defendant to accept a lawyer he does not want.* The value of state-appointed counsel was not unappreciated by the Founders, yet *the notion of compulsory counsel was utterly foreign* to them. And *whatever else may be said of those who wrote the Bill of Rights, surely there can be no doubt that they understood the inestimable worth of free choice.*

*Id.* at 833–34, 95 S.Ct. 2525 (emphasis supplied). The right to represent oneself is not a second-class right that may be casually shunted aside.

Maryland has consistently followed *Faretta v. California* in recognizing the constitutional right to pro se representation. *State v. Campbell,* 385 Md. 616, 626–27, 870 A.2d 217 (2005) ("[T]wo fundamental rights . . . are guaranteed by the Sixth Amendment to the United States Constitution: the right to the assistance of counsel and the right of self-representation."); *Gregg v. State,* 377 Md. 515, 548, 833 A.2d 1040 (2003) ("The Supreme Court reasoned that the Sixth Amendment to the United States Constitution grants the accused not only the right to be represented by counsel, but also the right to make his own defense *without* the assistance of counsel."); *Johnson v. State,* 355 Md. 420, 441–42, 735 A.2d 1003 (1999) ("Conversely, a defendant also has a constitutional right to self-representation."); *State v. Brown,* 342 Md. 404, 412–13, 676 A.2d 513 (1996) ("[T]wo rights . . . are fundamental to our system of criminal justice: the defendant's right to counsel, and the defendant's right to self-representation."); *Fowlkes v. State,* 311 Md. 586, 589, 536 A.2d 1149 (1988) ("Under the Sixth Amendment, a defendant also has an independent right to reject the assistance of counsel and to elect to represent himself."); *Parren v. State,* 309 Md. 260, 263–65, 523 A.2d 597 (1987) ("[T]here are only two types of representation constitutionally guaranteed—representation by counsel and representation *pro se*—and they are mutually exclusive."); *Leonard v. State,* 302 Md. 111, 121, 486 A.2d 163 (1985); *Snead v. State,* 286 Md. 122, 123–27, 406 A.2d 98 (1979) ("It is now clear that

an accused in a criminal prosecution has two independent constitutional rights with regard to the management of his defense. He has both the right to have the assistance of counsel and the right to defend *pro se*."); *State v. Renshaw,* 276 Md. 259, 267, 347 A.2d 219 (1975). See also *McKaskle v. Wiggins,* 465 U.S. 168, 176–77, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984) ("The right to appear *pro se* exists to affirm the dignity and autonomy of the accused and to allow the presentation of what may, at least occasionally, be the accused's best possible defense.").

The problem, of course, is that the right to counsel and the correlative right to *pro se* representation are not, and in the nature of things cannot be, literally equal. There is, to begin with, an inherent psychic tension between them. They push in opposite directions. When, therefore, those opposing pushes are in a state of equilibrium, there must be a tiebreaker. The law does not say, for instance, that a defendant must intelligently and knowingly waive the right of self-representation before he may invoke the right to counsel. How then does the law handle the delicate balance between a preferred constitutional right and a non-preferred constitutional right when they are in opposition?

Of necessity, there is a presumption that when all else is equal, the right to counsel will prevail over the right to *pro se* representation.[3] To rebut that presumption, there

---

**3.** Judge Orth referred to the unavoidable disparity in treatment of the two mutually exclusive rights in *Parren v. State,* 309 Md. 260, 266, 523 A.2d 597 (1987):

*When an accused is constitutionally entitled to the assistance of counsel, the right attaches to him without any affirmative action on his part.* On the other hand, *when an accused desires to represent himself he must assert that right, and its grant is conditioned upon a valid waiver of the right to assistance of counsel.*

(Emphasis supplied). Judge Cole had similarly noted the disparity in treatment of the two rights in *Leonard v. State,* 302 Md. at 119, 486 A.2d 163. The preferred right must be waived in order for the non-preferred right to be successfully invoked.

*The rights are mutually exclusive and the defendant cannot assert both simultaneously.* The United States *Supreme Court* and other courts throughout the nation have *thus sought to protect the right to counsel*

must be a "knowing and intelligent" waiver of the right to counsel in order to establish the correlative right to self-representation. *Faretta v. California,* quoting both *Johnson v. Zerbst,* 304 U.S. 458, 464–65, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), and *Adams v. United States ex rel. McCann,* 317 U.S. at 279, 63 S.Ct. 236, set out the appropriate waiver standard.

When an accused manages his own defense, he relinquishes, as a purely factual matter, many of the traditional benefits associated with the right to counsel. For this reason, *in order to represent himself, the accused must "knowingly and intelligently" forgo those relinquished benefits. Johnson v. Zerbst,* 304 U.S. at 463–465[, 58 S.Ct. 1019]. Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, *he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that "he knows what he is doing and his choice is made with eyes open." Adams v. United States ex rel. McCann,* 317 U.S. at 279, 63 S.Ct. 236.

422 U.S. at 835, 95 S.Ct. 2525 (emphasis supplied).

In *State v. Brown,* 342 Md. 404, 414, 676 A.2d 513 (1996), Judge Raker thoroughly analyzed the steps that must be taken to invoke the right to *pro se* representation and pointed out that if *Faretta, Johnson v. Zerbst,* and *Adams* are satisfied that it would be "reversible error" to deny a request for self-representation.

If the defendant requests dismissal of counsel in order to proceed pro se, and if the proposal to discharge counsel is timely and unequivocal, the court must ordinarily grant the request. *Faretta.* By choosing self-representation, the defendant forgoes the right to counsel. Therefore, *the court must conduct a waiver inquiry to ensure that any decision*

---

*unless the defendant properly asserts his right to represent himself. The assertion of this right is conditioned upon a valid waiver of the right to assistance of counsel.*
(Emphasis supplied).

> to waive the right to counsel is "made with eyes open."
> (quoting *Adams v. United States ex rel. McCann*). *The*
> *Sixth Amendment requires that the defendant's waiver of*
> *the right to counsel must be "knowing and intelligent."*
> *Johnson v. Zerbst.* Although courts have recognized sever-
> al exceptions to the *Faretta* rule, these *exceptions have been*
> *narrowly construed to effectuate the defendant's right to*
> *self-representation.* Absent a recognized exception, *refusal*
> *to grant a timely, unequivocal request for self-representa-*
> *tion is reversible error.*

(Emphasis supplied).

The extended exchanges between Judge Ryan and the
appellant at the hearing on March 29, 2006, demonstrated
unequivocally that Muhammad freely and intelligently assert-
ed his constitutional right to self-representation pursuant to
*Faretta v. California.* His waiver of the right to counsel was
unquestionably "knowing and intelligent" according to the
waiver standard of *Johnson v. Zerbst.* He was fully apprised
by Judge Ryan of the disadvantages likely accruing to him
from the choice he made, but he nonetheless made that choice
"knowing what he was doing" and "with his eyes open"
according to *Adams v. United States ex rel. McCann.* The
Constitution requires nothing more for the vindication of the
fundamental right to self-representation. Indeed, the Consti-
tution may not tolerate anything more than that. As Judge
Eldridge noted in *Fowlkes v. State,* 311 Md. 586, 589, 536 A.2d
1149 (1988):

> The interplay among the right to counsel, waiver of the
> right to counsel, and the *Faretta* right of self-representa-
> tion, has posed problems.

In *Faretta v. California, Johnson v. Zerbst,* and *Adams v.*
*United States ex rel. McCann,* the Supreme Court struck a
finely calibrated balance between the conflicting and mutually
exclusive right to counsel and right to self-representation. An
additional thumb, no matter how nobly motivated, placed on
either pan of that scale could throw the Supreme Court's
delicately calibrated balance out of constitutional kilter. Gra-

tuitous additional layers of protection bestowed on the right to counsel, for instance, would certainly seem to pose undue and unconstitutional burdens on the correlative right to self-representation. If, arguendo, they should be in collision with each other, a rule of court would unquestionably have to yield to a fundamental constitutional right. Maryland Rule 4–215, for instance, arguably smothering the right to counsel under layer upon layer of implemental protection, could readily be deemed to pose an unconstitutional burden on the assertion of one's right to self-representation. Language in some of the caselaw to the effect that the rule implements and protects, at one and the same time, each of the two conflicting rights is gobbledygook, worthy of a political spinmeister or a snake oil salesman. It adds additional protection to the right to counsel by making it more difficult to invoke the right of pro se representation. It protects one at the expense of the other.

Of two mutually exclusive rights, the one that you will retain if you waive nothing is self-evidently the preferred alternative. Every additional requirement imposed by the rules increases the likelihood that the preferred right, that of counsel, will not be lost. By inverse proportion, however, it decreases the likelihood that the non-preferred right of *pro se* representation will be successfully invoked. Such implementing rules, to be sure, may better *protect the defendant*, but only in the sense that the unspoken premise of the rulemakers is that the best way to protect the defendant is to burden, and thereby to discourage, the option of *pro se* representation. To say, however, that the rule provides implemental *protection of the constitutional right to represent oneself* is so much pompous nonsense. The rule does the very opposite of what it is, in that regard, purported to do.

The fact that Rule 4–215 goes further than is constitutionally required was first noted by Judge Raker in *State v. Wischhusen*, 342 Md. 530, 543 n. 10, 677 A.2d 595 (1996):

> *Rule 4–215 imposes requirements that exceed constitutional standards.* For example, the Rule requires the court to inform the defendant of the nature of the charges and the potential penalty. *These duties need not be performed for*

*the judge to satisfy the knowing and intelligent waiver standard of Johnson v. Zerbst,* 304 U.S. at 464–65, 58 S.Ct. at 1023.

(Emphasis supplied). Chief Judge Bell similarly made note of the fact that Rule 4–215 goes beyond what is constitutionally mandated in *Richardson v. State,* 381 Md. 348, 367 n. 11, 849 A.2d 487 (2004):

> It is important to note that *Rule 4–215 imposes requirements that exceed constitutional standards. State v. Wischhusen,* 342 Md. 530, 543, n. 10, 677 A.2d 595, 601, n. 10 (1996); *see also Brown v. State,* 103 Md.App. 740, 654 A.2d 944 (1995), *aff'd,* 342 Md. 404, 676 A.2d 513 (1996).

(Emphasis supplied). And see *Broadwater v. State,* 171 Md. App. 297, 299, 909 A.2d 1112 (2006), *aff'd,* 401 Md. 175, 931 A.2d 1098 (2007), in which this Court pointed out that Rule 4–215 contains "stern directions far more unforgiving than the Sixth Amendment's right to the assistance of counsel itself."

With respect to such excess coverage, it is clear that a defendant who wishes to represent himself and who has satisfied *Faretta, Johnson v. Zerbst,* and *Adams* but who has failed to satisfy one of the non-constitutional provisions of Rule 4–215 could be denied his constitutional right to *pro se* representation if the rule of court were permitted to "trump" the constitutional principle. It is inconceivable that the Supreme Court would countenance such a thumb on the scales of its finely calibrated balancing.[4]

---

**4.** Even "precise rubrics" can, if construed obsessively, become counterproductive. We take our guidance in this regard from the words of Judge Wilner (former Chief Judge of this Court, then on the Court of Appeals but specially assigned for the case) in *Wiegand v. State,* 112 Md.App. 516, 524–25, 685 A.2d 880 (1996), as he wrote for a panel that included Judge Cathell (also later on the Court of Appeals).

While we fully understand that the Maryland Rules of Procedure are not merely helpful hints to practice and procedure in the courts but are instead "precise rubrics" intended to be followed, we surely do not believe that they should be interpreted to reach absurd and wholly unintended results. As with statutes, we are obliged to construe the rules to carry out the real intent of their promulgator.
See also *Best v. State,* 79 Md.App. 241, 249, 556 A.2d 701 (1989):

The fact that Rule 4–215(e), for instance, may provide more protection for the right to counsel than is constitutionally required may or may not pose a problem. A defendant might seek to discharge counsel, thus engaging the gears of Rule 4–215(e), for either of two very different reasons: 1) to obtain substitute counsel or 2) to represent himself *pro se*. A defendant's request to discharge is not a constant. The request may be handled differently and the response may have very different legal consequences depending upon the particular purpose giving rise to the request. Judge Raker recognized this difference in treatment contingent upon purpose in *State v. Brown*, 342 Md. 404, 413–14, 676 A.2d 513 (1996) ("The trial court's subsequent procedures depend on whether the defendant requests substitute counsel or self-representation."). See also *State v. Campbell*, 385 Md. at 627–28, 870 A.2d 217. In *Moten v. State*, 100 Md.App. 115, 640 A.2d 222 (1994), *reversed on other grounds*, 339 Md. 407, 663 A.2d 593 (1995), the Court was discussing Rule 4–215(e) and the effort by the defendant to discharge counsel. After noting the failure of the trial court to determine whether there was a meritorious reason for the requested discharge, this Court noted that different consequences might accrue, depending upon the defendant's purpose in seeking the discharge.

> We recognize that *if appellant had requested new counsel, the court's failure to make such a determination would make the waiver ineffective. In this case,* however, *appellant did not ask for another lawyer. He made a strategic decision to represent himself.*

*Id.* at 123, 640 A.2d 222 (emphasis supplied). This disparity alone should help to convey the desperately needed message that with a package of almost infinitely diverse provisions such as Maryland Rule 4–215, one cannot approach it with the delusive mantra that one rule fits all.

---

A rule—any rule—does not exist for its own sake alone but only to serve an undergirding purpose. When in our judgment that undergirding purpose has *clearly* been served, we are not about to worry over whether there has been blind and literal obedience to the rule in the tradition of a Prussian drillmaster.

■ Additional and constitutionally unrequired protection for the right to counsel is perfectly legitimate if it comes only at the expense of a defendant's desire to obtain substitute counsel. If, on the other hand, the constitutionally unrequired extra protection has a chilling effect on the fundamental constitutional right to represent oneself, that is, at the very least, another matter calling for another analysis. Our alternative holding with respect to this contention would be that if a provision of Rule 4–215 were violated and that provision were in excess of the constitutional requirements for an effective waiver, that provision of the rule would not be permitted to stand against what would otherwise be an entitlement to the Sixth Amendment right to self-representation according to established constitutional criteria.

### Maryland Rule 4–215

■ In this case, however, it is not necessary to resolve a conflict between a fundamental constitutional right and an implementing rule of court because we find no violation of the implementing rule. Muhammad now claims that Judge Ryan erroneously failed to comply with Rule 4–215 when he granted his request to discharge the two assistant public defenders who had been representing him so that he could represent himself. We note the irony that Muhammad is now complaining about receiving from Judge Ryan the very ruling that he so earnestly desired and fought so long and hard to obtain.

Because Muhammad, on March 29, 2006, already had counsel whom he sought to discharge, the pertinent provision of Rule 4–215 is subsection (e).

(e) Discharge of Counsel—Waiver. If a defendant requests permission to discharge an attorney whose appearance has been entered, the court shall permit the defendant to explain the reasons for the request. If the court finds that there is a meritorious reason for the defendant's request, the court shall permit the discharge of counsel; continue the action if necessary; and advise the defendant that if new counsel does not enter an appearance by the next scheduled trial date, the action will proceed to trial

with the defendant unrepresented by counsel. If the court finds no meritorious reason for the defendant's request, the court may not permit the discharge of counsel without first informing the defendant that the trial will proceed as scheduled with the defendant unrepresented by counsel if the defendant discharges counsel and does not have new counsel. *If the court permits the defendant to discharge counsel, it shall comply with subsections (a)(1)-(4) of this Rule if the docket or file does not reflect prior compliance.*

(Emphasis supplied).

Muhammad does not claim that there was any failure of compliance with subsection (e) except with respect to its last sentence, which incorporates the requirements of subsections (a)(1)-(4). That pertinent portion of subsection (a) provides as follows:

(a) **First appearance in court without counsel.** At the defendant's first appearance in court without counsel, . . . *the court shall:*

(1) *Make certain that the defendant has received a copy of the charging document containing notice as to the right to counsel.*

(2) Inform the defendant of the right to counsel and of the importance of assistance of counsel.

(3) Advise the defendant of the nature of the charges in the charging document, and the allowable penalties, including mandatory penalties, if any.

(4) Conduct a waiver inquiry pursuant to section (b) of this Rule if the defendant indicates a desire to waive counsel.

(Emphasis supplied).

Subsection (a)(4) has no applicability to this case. The colloquies between Judge Ryan and Muhammad, moreover, show clear compliance with subsections (a)(2) and (3). Muhammad, indeed, makes no argument with respect to either of those subsections. His contention focuses exclusively on subsection (a)(1). Again ironically, Muhammad does not assert that he did not receive a copy of the charging document. He

asserts only that Judge Ryan did not "make certain that the defendant . . . received a copy of the charging document," in literal compliance with subsection (a)(1). The complaint is only procedural, not substantive. The thrust of Muhammad's argument, as stated in his brief, is as follows:

What *the court utterly failed to* do in this case is *"[m]ake certain that the defendant has received a copy of the charging document* containing notice as to the right to counsel" are required by 4–215(a)(1). . . .

. . . .

The "precise rubrics" of 4–215 were not followed in the case at bar in that nowhere does the record demonstrate that Mr. Muhammad received a copy of the charging document including the advice of right to counsel. Thus, the *court could not, without asking Mr. Muhammad directly, which it did not do, make certain that he had received a copy of the charging document* as required by 4–215(a)(1).

(Emphasis supplied).

As we focus in on subsection (a)(1), it is important not to treat all of the provisions of Rule 4–215 the same but to recognize the fundamental difference, in terms of essential character, between subsection (a)(1), which concerns the happening of an event, and most of the other provisions of Rule 4–215, which involve the actual and direct imparting of specific information by the judge to the defendant. Subsection (a)(2) and (3), for instance, deal with such specific advisements.

*[T]he court shall:*

. . . .

(2) *Inform the defendant* of the right to counsel and of the importance of assistance of counsel.

(3) Advise the defendant of the nature of the charges in the charging document, and the allowable penalties, including mandatory penalties, if any.

(Emphasis supplied).

Subsection (a)(1), by contrast, is of an entirely different nature. In *Broadwater v. State,* 171 Md.App. at 304, 909 A.2d

1112, this Court pointed out the difference in character between subsection (a)(1), on the one hand, and other subsections dealing with informational advisements, on the other hand.

With respect to the three absolute requirements, the first is, essentially, the court's confirmation that someone delivered to the defendant "a copy of the charging document containing notice as to the right to counsel." The *second and third requirements*, concerning, respectively, 1) "the right to counsel" and "the importance of assistance of counsel" and 2) "the nature of the charges" and the "allowable penalties," *are actual advisements that must be made by the judge personally to the defendant on the face of the record. Some appreciation of the different natures of these three* (or four or five) *requirements will make an application of a sometimes overly generalized caselaw more sensitively possible.*

(Emphasis supplied).

As we pointed out, 171 Md.App. at 323, 909 A.2d 1112, subsection (a)(1) is in a class by itself and there is no need to treat it as one treats other subsections which are true advisements.

It would not, however, apply to *requirement # 1, by which the court only seeks information about an event* (the delivery of a copy of the charging document). *The recipient of information pursuant to requirement # 1 is the judge, not the defendant. The requirement is that "the court shall make certain" that the* event (the delivery of the charging document) *had* at some earlier time *actually taken place. This is not part of a message being aimed at the defendant.*

(Emphasis supplied).

Focusing in on subsection (a)(1), the only subsection being invoked by the appellant, we have already noted the fundamental difference between it and the other requirements of subsection (a). The others involve the process through which a judge imparts certain critical information to a defendant. Subsection (a)(1), unlike the other provisions, involves only the

objectively measured question of whether "the defendant received a copy of the charging document containing notice as to the right to counsel."

██ As *Fowlkes v. State*, 311 Md. 586, 609, 536 A.2d 1149 (1988), makes clear, the satisfaction of subsection (a)(1) does not require a judge to make inquiry of, or say anything to, a defendant in a courtroom. If evidence objectively establishes that the defendant actually received a copy of the charging document, moreover, the fact that the judge failed to "make certain" of that fact is immaterial. The very occurrence of receiving the document speaks for itself and *ipso facto* satisfies the subsection. The holding in this regard of *Fowlkes v. State* was unequivocal.

> As to subsections (1)(1)-(3), the record contains a copy of the charging document in the defendant's case. *This document, which bears the defendant's signature, contains a notice of the right to counsel; therefore, this document demonstrates compliance with subsection (a)(1).*

311 Md. at 609, 536 A.2d 1149 (emphasis supplied).

██ We cite *Fowlkes v. State* not to suggest that the facts showing compliance in that case parallel the facts showing compliance in the case before us. That is another mater, and we will address it. We cite *Fowlkes* for the threshold proposition that if extrinsic evidence is legally sufficient to support a finding that the defendant indeed received a copy of the charging document, adequate compliance with subsection (a)(1) has been shown. Whether the judge himself did or did not do something or other in the courtroom is a redundant technicality.

The evidence in this case was clearly legally sufficient to support a finding that Muhammad had, indeed, "received a copy of the charging document containing notice as to the right of counsel." Muhammad was indicted by the Montgomery County Grand Jury on June 16, 2005. That charging document was drawn in six counts, each charging a deliberate and premeditated murder in the first degree. Each respective count charged the murder of one of Muhammad's six murder

victims in Montgomery County and gave the name of the victim and the date of each particular murder.

On June 16, 2005, the Deputy State's Attorney for Montgomery County filed in the circuit court a Motion to Issue a Bench Warrant pursuant to Maryland Rule 4–212(d)(2). The motion recited that the indictment against Muhammad had been handed down on that day, June 16, 2005. Rule 4–212(a) provides in pertinent part:

> When a charging document is filed . . . a . . . warrant shall be issued in accordance with this Rule.

Subsection (d)(2) further provides, in pertinent part:

> (2) In the circuit court. *Upon the request of the State's Attorney, the court may order issuance of a warrant for the arrest of a defendant* . . . if an indictment has been filed against the defendant; and (A) the defendant has not been processed and released pursuant to Rule 4–216, or (B) the court finds there is a substantial likelihood that the defendant will not respond to a summons. *A copy of the charging document shall be attached to the warrant.*

(Emphasis supplied).

The Motion for the Issuance of the Bench Warrant further recited:

> 1. *This is the original charging document* and the Defendant has never been processed.
>
> 2. The issuance of a bench warrant will assure that the Defendant will be brought to court to answer for the charges filed in the instant matter.
>
> 3. The warrant will act as a detainer for the Defendant, who is in custody in another jurisdiction.

(Emphasis supplied).

Rule 4–202(a), in turn, prescribes the necessary contents of a charging document. After listing those required factual allegations that an indictment itself must contain, the subsection goes on to spell out the notice that the person charged must also receive, explaining in detail that person's right to an attorney. The notice that was included as part of the charg-

ing document against Muhammad followed verbatim the language of Rule 4–202(a):

TO THE PERSON CHARGED:

1. This paper charges you with committing a crime.

2. If you have been arrested, you have the right to have a judicial officer decide whether you should be released from jail until your trial.

3. You have the right to have a lawyer.

4. A lawyer can be helpful to you by:

● explaining the charges in this paper;

● explaining the possible penalties to you;

● helping you at trial;

● helping you protect your constitutional rights; and,

● helping you to get a fair penalty if convicted.

5. Even if you plan to plead guilty, a lawyer can be helpful.

6. If you want a lawyer but do not have the money to hire one, the Public Defender may provide a lawyer for you. The Court Clerk will tell you how to contact the Public Defender.

7. If you want a lawyer but you cannot get one and the Public Defender will not provide one for you, contact the Court Clerk as soon as possible.

8. *DO NOT WAIT UNTIL THE DATE OF YOUR TRIAL TO GET A LAWYER!* If you do not have a lawyer before the trial date, you may have to go to trial without one.

On that same day, June 16, the Bench Warrant was issued by Judge Durke G. Thompson. There is also in the file a directive to the Clerk of the Circuit Court to furnish "a triple certified copy of the charging document in this case" and the further notation that it was "issued on 6–16–05."

Muhammad, who had been convicted of first-degree murder and sentenced to death in Virginia, was at the time of his indictment in Montgomery County imprisoned in the Sussex I

State Prison in Waverly, Virginia. Katherine Winfree, the Deputy State's Attorney for Montgomery County, filed on June 16 a Certificate of Service, attesting that she had on that date mailed a copy of the charging document package to John Allen Muhammad at the Sussex I State Prison in Waverly, Virginia. Because Muhammad was, as of June 16, 2005, imprisoned in Virginia, the Bench Warrant, as its application recited, would also serve as a detainer. Rule 4–212(f)(2) controls that situation and it provides, *inter alia,* that the defendant shall be "served with *a copy of the charging document* and warrant."

There is also in the file evidence that Muhammad received a copy of the charging document on yet a second occasion. On the bottom of a copy of the Bench Warrant is a Return of Service from Sheriff Raymond M. Knight attesting that he had "served a copy" on Muhammad on August 22, 2005. With respect to such a Return of Service, Rule 4–212(g) provides:

> (g) **Return of service.** *The officer who served the defendant with* the summons or *warrant and the charging document shall make a prompt return of service* to the court that shows the date, time, and place of service.

(Emphasis supplied).

As further evidence of receipt of the charging document by Muhammad, on that same day, August 22, the Public Defender's Office, representing Muhammad, filed a motion to waive the Bench Warrant hearing on the charges, noting that Muhammad had been indicted by the Montgomery County Grand Jury.

From that total predicate, we hold that the evidence abundantly supports the conclusion that Muhammad received "a copy of the charging document containing notice as to the right to counsel" and that subsection (a)(1) was thereby satisfied. *Fowlkes v. State,* 311 Md. at 609, 536 A.2d 1149; *Moten v. State,* 100 Md.App. 115, 121, 640 A.2d 222 (1994), reversed on other grounds by *Moten v. State,* 339 Md. 407, 663 A.2d 593 (1995).

Although the extended exchanges between Judge Ryan and Muhammad on March 29, 2006 may not, in and of themselves, prove that Muhammad had received a copy of the charging document, they do offer persuasive corroboration of that fact. Muhammad stated that he was charged with six counts of first-degree murder in Montgomery County. He knew that the death penalty had been dropped but that he faced the possibility of life imprisonment without parole on each count. At one point, before Judge Ryan cut him off, he began to list the specific names of the persons he was charged with killing.

Q Now, tell me what you understand in this jurisdiction, here in Maryland, are the nature of the charges against you. What do you understand you're being charged with?

A I understand that *I'm being charged with six counts of murder pertaining to,* I think his first, last *name is Walekar,* Mr. Walekar? *The second person—*

Q You don't have to tell me their specific dates and places and all the specific allegations. I just want to make sure you understand what you're charged with and how serious these charges are.

(Emphasis supplied).

If Muhammad behaved as if he received a copy of the charging document (he did so behave), it is more likely that he received a copy than if he had not so behaved. Through the long and hard fought hearing of March 29, 2006, neither Muhammad nor anyone on his behalf ever complained of not having received a copy of the charging document. Even as of this appeal he makes no such complaint. Once again, we consider such behavior not as proof *per se* of compliance but as behavior corroborative of other proof. It is not without some evidentiary significant.

Throughout the entire day-long hearing, moreover, Muhammad exhibited a sophisticated understanding of both his right to counsel and his right to self-representation. If nothing else, Muhammad's detailed understanding of the charging document tends to corroborate the conclusion that he had,

indeed, received a copy of the charging document. Maryland Rule 4–215(a)(1) was satisfied.

## A Rule 4–215(a)(1) Violation As Harmless Error

 As an alternative holding, we also conclude that even if, purely *arguendo,* we were to assume that Rule 4–215(a)(1) had been violated, we would still be persuaded beyond a reasonable doubt that such error was harmless in this case. Muhammad argues that a violation of Rule 4–215(a) may never be harmless error and he cites for that proposition *Parren v. State,* 309 Md. at 280–82, 523 A.2d 597, and *Moten v. State,* 339 Md. at 411–13, 663 A.2d 593. Both of those cases, however, dealt with violations of subsection (a)(3) and not with violations of subsection (a)(1).

We have already belabored the fundamental difference in character between subsection (a)(1) and subsection (a)(3). Subsection (a)(3) deals with the advising of the defendant by the judge of certain critical information. Subsection (a)(1) deals with an entirely different matter. What is true with respect to a subsection (a)(3) violation is not necessarily true at all about a subsection (a)(1) violation and the appellant cannot prove his point by simplistic analogy.

*Parren v. State,* 309 Md. at 280, 523 A.2d 597, clearly concerned a subsection (a)(3) violation:

> [T]he trial court did not comply with that part of *§ (a)(3) which requires that "the court shall ... advise the defendant of ... the allowable penalties ..."*

(Emphasis supplied). The *Parren* Court went on, 309 Md. at 282, 523 A.2d 597:

> We hold that the *noncompliance with that part of subsection (3) of § (a) of Rule 4–215 which requires that the trial court advise the defendants of the penalties allowed* for the crimes charged against them, rendered their waivers of counsel ineffective.

(Emphasis supplied).

The holding of the Court of Appeals in *Moten v. State* was equally tightly confined to a subsection (a)(3) violation. At the

very outset of her opinion, Judge Raker clearly stated the precise issue before the Court.

> This case presents *the question of whether a trial court's failure to advise a defendant* who wishes to waive counsel *of allowable penalties,* as required by Maryland Rule 4–215, *can be harmless error. We shall answer in the negative.*

339 Md. at 408, 663 A.2d 593 (emphasis supplied). The Court followed its earlier holding in *Parren.*

> We hold that under *Parren v. State,* 309 Md. 260, 523 A.2d 597 (1987), harmless error analysis is inapplicable to *a violation of Maryland Rule 4–215(a)(3).*

339 Md. at 409, 663 A.2d 593 (emphasis supplied). The violations in *Parren* and *Moten* were precisely the same.

> The defendants' convictions [in *Parren* ] were accordingly reversed, because "the noncompliance with *that part of subsection (3) of § (a) of Rule 4–215 which requires that the trial court advise the defendants of the penalties* allowed for the crimes charged against them, rendered their waivers of counsel ineffective.
>
> *Moten,* like the defendants in *Par[r]en, was not informed by the court of the allowable penalties* for the charges pending against him. As in *Parren,* the advice given in this case is insufficient.

339 Md. at 411–12, 663 A.2d 593 (emphasis supplied).

As we have already discussed fully, subsection (a)(1) deals with a requirement of an entirely different nature. Even if we were to hypothesize, *arguendo,* a subsection (a)(1) violation, we are persuaded beyond a reasonable doubt that that fact would not have made any difference whatsoever to Muhammad's knowing and intelligent decision to waive the assistance of counsel in this case and to assert his constitutional right to represent himself. Muhammad's decision was not flawed by any lack of knowledge. A compelled reversal of the convictions in this case on the basis of something that clearly did not make any difference would be senseless.

We find legal support for our conclusion, moreover, in the decision of Chief Judge Murphy for this Court in *Moten v.*

*State,* 100 Md.App. 115, 640 A.2d 222 (1994). In our *Moten,* this Court found violations of both subsections (a)(1) and (a)(3). We held that both were susceptible to harmless error analysis. The Court of Appeals reversed our holding with respect to a subsection (a)(3) violation. That part of Judge Murphy's opinion dealing with a subsection (a)(1) violation, on the other hand, was left untouched. It has never been reversed nor overruled. It is as of this moment the law of Maryland, and we shall follow it.

As in this case, Moten did not assert any ultimate prejudice but was content to rely exclusively on a procedural glitch.

> Appellant does not contend that the record fails to show whether he received a copy of the charging document. *He argues* instead *that he is entitled to a new trial merely because* when he asserted his right to self representation, *Judge Wright failed to question him as required by the rule.*

100 Md.App. at 120 n. 2, 640 A.2d 222 (emphasis supplied). Our ultimate conclusion was clear.

> It is true that *Judge Wright should have asked appellant whether he had received a copy of the charging document,* which in this case was an indictment filed on December 8, 1992. *The failure to ask that question, however, does not require a reversal of appellant's conviction.*

*Id.* at 121, 640 A.2d 222 (emphasis supplied).

## Contention II:

### The Scheduling of the Competence Hearing

The appellant's second contention concerns Judge Ryan's ruling that he was competent to stand trial. That issue is so inextricably interwoven with the issue of his competence to represent himself *pro se* that it is impossible to separate them into watertight analyses. Everything that we have said in our resolution of the first contention bears with equal relevance on this second contention.

Competence to decide to represent oneself is the same thing as competence to stand trial. In *Godinez v.*

*Moran,* 509 U.S. 389, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993), the Supreme Court pointed out that the necessary competence to choose self-representation over the right to counsel requires *ipso facto* the same degree of competence that is required to stand trial, no more and no less.

> This case presents *the question whether the competency standard for ... waiving the right to counsel is higher than the competency standard for standing trial.* We hold that *it is not.*

509 U.S. at 391, 113 S.Ct. 2680 (emphasis supplied). The Court elaborated:

> Nor do we think that a defendant who waives his right to the assistance of counsel must be more competent than a defendant who does not, since there is no reason to believe that the decision to waive counsel requires an appreciably higher level of mental functioning than the decision to waive other constitutional rights.

*Id.* at 399, 113 S.Ct. 2680.

The defendant's skill, or lack thereof, in conducting a *pro se* defense, when that is the issue, is an irrelevant consideration. It is the *understanding of what is going on* that is the critical criterion.

> In *Faretta v. California,* we held that a defendant choosing self-representation must do so "competently and intelligently," but we made it clear that the *defendant's "technical legal knowledge" is "not relevant" to the determination whether he is competent to waive his right to counsel,* and we emphasized that *although the defendant "may conduct his own defense ultimately to his own detriment, his choice must be honored."* Thus, while "[i]t is undeniable that in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts," *a criminal defendant's ability to represent himself has no bearing upon his competence to choose self-representation.*

*Id.* at 399–400, 113 S.Ct. 2680 (emphasis supplied).

 Judge Ryan properly found that Muhammad was competent to defend himself. One cannot be competent to

defend oneself, however, if one does not understand what is going on in the courtroom. That understanding is the core requirement of competence to stand trial. The *ability* (not necessarily the willingness but simply the raw *ability* ) to be of assistance to one's attorney is implicit in the ability to be of assistance to oneself, if one is representing oneself. The two competencies are one and the same.

In *Thanos v. State*, 332 Md. 511, 519–20, 632 A.2d 768 (1993), Judge McAuliffe wrote for the Court of Appeals as it held that the defendant in that case was competent to discharge his attorneys and to represent himself. The Court cited *Godinez v. Moran* for the proposition that the "competency standards [are] the same for standing trial and for waiver, even though a valid waiver may require [the] additional finding that it was knowing and voluntary."

In assessing competence, moreover, it is important to keep in the front of the mind that competence to stand trial (or to waive counsel) is a very different thing than criminal responsibility. It is far more a matter of raw intelligence than it is of balanced psychiatric judgment or legal sanity or of mental health generally. Because of the very nature of the subject, it is one in which a defendant's conversation with a judge may be far more revealing than a defendant's conversation with a psychiatrist or psychologist. The judge both speaks the language and understands the language of courtroom behavior and courtroom problems, which may sometimes be largely a foreign tongue to the most educated o f psychiatrists. The two disciplines are very different, and the professor who is, in effect, marking the defendant's paper needs to be a master of the appropriate discipline.

In Maryland Code, Criminal Procedure Article, § 3–101(f), the Legislature has set out precisely the limited scope of the pertinent inquiry, as it defines "incompetent to stand trial" to mean "not able (1) to understand the nature or object of the proceeding; or (2) to assist in one's defense." It is much more a function of rationality than of mental health generally, as *Raithel v. State*, 280 Md. 291, 299–300, 372 A.2d 1069 (1977)

(quoting *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960)), prescribes the two prerequisites to a finding of competency: "the accused must have *a rational as well as factual understanding of the proceedings* against him, [and] must at the trial have sufficient *present ability to consult with his lawyer with a reasonable degree of rational understanding.*" *Gregg v. State*, 377 Md. 515, 527, 833 A.2d 1040 (2003) (emphasis supplied). And see *Thanos v. State*, 330 Md. 77, 87, 622 A.2d 727 (1993).

In *Gregg v. State*, the Director of Forensic Psychiatry at the Crownsville Hospital had examined Gregg and concluded that "Gregg was not competent to stand trial because [he] the doctor believed the defendant did not have a 'rational understanding' of the charges against him." *Id.* at 520, 833 A.2d 1040. On cross-examination, however, it was developed that the doctor's conclusion was based far more on the doctor's belief that Gregg would likely remain dangerous and repeat his criminal behavior once released than it did on Gregg's ability to perform in the courtroom. *Id.* at 520–22, 833 A.2d 1040. Notwithstanding the doctor's conclusion, the trial judge ruled that Gregg was competent to stand trial. In affirming the trial judge's determination, Judge Harrell pointed to the criteria that are far more pertinent than the ones relied upon by the psychiatrist.

Gregg's behavior at trial may be described as stubborn and argumentative at most. *He responded appropriately to the judge's questions and his defense was in no way aberrant for a pro se defendant. He demonstrated both a rational understanding of the proceedings in which he was involved and of the relevant facts.*

*Id.* at 547, 833 A.2d 1040 (emphasis supplied).

Precisely the same type of exchange between the trial judge and the defendant was held to have been of pivotal significance, in affirming a decision of the trial judge not *sua sponte* to hold a competency hearing, in *Johnson v. State*, 67 Md.App. 347, 359–60, 507 A.2d 1134 (1986).

*The judge's questions concerned not only appellant's under-standing of the charges and of his rights,* but also inquired into appellant's age, family history, educational background, work history, medical history and psychological history. *Appellant answered all of the judge's questions in a ration-al, coherent manner. He also displayed a marked degree of sophistication about the law. While his legal skills were not those of a lawyer, he did appear to have gained some practical understanding of the law,* perhaps through his prior confrontations with it. In sum, *there is every indica-tion in the record that appellant met the standard of competency to stand trial.*

(Emphasis supplied).

The defense (on this contention it is questionable whether that collective designation includes Muhammad himself or not) mounts a two-pronged attack on Judge Ryan's ruling that Muhammad was competent to stand trial. Procedurally, the defense alleges that Judge Ryan abused his discretion by going forward with a hearing on competence on March 29, 2006 rather than rescheduling the hearing for some later date. Substantively, the defense contends that the ultimate ruling itself was erroneous.

## A. The Timing of the Hearing

The issue is not that of whether there would be a *hearing* on competence or whether Judge Ryan would make a *ruling* on competence. In this case, there was a hearing and there was a ruling. Both took place on March 29, 2006. The issue rather is simply one of when that hearing and ruling would take place. This is one of those calls concerning the scheduling and the management of a trial that invokes the abuse of discretion standard on the part of the trial judge.

The thrust of the argument made by the defense, largely on the basis of a recently prepared evaluation of Muhammad by Dr. Dorothy Otnow Lewis, was that the competency hearing should have been held on a later date so that Dr. Lewis could be present to testify. All of the parties were then before the

court on March 29, 2006, to resolve the question of Muhammad's expressed desire to discharge counsel and to represent himself. Dr. Lewis's report was dated March 27, 2006, two days earlier.

A number of factors persuade us that Judge Ryan did not abuse his discretion in going forward and deciding the question of Muhammad's competence to stand trial on that very day. It was on March 24, 2006, that Judge Ryan had received a letter from Muhammad requesting that he be allowed to discharge counsel and to represent himself. Because the massive month-long trial of this case was scheduled to begin within another month, Judge Ryan moved immediately to get the new issue resolved, so that old counsel, new counsel, or Muhammad himself could plan accordingly. He ordered a hearing on it for March 29. Whether defense counsel's subsequent timing was simply a matter of happenstance or whether there was a cause-and-effect relationship at work, counsel filed on March 28 a suggestion of Muhammad's incompetence to stand trial. If incompetent to stand trial, Muhammad would have been thereby incompetent to dismiss counsel. The former would have had a decided influence on the latter.

At that point, counsel had been working with the appellant on the case for seven months. A scheduling order had directed that all pretrial motions be filed by November 7, 2005, and that all experts be designated by November 28, 2005. As part of the responsive flurry, Dr. Lewis filed her evaluative report on March 27.

The most ardent and articulate opponent of the suggestion of incompetence was Muhammad himself. He was insulted by the suggestion. He had received his copy of counsel's suggestion just moments before he entered the courtroom for the hearing.

MR. MUHAMMAD: Your Honor, I just received this about maybe 30 seconds before I came out here. *Your Honor, it is ludicrous.*

THE COURT: Okay, listen. We're not in a hurry. If you want to read that, you should.

MR. MUHAMMAD: Your Honor, *I have read enough of this to let me know that it is ludicrous.*

(Emphasis supplied).

It was Muhammad himself who first labeled the sudden suggestion of his incompetence as a defense counsel ploy to foreclose his effort to discharge counsel and to represent himself. If he was to be deemed incompetent to stand trial, he would be *ipso facto* incompetent to discharge his attorneys.

MR. MUHAMMAD: Your Honor, this man's argument defeats itself. If he truly, honestly believes what he's saying, Your Honor, *this would have been brought up way before I sent you a letter about that I wanted to represent myself,* and to inform you of this before the trial started. . . . *So when I decide* that no, I'm not going to let that happen the way it happened in Virginia, *[defense counsel] came up with this plan to say that Muhammad is incompetent.*

All of these months, *all of a sudden now they want to raise the issue that I'm incompetent because I have sent you a letter* that I've expressed to you all what these people have been doing to me.

(Emphasis supplied).

Just as Muhammad himself was adamantly opposed to any suggestion that he was incompetent, Judge Ryan had seen nothing to suggest to him that Muhammad's competence was in any way in doubt. The suggestion of incompetence to stand trial was exclusively the idea of defense counsel, over Muhammad's strenuous objection.

The State's response to defense counsel's request for a postponed hearing on Muhammad's competence to stand trial was precisely the same as Muhammad's response had been. The assistant state's attorney made this point forcefully to Judge Ryan.

*Eight months ago they entered their appearance.* They have met with him numerous times during the course of that period. *They felt he was competent to choose a trial date. They felt he was competent to waive his rights under*

*the 180 day rule.* They felt he was competent to waive his constitutional speedy trial rights. *They felt he was competent to waive his rights under the Interstate Agreement on Detainers.* Later *they filed 10 motions, and felt that he was competent to obviously assist them in the filing of those motions,* and they advanced that.

*We've had numerous hearings where no hint or suggestion of competency has been raised. We've had meetings in your chambers. No hint of competency has been mentioned.* The State and defense counsel have met numerous times to talk about the mechanics of this case. *No mention of issues, concerns, thoughts about competency.* Yet *the only mention is made once Mr. Muhammad asserts in his letter that he's seeking to represent himself* . . . It can't be ignored that that is the context in which this request has been made.

(Emphasis supplied).

Defense counsel now argue that the hearing on March 29 was not titled as a hearing on competency to stand trial and that they were, therefore, totally unwarned that the issue would be taken up at that hearing and were totally unprepared to litigate it. There is a surface plausibility to that argument, but it will not withstand close analysis. Counsel knew full well that the stated purpose of the March 29 hearing was to take up and to resolve the issue of Muhammad's request to discharge counsel and to represent himself *pro se.* They knew full well that a critical factor in deciding whether a defendant may exercise such an option is whether the defendant possesses the competence to do so. They knew full well that the competence to represent oneself is indistinguishable from the competence to stand trial. Anything that counsel may have wished to bring up at some later date, therefore, was already relevant and material to the issue that was scheduled to be resolved on March 29. The complaint about not being warned and not being ready falls on deaf ears. A decision as to one aspect of competence was necessarily a decision as to both.

Dr. Lewis's evaluative report, moreover, was received in evidence on March 29 and was considered by Judge Ryan. Dr. Lewis's report included such observations as, "Mr. Muhammad suffers from brain dysfunction, with evidence of impaired frontal, temporal, and parietal function." There was no mention, on the other hand, of whether he understood the nature of the criminal proceedings in which he was involved. Judge Ryan was entitled not to be persuaded by Dr. Lewis's report. *Maggio v. Fulford*, 462 U.S. 111, 115–18, 103 S.Ct. 2261, 76 L.Ed.2d 794 (1983). He was not persuaded.

Highly pertinent to the resolution of this issue, on the other hand, was Judge Ryan's observations of Muhammad in action in a courtroom setting. Judge Ryan's opportunity to observe Muhammad did not begin, moreover, on March 29. On March 6, Judge Ryan had presided over a motions hearing with Muhammad present. At that hearing, Muhammad had noted his disagreement with his counsel's motion to sever and had vigorously argued for technical assistance that he needed to acquire access to the thousands of pages of discovery provided to him by the State. He demonstrated that he knew what was going on and that he could handle himself in a courtroom.

When counsel for Muhammad filed their suggestion of incompetence just before the March 29 hearing, the State filed a response. With that response the State included portions of Muhammad's month-long trial in Virginia. Included were portions of Muhammad's opening statement to the jury during that part of the trial in which he was representing himself. Also included were portions of the transcript showing objections lodged by Muhammad, his cross-examination of a state expert witness, and the Virginia court's voir dire of him regarding his request to represent himself, which was subsequently granted. As part of its examination of that question, the Virginia court asked Muhammad's two defense lawyers if he was competent. Counsel, who had spent months with Muhammad working on the case, replied:

"This is *one of the only defendants I know who's read every piece of paper in the case.* We've given him everything. We've gone over the broad outlines of the case and almost

all of the facts. *He has a grasp of the parameters of the case."*

(Emphasis supplied). On the narrow issue of the ability to participate in a trial, the observations from Virginia were quite possibly much more directly on point than were the observations of Dr. Lewis.

Prepared then to go forward with his own further examination of Muhammad in order to assess personally his competence both to go to trial and to represent himself, Judge Ryan declined to defer the decision until some later date. There was obviously support for what Judge Ryan did. We see no abuse of discretion in that ruling.

## B. The Decision As to Competence

 Most of the lengthy exchanges between Judge Ryan and Muhammad have already been quoted in our analysis of the first contention. Near the end of their colloquy, Muhammad asserted again his understanding of courtroom procedure.

Q Well, do you understand that there is a difference between being crazy and incompetent?

A Yes, Your Honor.

Q Two different things.

A Yes.

Q What do you understand the difference to be?

A Your Honor, *I'm competent in knowing the procedures, in knowing my responsibility as far as defending myself, knowing the responsibility as far as the evidence that needs to be presented, how it needs to be presented, and how to cross or not cross certain evidence, the purpose. I know the reason for the prosecutors, their obligation, their responsibility.*

(Emphasis supplied).

In *Thanos v. State,* 330 Md. 77, 86–87, 622 A.2d 727 (1993), the Court of Appeals clearly indicated that a trial judge's observation of a defendant in the courtroom can be critical and dispositive evidence on the issue of competence to stand trial.

Our independent review of the record does not indicate that the trial court erred in failing to grant Thanos a competency hearing. . . . While Thanos did make some peculiar remarks to the trial judge, *his words on the whole were very lucid. He appeared to grasp all of his rights as they arose throughout the proceedings* . . . .

Based on the foregoing, we think *the record discloses that Thanos met the two-pronged test for competency to stand trial. He exhibited both "present ability to consult with his lawyer with a reasonable degree of rational understanding—and . . . a rational as well as factual understanding of the proceedings against him."* All else aside, Thanos's thoughtful contemplation of how his own potentially disruptive presence would affect the deliberations of the factfinder indicates that *he grasped not only the basic elements of the trial process but also its strategic dimensions.* The trial court did not err in not conducting, *sua sponte,* a competency hearing.

(Emphasis supplied). See also *Johnson v. State,* 67 Md.App. at 359–60, 507 A.2d 1134.

Judge Ryan's finding that Muhammad was competent to stand trial was clear.

THE COURT: Okay. Well, I certainly don't want to do anything that is clearly wrong or unfair, or rush to judgment. But I don't know Mr. Muhammad very well, but *I've talked to him a few times, and the few times I've talked to you,* including today, *you haven't said anything that wasn't appropriate. [Y]ou understand what we're talking about. You're able to express yourself.* You laughed when it was appropriate and you got mad when it was appropriate. And *you've convinced me that you do understand the nature of the charges against you. You do understand how serious this is,* and *you understand that the prosecution has evidence it has compiled to* present to the jury in efforts to find you guilty of what they've charged you with.

And I understand and *I find that you do have the ability to assist your lawyers.* But you haven't, but you haven't. I'm not saying you haven't in any way, but you haven't.
. . . .

THE COURT: ... And I'm saying that *you appear to me, and I find that you are competent.*

(Emphasis supplied).

There were facts and circumstances before Judge Ryan, including significantly his own firsthand observations, that amply supported that final decision. It was not, therefore, erroneous. *Colbert v. State,* 18 Md.App. 632, 642, 308 A.2d 726, *cert. denied,* 269 Md. 756 (1973). Neither, for that matter, was it an abuse of discretion. By either standard, it clearly passed muster.

## C. Defense Counsel's Afterthought

It was on March 29, 2006, that Judge Ryan granted Muhammad's request to discharge counsel and to represent himself. It was on that day, therefore, that the District Public Defender and the Deputy District Public Defender, who had been representing Muhammad, ceased to represent him. On April 24, three private attorneys volunteered to act as standby counsel to assist Muhammad.

On April 27, however, it was the attorneys who had been discharged who wrote a letter to Judge Ryan asking him to make an attached letter from Dr. David Williamson "a part of the permanent record in this case." Arguably, that letter may have had some bearing on competency in that it may have contradicted a passing comment by Muhammad at the March 29 hearing. Implicitly, the purpose of the letter would seem to have been to encourage a reconsideration by Judge Ryan of his earlier competency ruling, although no such motion had been filed. Indeed, the defense now agues that Dr. Williamson's "letter surely raised enough questions about Mr. Muhammad's competency to require the court to exercise its discretion to reconsider its prior competency decision." At that point, of course, it was only Muhammad himself who

could have moved to have Judge Ryan reconsider his earlier decision. Former counsel had no standing to do so.

The State moved to strike the filing. Muhammad, who was then representing himself, also stated unequivocally that the proposed filing should not be allowed in the record. Judge Ryan granted the State's motion. The defense now claims that that was an abuse of discretion. We do not agree. Counsel who no longer represented Muhammad had no standing to do anything on his behalf, however their action may be titled or characterized. *A fortiori,* discharged counsel have no standing to do something over Muhammad's objection at a time when he was representing himself.

Fully dispositive of this issue is *Thanos v. State,* 332 Md. 511, 518, 632 A.2d 768 (1993). The public defender, who had earlier represented Thanos, sought to file a petition for certiorari review with the Supreme Court over Thanos's objection. Thanos had been convicted of first-degree murder and had been sentenced to death. The public defender also sought to appeal to the Court of Appeals the granting by the trial judge of Thanos's motion to discharge counsel. The State moved to dismiss the appeal on the ground that former counsel no longer had any legal authority to act on Thanos's behalf. The Court of Appeals agreed and dismissed the appeal. Judge McAuliffe's opinion explained:

> The instant appeal was filed in Thanos's name by the Office of the Public Defender (Public Defender). The appeal questions the competency finding, the propriety of having that decision made by the same trial judge who originally sentenced the defendant, and the propriety of obtaining any waiver prior to the expiration of the 240–day automatic stay. In response, *the State has moved to dismiss the appeal based on lack of standing. The State asserts that because the Public Defender no longer represents the defendant, it has no standing to bring the appeal.*
>
> The questions of competency and standing are interrelated. *If the trial court correctly determined that the defendant was competent to discharge the Public Defender and*

*had knowingly and voluntarily done so, the Public Defender would have no standing to bring this appeal.*

332 Md. at 518, 632 A.2d 768 (emphasis supplied).

The holding of the Court of Appeals was unequivocal.

We hold, therefore, that the trial judge did not err in his conduct of the hearing, or in finding that the defendant was competent to discharge the Public Defender as his attorney, and that the defendant did so knowingly, voluntarily, and intelligently. It follows that *the Public Defender did not represent the defendant when he noted this appeal, and was without standing to do so. The defendant having discharged his attorney* and having determined that no further appeal should be taken, *the appeal must be dismissed.*

*Id.* at 520, 632 A.2d 768 (emphasis supplied).

### "The Proof of the Pudding ..."

If ever an alternative holding of harmless error would be appropriate if necessary, it is here. What Judge Ryan was called upon to do on March 29, 2006, was to make a prediction, based on the record before him, as to whether Muhammad, a month hence, would be competent to stand trial. Whether that prediction was arrived at by proper or improper procedure no longer really matters. The event as to which the prediction was made has now occurred, and we know the result. The prediction itself, let alone how we arrived at the prediction, is now beside the point.

Once the game is over, the significance of the pre-game forecast is, at the very least, almost totally marginalized. The prediction in this case turned out to be correct. Muhammad's actual performance fully vindicated Judge Ryan's prediction. In a month-long trial involving well over a hundred witnesses and spread over thousands upon thousands of pages of transcript, Muhammad demonstrated, in real time, that he was both competent to stand trial and competent to represent himself *pro se.* He knew the facts. He knew the law. He was alertly on top of the testimony of every witness. He lodged cogent and articulate objections and argued them

forcefully. For a legally untrained *pro se* performance, he turned in a truly remarkable performance.

How more definitively can it be proved that one is competent to perform than by having him actually perform? It is as if the entire month-long trial had been a dress rehearsal or an exhibition game, carefully staged as a mock trial to see if Muhammad actually could do what some claimed he could do and others suggested he could not do. In the last analysis, he did it.

Even if, purely *arguendo*, the prediction that Muhammad was competent to stand trial had been somehow procedurally flawed, the assumed error self-evidently turned out to be harmless. Judge Ryan's prediction of competence turned out to be true, so no harm was done. Once Muhammad has demonstrated that he was, indeed, competent to stand trial by actually standing trial, should there be another month-long trial so that he can demonstrate his competence all over again for a second time? Of course not!

At the end of the trial, Muhammad delivered a closing argument to the jury that lasted for over three hours. He demonstrated a total mastery of the multitudinous facts in the case. His discussions of 1) the burden of proof and reasonable doubt and 2) the role of a juror as a fact finder were right on point. Muhammad's argument about the ambiguity of ballistics comparisons, enhanced by his use of slides, was adroitly handled. He attacked DNA identification, particularly when the result is that the subject "cannot be ruled out" as the donor. His argument about the absence of any traces of gunpowder in the Chevrolet Caprice was articulately presented. For a legally untrained *pro se* performance, he gave a remarkable performance. By his performance, he demonstrated that any suggestion that he were not competent to stand trial was, as he himself characterized it when the subject first arose, "ludicrous."

Technically, this is not a garden variety harmless error scenario. Normally, in measuring harmless error, we are called upon to decide whether an evidentiary error or some other trial error may have had a critical impact on the fact

finder's ultimate verdict. In this case, by contrast, we may actually be considering the question of whether any *prejudice* ultimately resulted from the hypothesized procedural flaw and whether, therefore, such a flaw could even be deemed error in the first instance. The absence of prejudice, on the one hand, and the harmlessness of error, on the other hand, are closely related phenomena, but for the very different allocations of the burden of proof. With the one, the defendant must show *prejudice* to establish error; with the other, the State must show that the actual error was harmless.

It is unnecessary in this case to decide which of those two phenomena we are actually dealing with, because either one produces the same result. A defendant who was incompetent to stand trial was not erroneously required to do so. That is the harm that the competency law is designed to avoid. That harm did not occur in this case.

### Contention III:

### Excluding Testimony

Muhammad's third contention breaks down into five distinct, albeit similar, subcontentions. Four of the subcontentions charge that Judge Ryan erroneously refused to permit the defense to call particular defense witnesses—1) Deputy Sheriff C. Wade of the Montgomery County Sheriff's Department; 2) Detective June Boyle from Virginia; 3) Clyde Wilson, a civilian from Montgomery, Alabama; and 4) J. Wyndal Gordon, Esq., one of Muhammad's standby counsel. The fifth subcontention is a collective one, claiming that Judge Ryan erroneously refused to issue the certifications necessary for Muhammad to obtain subpoenas for the appearance at his trial of a large number of out-of-state witnesses. In varying degrees, each of these subcontentions founders on the shoals of immateriality.

Before taking them up, one by one, it is appropriate to set out the controlling legal guidelines. This trial went on for four and a half weeks, and the jury heard from 133 witnesses. As his own *pro se* representative, Muhammad demonstrated a desire to call a multitude of witnesses who had little or no

relevant testimony to offer. In an attempt to exercise some discretionary control over a sprawling proceeding, Judge Ryan insisted on proffers of materiality rather than giving Muhammad *carte blanche* to wander aimlessly down meaningless tangents.

 Although the right to present witnesses in one's defense in a fundamental right guaranteed by the Sixth Amendment, the Court of Appeals pointed out in *Wilson v. State,* 345 Md. 437, 448, 693 A.2d 344 (1997), that the right, "though fundamental, is not absolute." To establish a violation of the right, a defendant must show that the testimony in issue "would be both admissible and helpful to the defense." *Id.*

In *Wilson,* 345 Md. at 448, 693 A.2d 344, the Court of Appeals quoted with approval from the decision of the Supreme Court in *Taylor v. Illinois,* 484 U.S. 400, 410, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988):

> "[T]he accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence. The Compulsory Process Clause provides him with an effective weapon, but it is a weapon that cannot be used irresponsibly."

In *United States v. Valenzuela–Bernal,* 458 U.S. 858, 867, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982), the Supreme Court stressed that a defendant "must at least make some plausible showing of how [the witness's] testimony would have been both material and favorable to his defense." The Supreme Court in *Taylor v. Illinois* further admonished:

> The trial process would be a shambles if either party had an absolute right to control the time and content of his witnesses' testimony.... The State's interest in the orderly conduct of a criminal trial is sufficient to justify the imposition and enforcement of firm, though not always inflexible, rules relating to the identification and presentation of evidence.

484 U.S. at 411, 108 S.Ct. 646.

 To insure that a trial does not stray into distracting and confusing by-ways, broad discretion is entrusted to the

trial judge to control the flow of the trial and the reception of evidence. Maryland Rule 5–104(a) and 5–403. See also *Kelly v. State,* 392 Md. 511, 530, 534, 898 A.2d 419 (2006); *Merzbacher v. State,* 346 Md. 391, 404, 697 A.2d 432 (1997); *Marshall v. State,* 174 Md.App. 572, 581, 923 A.2d 143 (2007).

In *Smith v. State,* 371 Md. 496, 504, 810 A.2d 449 (2002), the Court of Appeals emphasized that the right to present a defense, albeit fundamental, is nonetheless subject

> "to two paramount rules of evidence, embodied both in case law and in Maryland Rules 5–402 and 5–403. The first is that *evidence that is not relevant to a material issue is inadmissible.* The second is that, *even if relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of* unfair prejudice, *confusion of the issues, or misleading the jury.*"

(Emphasis supplied). See also *Ebb v. State,* 341 Md. 578, 588, 671 A.2d 974 (1996) (Trial court should not permit questioning to stray into collateral matters which would obscure trial issues and lead to fact finder's confusion).

In reviewing a judge's exercise of control over the receipt of evidence based on, *inter alia,* its materiality, the standard to be applied is the abuse of discretion standard. As the Court of Appeals explained in *Cooley v. State,* 385 Md. 165, 175–76, 867 A.2d 1065 (2005):

> " 'Abuse occurs when a trial judge exercises discretion in an arbitrary or capricious manner or when he or she acts beyond the letter or reason of the law.... *The conduct of the trial must of necessity rest largely in the control and discretion of the presiding judge* and *an appellate court should in no case interfere with that judgment unless there has been an abuse of discretion* by the trial judge of a character likely to have injured the complaining party.' "

(Emphasis supplied). See also *Kelly v. State,* 392 Md. at 531–32, 898 A.2d 419; *Fontaine v. State,* 134 Md.App. 275, 288, 759 A.2d 1136, *cert. denied,* 362 Md. 188, 763 A.2d 734 (2000).

## A. Certification of Out–of–State Subpoenas

■■■ We turn first to the collective subcontention. Although the subcontention, as we shall explain, has not been presented in a way that calls for appellate review, a brief explanation of its background will provide a helpful context for viewing in realistic perspective this entire package of subcontentions. The process for obtaining the attendance of out-of-state witnesses is spelled out in Maryland Code, Courts and Judicial Proceedings Article, § 9–303(a), the Maryland Uniform Act to Secure the Attendance of Witnesses From Without a State in Criminal Proceedings. That section provides:

(a) *Certificate that witness is needed in this State.—If a person in any state,* which by its laws has made provision for commanding persons within its borders to attend and testify in criminal prosecutions, or grand jury investigations commenced or about to commence, in this State, *is a material witness in a prosecution pending in a court of record in this State,* or in a grand jury investigation which has commenced or is about to commence, a *judge of the court may issue a certificate under the seal of the court stating these facts* and specifying the number of days the witness will be required. A certificate may include a recommendation that the witness be taken into immediate custody and delivered to an officer of this State to assure his attendance in this State, unless the witness shall be admitted to bail by the appropriate authority, upon condition that the witness will appear at the time and place specified in the subpoena or summons served upon him. This *certificate shall be presented to a judge of a court of record in the county in which the witness is found.*

(Emphasis supplied).

On March 29, 2006, the day that Muhammad first represented himself *pro se,* the subject of his obtaining the attendance of out-of-state witnesses first arose. Judge Ryan announced that he would conduct a hearing two days later, on March 31, at which time Muhammad could present his list of proposed

witnesses. Muhammad agreed to do so. On March 31, however, Muhammad appeared without his list. Muhammad explained that he had mailed the list. Judge Ryan had not received it. Muhammad added that "it wasn't all of them but it was a good amount." Judge Ryan cautioned Muhammad that obtaining out-of-state witnesses was "not a simple process of sending a letter."

The next hearing to take up the subject convened on April 6. Judge Ryan still had not received the list that Muhammad claimed to have mailed. Muhammad handed Judge Ryan a list of names that he had "come up with thus far." It included both in-state and out-of-state witnesses. Muhammad's April 6 list consisted of 545 proposed defense witnesses. There was a handwritten list of 178 names plus a typed list of 367 names that was a photocopy of a State list of its potential witnesses. There was no indication of what any of the proposed witnesses could testify about. On April 7, the State moved for a stay of service and a hearing so that Judge Ryan could hear argument on the materiality and competence of Muhammad's hundreds of proposed witnesses.

The next day that the court was available for a hearing was April 24. Prior to that hearing, the State had on April 20 filed its response to Muhammad's request for witness subpoenas. It asserted that many of Muhammad's 545 proposed witnesses could not provide competent, material, or relevant testimony. It pointed out that many of Muhammad's requests were incomplete and that Muhammad had failed to satisfy the basic requirement of Maryland Rule 4–265, governing in-state subpoenas. The State argued that the right to compulsory service is not an absolute and that Muhammad's "hugely overbroad request" amounted to an abuse of process. The State moved that Muhammad should be required to cure any defects with respect to his out-of-state witnesses by May 1 and that, upon his completion of the appropriate paper work to comply with § 9–303, the court should hold a hearing to determine the relevancy and materiality of what those witnesses could say.

On April 24, Judge Ryan appointed three standby counsel to assist Muhammad. When Muhammad asked for "subpoena

forms" for out-of-state witnesses, Judge Ryan explained that there were no such forms but advised him that standby counsel could help him to satisfy the § 9–303 requirements. Judge Ryan, in the meantime, had ordered that subpoenas be issued for all of Muhammad's requested in-state witnesses for whom he had provided the necessary names and addresses. At the hearing on April 24, Judge Ryan asked Muhammad how the likely testimony of certain out-of-state witnesses would be relevant or material. Muhammad repeatedly asserted that he was not required to do so.

On April 28, Muhammad was back before Judge Ryan with his witness problems. He informed Judge Ryan that he had gone over the matter with his standby counsel and was "in the process" of trying to obtain the necessary addresses and other necessary information about his desired witnesses. With every passing hearing there were a lot of words and promises about what was being done or would soon be done but no final action permitting compliance with § 9–303. On April 28, Judge Ryan warned Muhammad:

> I'm not going to let you just dragnet 500 or 600 names and tell them to hold off, don't come, we'll let you know if we need you. That's not how this is done. *Whoever you subpoena as a witness has to be someone who* is competent, *has personal knowledge of some facts alleged in your case,* and that whatever they know *is relevant to the issues in your case. Otherwise they cannot be witnesses.*
>
> And I tried to explain that to you the other day. I told you I'd work with you, but you have to make some representations to me who these people are and what they know about the facts in your case, what do they know about this case. And *if you can't tell me* what they, *what they know, or the purpose for which you're calling them,* what you expect their testimony to be, I'm not, *I'm not going to let you summons them.*

(Emphasis supplied).

Muhammad stated that he understood. He explained that he was "trying to get them in." Judge Ryan agreed with the

State that a final list of witnesses would be needed for the voir dire examination of the prospective jurors that was scheduled to begin on May 1. Judge Ryan agreed to address and to finalize this problem about witnesses the "first thing" on May 1. He again cautioned Muhammad, "It can't be 500 or 600 names."

On May 1 Muhammad still had not given the court what it needed. Before the voir dire process began, Muhammad handed Judge Ryan a list of the witnesses he wanted subpoenaed. The State pointed out that the requests for out-of-state witnesses were still not in compliance with § 9–303. *Muhammad admitted that he had not yet talked to his standby counsel* so that they could help him with this process. The State reminded the court that a final list of witnesses was needed for the voir dire process. Judge Ryan finally expressed his exasperation:

Out-of-state witness, it's too late. It's too late. You're not going to be able to subpoena out-of-state witnesses. You haven't complied with the rules of the court.

Judge Ryan again tried to explain:

THE COURT: And *you don't have ready for submission the necessary papers to, to have our Clerk's Office send them to the various states to begin the process.*

MR. MUHAMMAD: I understand.

THE COURT: You haven't done that yet.

When Muhammad then complained that he had been unaware that there was any deadline, Judge Ryan relented. He stated:

If you can overnight, if you can figure out some way to do it, I'm not saying, "No," but I'm not saying, "Yes," either.

On the next morning, May 2, Muhammad filed a Motion to Issue Out–of–State Subpoenas, listing 51 witnesses. The matter was taken up again on the afternoon of May 3. The State argued that the Motion of May 2 was "very late," that there had been many missed deadlines and delays, and that Muhammad and standby counsel had had all weekend to get their list

of witnesses in order but had failed to provide the list in time for the voir dire of May 1. More significantly, the State pointed out that the list of May 2 still failed to comply with § 9–303, because "there's no certification that anyone here is a material witness." It stated that this was more than a procedural technicality in that among the witnesses listed were the Commonwealth Attorney for Fairfax County, Virginia, and his deputy and a person in Illinois who had "made a prank call to a radio station regarding the sniper incidents." Materiality was the overriding concern. Judge Ryan expressly told Muhammad yet again that in order for the court to certify that the witnesses were material, Muhammad would need to file an affidavit or state under oath in the courtroom "what it is precisely that this person has to offer in this case."

Muhammad offered to be put under oath to swear that the witnesses were "vital to his case." Judge Ryan explained to Muhammad that he had not completed the necessary paperwork so that Judge Ryan could make the necessary assessment of materiality. Judge Ryan then ruled.

> And the more we're talking about it and the more we're thinking about it, Mr. Muhammad, I've been working with you on this and we keep talking about it. And I've tried to do what I could to help you get all this started, and *I just have to make a decision.* And here's what I'm going to do. I'm going to decide that *it is too late* and *I'm not going to authorize the issuance of any process to have subpoenaed out-of-state witnesses.* I've made a decision on that. I know your opposition to it and I've heard your opposition, but I have to make a decision. *We just can't keep talking about it.* And *that's it.*

(Emphasis supplied).

That, however, was not it. On May 11, Muhammad filed a Motion for Reconsideration of Request for Certification of Out–of–State Witnesses. The proposed order that he attached to the motion further provided that "the State appropriate the necessary funds to ease the burden of having Defendant's Witnesses travel to Rockville, Maryland" and that

"this matter (presumably the trial) be postponed or continued in order to serve process on the Out–of–State Witnesses so that they may appear and testify favorably on the Defendant's behalf." [5] Muhammad handed Judge Ryan "a large stack of papers" and announced, "We'll start with the D.C. witnesses." Judge Ryan stopped him and again explained that he had repeatedly asked Muhammad to proffer the testimony of the out-of-state witnesses he wanted subpoenaed, but that Muhammad had failed to comply with that requirement. In denying the Motion to Reconsider, Judge Ryan stated:

> THE COURT: ... *I have asked you several times to represent, to articulate to me, the specific nature of the testimony of the people you want subpoenaed to come here. And you have consistently told me,* you told me basically, you told me you feel your defense, and *you're reluctant to do that.*
>
> *Before* I were to *authorize a subpoena to be sent to any other state, I have to be satisfied with it.* That whoever that person is, and wherever that person is, before I can command that—I mean, I can't command. I don't have jurisdiction over them. I've got to send it to another jurisdiction. And *I have to certify to that other jurisdiction that I'm satisfied that this person is a material witness in this case. And I'm not,* Mr. Muhammad, I'm going to tell you again, sir. *I've reconsidered your motion, and I'm again denying it. These out-of-state subpoenas will not be issued for all the reasons I've already said.*

(Emphasis supplied).

On the merits, we would have no difficulty in affirming the decision of Judge Ryan not to initiate the formal process for obtaining witnesses from out of state. Section 9–303 would have required Judge Ryan, as a Maryland judge, to certify to

---

5. Appended to the Motion for Reconsideration was a pared down list of 42 out-of-state witnesses. Some clue as to probable immateriality may be gleaned from the fact that two of them were from Georgia, two from Illinois, one from Iowa, and four from Louisiana. Thus far, there is no suggestion as to what any of those people may have had to contribute to the trial.

a judge in another state that he was satisfied that a particular witness actually had material information about the issues on trial in Maryland. The request would then have asked that out-of-state judge to issue formal process against the prospective witness, compelling his attendance at the Maryland trial. Muhammad never furnished Judge Ryan with the necessary proffer of what any of the witnesses could have testified to in order to satisfy Judge Ryan that the witnesses were, indeed, material. Judge Ryan did not abuse his discretion.

■ In this case and on this issue, however, Muhammad has not even cleared the necessary preliminary hurdle to reach those merits. Even as of this late date, Muhammad has not proffered to us on this appeal what his out-of-state witnesses would likely have testified about. A claim that the exclusion of evidence constitutes reversible error is generally not preserved for appellate review absent a formal proffer of the contents and materiality of the excluded testimony. Maryland Rule 5–103(a)(2); *Merzbacher v. State,* 346 Md. 391, 416, 697 A.2d 432 (1997) (objection to exclusion of evidence unpreserved where appellate court is in no position to discern what the evidence may have been); *Ratchford v. State,* 141 Md.App. 354, 368, 785 A.2d 826 (2001), *cert. denied,* 368 Md. 241, 792 A.2d 1178 (2002) (failure to proffer contents of excluded testimony is "absolutely foreclosing" as to claims). This impediment to appellate review effectively moots any consideration, as an alternate holding, of harmless error. Even if, *arguendo,* certification for the out-of-state witnesses had been erroneously denied, we have no idea whether such a hypothesized error would have been harmful or harmless because we have no idea what the excluded testimony might have been.

## B. Deputy Sheriff Wade

On May 3, just before the selection of the jury had been completed, the State moved to have the name of Deputy Wade of the Montgomery County Sheriff's Department struck from Muhammad's witness list. It explained that Deputy Wade's only contact with the case was that he had transported

Muhammad to the court house and that he was "not a relevant witness." Judge Ryan sought to learn from Muhammad whether Deputy Wade was, indeed, a material witness.

THE COURT: ... Mr. Muhammad ... would you please *tell me what relevant testimony Sheriff Wade has to this case? Why are you subpoenaing* him as a witness in this case?

MR. MUHAMMAD: Your Honor, to my knowledge, *Sheriff Wade was part of the investigation of a shooting that had happened during this time.* As a matter of fact, him and two other officers at the time.

THE COURT: *Which shooting? Do you know?*

MR. MUHAMMAD: *Not at this moment,* Your Honor.

THE COURT: Well—

MR. MUHAMMAD: Your Honor, *it's a shooting that happened around about the same time as these sniper events.* I mean, *I can give you that information. But to ask me even more than that and I have to disclose more would constitute going into my case.*

(Emphasis supplied).

Muhammad stated that Deputy Wade had investigated an incident which, at the time, was not known to be unrelated to "the sniper case."

MR. MUHAMMAD: Your Honor, *during the time of the shootings he was in an incident that they considered to be a part of the sniper investigation, and they investigated it.*

The State offered a clarification of what Muhammad was talking about.

[THE PROSECUTOR:] I would hazard a guess. *Between October 2nd and October 24th* in the jurisdictions where the sniper shootings occurred, Montgomery, Prince George's, D.C., Spotsylvania County, Hanover County, Fairfax, that *there were probably 200–plus shootings totally unrelated to the sniper shootings.* And we can be here until next year if we wanted to hear from every officer who investigated all of those cases. My understanding is that

*Sheriff Wade responded to a gunshot that was reported, the sound of a gunshot.* There was no victim, and *it was never connected or related to the sniper shootings.*

(Emphasis supplied).

Judge Ryan ruled:

THE COURT: Mr. Muhammad, *I'm determining that Sheriff Wade has no relevant evidence to the trial that we're about to begin.* And I'm not going to permit him to be a witness in this case.

(Emphasis supplied).

Although it appears that Muhammad was on a "fishing expedition," he himself was in a position to allay such fears by proffering, as he was requested to do, what material testimony Deputy Wade might have given. On the merits, we would hold that Judge Ryan's ruling was not an abuse of discretion because no proffer had been given to him. We cannot reach those merits, however, because, even as of this late date, no proffer has been given to us.

## C. Detective June Boyle

Detective June Boyle is a Virginia law enforcement officer. Shortly after the arrest of Muhammad and Malvo on October 24, 2002, she had a lengthy interview with Malvo. Pursuant to an arrangement he worked out with Muhammad, Malvo agreed that, if he were to be interrogated in Virginia, he would say that he, rather than Muhammad, had been the triggerman in all of the shootings. This arrangement was to save Muhammad from the risk of the death penalty because Virginia is a capital punishment state. Malvo, as a juvenile, did not run the risk.

When Detective Boyle informed Malvo that he was in Virginia, Malvo confessed to having been the triggerman in all the shootings. He has since repudiated that statement. At trial, he acknowledged that he had earlier made that statement and he explained his reason for having done so.

On May 25, the State moved to quash the subpoena that the defense had had served on Detective Boyle the day before in order to prevent the defense from calling her as a witness. The State advanced three grounds for its request: 1) Detective Boyle had no material testimony to give; 2) she had, prior to being served, been present in the courtroom notwithstanding the sequestration order; and 3) her name had not been read to the prospective jurors during voir dire.

When Judge Ryan asked Muhammad "for what purpose would you be calling her?" one of his shifting responses was that "It's been stated by the State that Lee Boyd Malvo made false statements in his statement with June Boyle." She would not, however, have been permitted to impeach Malvo's testimonial credibility by showing that he had made a prior inconsistent statement about which of the two snipers had been the actual triggerman. Malvo, in his testimony, had already acknowledged his false statement to Detective Boyle in that regard and had explained his reasons for that earlier falsity. Judge Ryan explained that Detective Boyle would not be permitted to testify for that purpose.

THE COURT: ... [W]hen Mr. Malvo testified he testified that he had lied and had given false information to her.

So *if you were to call her to ask her if he did give her false information* or what information he gave her that was false *it wouldn't be permissible.*

There were then intimations that Muhammad wanted to bring out the fact that Detective Boyle had believed Malvo's earlier account of who the triggerman had been, arguably suggesting that that version was more credible than Malvo's trial testimony. Judge Ryan explained that a witness cannot be put on the stand to state that he or she believes or disbelieves the testimony of another witness.

MR. MUHAMMAD: Your Honor, her impression of what he was telling her at that particular time, what he allegedly was telling her she believed it to be true. . . .

THE COURT: Mr. Muhammad, *what she believed or what her impression of it is is not relevant.*

(Emphasis supplied).

What Muhammad really wanted to suggest from the testimony of Detective Boyle, however, was that Malvo had never told her anything and that the whole purpose and effect of her examination of Malvo was to instruct him as to all of the details of a string of crimes that he otherwise knew nothing about. Judge Ryan pointed out that during Muhammad's lengthy cross-examination of Malvo a day earlier, Muhammad had never inquired into this alternative source of Malvo's extensive information. Muhammad acknowledged that that was so.

THE COURT: Mr. Malvo was on that witness stand for quite some time. And *I don't recall you asking him that question.*

MR. MUHAMMAD: Say again?

THE COURT: *I don't recall [your] asking him* the statements he made to Ms. Boyle were his statements or did she tell him what to say. *You didn't ask him that, did you?*

MR. MUHAMMAD: No, no, Your Honor, not, not to my knowledge because *it was not my intention to ask him that. It was my intention to ask June Boyle.*

THE COURT: Okay, well, then *you can't ask her that question. I'm not going to permit you to do that.*

(Emphasis supplied).

The State protested that Muhammad lacked any good faith reason to expect that Detective Boyle would testify to such an effect. Judge Ryan made one final effort to get some kind of a general proffer out of Muhammad, but the effort was to no avail. The whole exercise appeared to be a pointless "fishing expedition."

MR. MUHAMMAD: Your Honor, *I can't* sit up here and *tell you every single thing that I'm going to ask June Boyle* on that stand *because I don't know what June Boyle is going to say* specifically on that stand, okay.

THE COURT: Okay, you don't have to tell me every question you intend to ask her. But *you have told me the areas you intend to ask her about.* And *I'm determining that those areas are not relevant to the evidence as it's being presented* and *I'm not going to permit you to call her* for the reasons you've stated.

(Emphasis supplied).

If the merits of this contention were properly before us, we would hold that Judge Ryan was, with that ruling, operating within his proper discretionary range for any of three reasons. To have put Detective Boyle on the stand would have been a violation of the sequestration order. In *Redditt v. State*, 337 Md. 621, 629, 655 A.2d 390 (1995), Judge Rodowsky stressed the discretionary nature of the judge's decision.

When there has been a violation of a sequestration order, *whether there is to be a sanction and,* if so, *what sanction to impose, are decisions left to the sound discretion of the trial judge.*

(Emphasis supplied). See also *Brown v. State*, 272 Md. 450, 477–78, 325 A.2d 557 (1974); *Cunningham v. State*, 247 Md. 404, 417, 231 A.2d 501 (1967); *Mayson v. State*, 238 Md. 283, 290, 208 A.2d 599 (1965); *Hill v. State*, 134 Md.App. 327, 349, 759 A.2d 1164 (2000).

Quite independently, Detective Boyle's name had not been read to the jurors upon voir dire. As Judge Sonner pointed out in *Burral v. State*, 118 Md.App. 288, 300–01, 702 A.2d 781 (1997), the trial judge has the discretion in such a case to preclude the witness from testifying. Most significantly, Muhammad never satisfied Judge Ryan that he had any realistic expectation that Detective Boyle had any material evidence to offer. For any of these three reasons, and certainly for all of them combined, we would not be able to find that Judge Ryan abused his discretion.

At the threshold, however, the issue is not properly before us because Muhammad has made no proffer to us of what Detective Boyle's testimony would have been. *Merzbacher v.*

*State,* 346 Md. at 416, 697 A.2d 432; *Ratchford v. State,* 141 Md.App. at 368, 785 A.2d 826.

██ Even if, purely *arguendo,* Judge Ryan's decision not to permit Detective Boyle to be called as a witness were in error, we would in this case be persuaded beyond all reasonable doubt that such an error was harmless.

## D. Clyde Wilson

██ On May 26, Muhammad, as his case was ending, indicated that he was about to call as a witness, as soon as he arrived in the court house, Clyde Wilson. Muhammad proffered that Wilson would have testified with respect to the September 21, 2002 shooting in Montgomery, Alabama. Wilson was apparently a civilian witness to that shooting.

Muhammad proffered to Judge Ryan what Wilson's testimony would be. Wilson saw a young man running from the scene of the Montgomery shooting being chased by a police officer. Wilson joined in the chase, but the culprit got away. In giving a description of the fleeing suspect, Wilson apparently described him as "not an Afro–American."

The State objected to Wilson's being called as a witness on the ground that his name had not been given to the jurors on voir dire and that his being called as a witness came as a total surprise to the State. The Assistant State's Attorney stated to the court.

MS. WINFREE: His name, I've got the transcript. *His name was not read to the jury.* Mr. Muhammad has had numerous opportunities to cure these problems. You gave him opportunities way in advance of the trial. *This was the kind of problem that we wanted to make sure we didn't have.* And that is why you set the deadlines. *He has completely failed to comply with those deadlines.* It's a day late, it's a dollar short, we are ready to close. He *should not be permitted to bring this witness in at this 11th hour*

*this way.* It's actually past the 11th hour and we strenuously object to this witness being called to testify.

(Emphasis supplied).

Judge Ryan ruled:

I'm not going to permit that witness to testify for all the reasons I've put onto the record. So that's it.

When shortly thereafter standby counsel raised the subject again, Judge Ryan reaffirmed:

Mr. Muhammad, I'm not going to permit this witness to testify if it creates the position the State is in that prejudices their opportunity to either cross-examine him or rebut his testimony because he's a new name injected this morning into this trial.

On the merits, we hold that Judge Ryan did not abuse his discretion. Dispositive is the decision of this Court in *Burral v. State, supra.* Judge Sonner's statement of the law was clear.

The court may also exclude witnesses whom the defense or the prosecution have failed to disclose for purposes of voir dire.

118 Md.App. at 300, 702 A.2d 781.

In *Burral,* we built upon the earlier Court of Appeals decision in *Taliaferro v. State,* 295 Md. 376, 388–89, 456 A.2d 29 (1983). We described, 118 Md.App. at 300, 702 A.2d 781, the *Taliaferro* holding.

In *Taliaferro,* the Court held that it was not an abuse of discretion or a denial of due process to prevent defendant's alibi witness from testifying, where the defendant did not disclose the witness until the close of the State's case, and the proffered witness would have been the defendant's only witness.

This Court then held that the *Taliaferro* rationale extended to witnesses generally and not just to alibi witnesses.

We hold that the rationale expressed in *Taliaferro,* namely that a trial judge may exclude non-disclosed alibi witnesses,

can be extended to cover the exclusion of other witnesses whom the defense unjustifiably fails to disclose.

*Id.* at 301, 702 A.2d 781.

Muhammad's response, in his reply brief, is to tell us that "*Burral* was wrongly decided." We do not agree.

 Even if, *arguendo,* our holding in this regard were in error, we would still be persuaded beyond a reasonable doubt that such error was harmless. Even if we were confining our harmless error analysis to the Montgomery, Alabama shooting alone (we are not so confining it), the presumed error would have been harmless. Even granting that one of the witnesses to that crime described the fleeing suspect as "not an Afro–American," Lt. Graboys described the suspect as an Afro–American and identified him as Lee Malvo. At that point, either one of the two witnesses could easily have been mistaken.

Lee Malvo himself, however, took the stand and acknowledged that he was the suspect in question. The phone call to Father Sullivan in Ashland, Virginia, further confirmed that fact. The "Armor Light" gun catalog dropped by the suspect at the scene, moreover, had Malvo's fingerprints on it. The ballistics examination furthermore showed that the bullet that killed Claudine Parker had been fired from Muhammad's Bushmaster rifle. Wilson's testimony would not have dented the establishment of the Montgomery, Alabama shooting itself in the slightest respect.

*A fortiori,* it would not have dented the six convictions for the murders in Montgomery County, Maryland. Wilson's supposed testimony did not touch those crimes in any way. The entire Montgomery, Alabama, episode was simply one of many "other crimes" to help confirm the identification of Muhammad and Malvo as the Montgomery County, Maryland killers. That identification of Muhammad and Malvo as the killers was proved in so many ways that the casting of the slightest shadow on one of the "other crimes" was self-evidently inconsequential in the extreme.

## E.J. Wyndal Gordon, Esq.

 Another witness whom Muhammad was not permitted to call was one of his standby counsel, J. Wyndal Gordon, Esq. Mr. Gordon had no information to offer on the crimes for which Muhammad was being tried or even, for that matter, on any of the "other crimes." His function would have been exclusively to impeach the testimonial credibility of a witness by showing a prior inconsistent statement on the part of that witness pursuant to Maryland Rule 5–613(b).

When Judge Ryan ruled that Muhammad could not call Mr. Gordon as a witness, it was clearly based on his concern to keep an already long protracted trial moving toward resolution and not to allow the case to get "sidetracked" by an issue that was of little consequence.

MR. MUHAMMAD: Your Honor, *may I have permission to call Wyndal,* my other attorney *tomorrow?*

THE COURT: This gentleman? Mr. Gordon, you want to call him as a witness?

MR. MUHAMMAD: As a witness.

THE COURT: *No, sir. We're still trying this case. We're trying this case. We're not getting sidetracked by something else now.* I've dealt with that now and *we're going forward with this trial.*

(Emphasis supplied).

Such a ruling would have been pursuant to Maryland Rule 5–403, which provides:

*Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of* unfair prejudice, *confusion of the issues, or misleading the jury, or* by considerations *of undue delay, waste of time, or needless presentation of cumulative evidence.*

(Emphasis supplied).

We would not be inclined to find that Judge Ryan abused his discretion in making a policy judgment to "keep the trial moving" and not to let the jury be confused by a tangential issue of little consequence. It is not necessary for us to make

such a decision, however, because it behooves us to proceed immediately to the question of harmless error.

The witness whom the prior inconsistent statement would have impeached was not a State's witness, but a defense witness. As his second witness, Muhammad called Maria Rodriguez who, on October 22, 2002, lived near the place where Conrad Johnson was shot and killed. Ms. Rodriguez was from El Salvador, had been in the United States for seven years, and had some difficulty with the English language. Ms. Rodriguez's attention was directed to the morning of October 22, and she was asked if something directed her attention to her window. She replied:

A I heard a gun shot. I heard this gun shot and I, well I was across from this park where the gun shot was heard. Okay. And so I approached the window and I saw a man jump over the bench from the park toward the *apartments.*

Q Was that it? Okay.

A Yes. And that was when the police arrived and they asked me what I had seen and I said, well, I saw him. They asked me how he was and I said he, and so I was asked what he was like and I said, well *he was a tall man. He had on an overcoat and it was dark.* I could see. It was black. And *they said what was he like. I said that he was a man of color.* And that was that.

(Emphasis supplied).

Muhammad sought to clarify what she meant by "a man of color."

BY MR. MUHAMMAD:

Q Ma'am, *was the man that you saw African American?*

A *Yes.*

(Emphasis supplied).

It was that description of the man Ms. Rodriguez saw running as "Afro–American" that Mr. Gordon was prepared to impeach. It was a description that surprised the defense. It was expecting Ms. Rodriguez to say that the man was not

Afro–American. Mr. Gordon had driven Ms. Rodriguez to the court house that morning. Ms. Rodriguez had allegedly told Mr. Gordon unambiguously that the man she saw running was not black.

Assuming that it was not "trumped" by Rule 5–403, Muhammad would have been permitted to impeach Ms. Rodriguez by offering, through Mr. Gordon, extrinsic evidence of her earlier inconsistent statement. Maryland Rule 5–613(b). Muhammad was unexpectedly surprised by her answer and was, again barring Rule 5–403, entitled to negate it. One of the purposes of such impeachment is to explain to the jury what his reason had been for calling a witness who was not helpful to him in the first place.

The statement that Ms. Rodriguez gave to Mr. Gordon, however, was not admissible as substantive evidence. Muhammad's argument that it is admissible as substantive evidence pursuant to Rule 5–802.1(c) as a statement of identification is without merit. A general description of a person observed by a witness is not an "identification" within the contemplation of Rule 5–802.1(c). That subsection deals with the pinpointing of a particular individual, such as picking someone out of a line-up or a photographic array. A description of a person is not an identification, as that term of art is used.

The function of the impeachment, had it been allowed, would have been to negate Ms. Rodriguez's description of the running man as Afro–American. It would not substantively have established the converse, that he was not Afro–American. The net effect would have been that she saw a tall man running and that she said nothing further about whether he was or was not Afro–American. Even, therefore, if there had been a permitted impeachment of Ms. Rodriguez, it would have affected nothing. It would have had no impact at all on the State's case. It would simply have meant that the defense had called an insignificant witness who ended up neither helping nor hurting its case. That's about as inconsequential as it gets.

## The Subcontentions Collectively

Isolated in the vacuum of a single subcontention, an abstract legal principle may appear to be an indispensable part of a defendant's basic constitutional right to present a defense. Viewed, however, in the totality of all of the subcontentions collectively, let alone in the totality of the entire trial, that abstract principle may appear in a very different light. It is the trial judge who, as a direct observer, gets a visceral sense, the "feel," of the totality of the trial.

The larger picture here may well have been that the defense being mounted by Muhammad was simply not gaining any traction. It may have appeared to be spinning its wheels, in the desperate hope that something might work but with no articulable expectation of what that something might be. If Judge Ryan sensed that, realistically, that was what was happening, such a sense would inform his discretion, as he then performed Rule 5–403's delicate balancing of some "probative value," on the one hand, against the risk of "undue delay" and "waste of time," on the other hand, particularly with a jury that had already been in the box for a month. Such discretionary balancing is done with the judge's unique view to the totality of the entire trial. That sort of informed discretion will not be lightly second-guessed on appellate review.

## Contention IV:

## Prior Recorded Testimony

With Muhammad's fourth contention, his arguments begin to drift into the nether world of marginalized significance. Muhammad's fourth contention is that Judge Ryan erroneously allowed the State to introduce into evidence the prior recorded testimony of Dr. Emily Ward from Alabama. On May 15, approximately half way through the trial, the State's case was reaching the point where it began to introduce evidence about the September 21, 2002, murder of Claudine Parker and attempted murder of Kelly Adams in Montgomery, Alabama. One of the witnesses was to have been Dr.

Emily Ward, a medical examiner for the State of Alabama, who performed the autopsy on Claudine Parker. Dr. Ward had been properly served with a subpoena and she had agreed to testify in Maryland. On May 15, however, the Assistant State's Attorney proffered to Judge Ryan that although "we expected [her] to be here,"

Dr. Ward's adult son suffered some type of medical setback. She wouldn't be exactly clear to us. We attached a letter and an e-mail, e-mail correspondence to our motion and she has taken family medical leave from her job. She had to get him, she was trying to find him full-time care placement. She isn't able to work down in Alabama and she's not available to travel up here because of his medical condition. So, she is unavailable as well.

Dr. Ward had previously testified against Muhammad, with respect to the same autopsy, in the capital trial against him in Virginia. She was fully available for cross-examination by him at that trial. In fact, at the Virginia trial Muhammad elected not to cross-examine Dr. Ward. The State moved, on May 15, to be allowed to introduce into evidence Dr. Ward's sworn testimony from the Virginia trial.

Along with its motion, the State introduced several documents, bearing on the diligence of its effort to obtain the live testimony of the witness. The first was an e-mail exchange between Dr. Ward and Paula Slan, the Victim–Witness Coordinator of the Montgomery County States Attorneys Office. On April 25, 2006, Ms. Slan wrote to Dr. Ward.

I want to make sure that you know that you are scheduled to testify in the above case on May 17, 2006, in Montgomery County, Rockville, Maryland. This is a tentative date, and I will continue to keep you informed as we progress with the trial. I'd like to fly you in the night before your testimony and fly you home either the evening of your testimony or the next day. Please confirm you've gotten this notice, and also give me the name of the airport you use to fly out of in your area. Thank you for your cooperation.

Dr. Ward responded on the next day.

I have tried to call you, but whenever I get a free moment, it is always after hours. I have had to take Family Medical Leave because of a critical problem with my adult son. I am *most likely* not going to be able to travel in May. Even if I find residential placement for him before then, I have a subpoena to be at a hearing in Nashville on the 17th at 1:00. Please call our personnel director, Evonne Benford, at the Auburn office if you need clarification. I can't talk with you today because I have two doctor's appointments and will be tied up most of the day. I am very sorry, but I don't have anyone to help me with my son and he can't be left alone. Emily Ward.

The second attached document was a letter to Vivek Chopra, the prosecutor, from F. Taylor Noggle, Jr., the Director of the Alabama Department of Forensic Sciences.

Reference Dr. Emily Ward, who is a full-time Medical Examiner for the Alabama Department of Forensics, regarding her inability to appear in the Montgomery County Maryland court on May 17, 2006, the following issues are presented: Dr. Ward has a dependent son who requires constant medical attention which prohibits any overnight absences for travel until a resolution is obtained. She has Family Medical Leave Act rights to include twelve (12) weeks of leave to take care of a family member which she is presently using. If further assistance is required, please contact Evonne Copeland, Personnel Manager.

Judge Ryan ruled that Dr. Ward's prior recorded testimony would be received in evidence. Muhammad now contends that the State did not make an adequate showing of unavailability. The admissibility of former testimony is governed by Maryland Rule 5–804(b)(1), which provides in pertinent part:

(b) Hearsay exceptions. *The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:*

(1) *Former testimony. Testimony given as a witness in any action* or proceeding or in a deposition taken in compliance with law in the course of any action or proceeding, *if*

*the party against whom the testimony is now offered,* or, in a civil action or proceeding, a predecessor in interest, *had an opportunity* and similar motive *to develop the testimony by* direct, cross, or redirect *examination.*

(Emphasis supplied).

The requisite unavailability of a witness, in turn, is controlled by subsection (a)(5) of the same rule, which provides in pertinent part:

(a) Definition of unavailability. *"Unavailability* as a witness" *includes situations in which the declarant:*

(5) *is absent* from the hearing *and the proponent of the statement has been unable to procure the declarant's attendance* . . . by process or other *reasonable means.*

(Emphasis supplied).

### The Threshold of Preservation

■■■ The State initially claims that this contention is not preserved because essentially everything that Dr. Ward testified to through the introduction of her former testimony came into evidence independently from other sources without objection. See *Williams v. State,* 131 Md.App. 1, 24–28, 748 A.2d 1, *cert. denied,* 359 Md. 335, 753 A.2d 1032 (2000), and the cases therein collected. In her recorded testimony, Dr. Ward described the "snowstorm effect" from the small fragments of metal that disintegrated as the bullet passed through the body. She identified the fragments removed from Claudine Parker's body and testified that Claudine Parker "died as a result of a gunshot wound of the back."

Dr. Ward's autopsy report, however, also came into evidence but without objection. The autopsy report itself listed the cause of Claudine Parker's death and described the seven bullet fragments that were recovered from the wound track. The only thing missing was the phrase "snowstorm effect." The sole value of the phrase "snowstorm effect," however, was to provide the predicate for an inference that the bullet producing such an effect was fired from a high velocity rifle. That, in turn, was just the predicate for the inference that it

was fired from Muhammad's Bushmaster rifle. Walter Dandridge, an ATF firearms examiner, also testified without objection. He examined the bullet fragments from Claudine Parker and determined that they had been fired from the high velocity Bushmaster rifle recovered from Muhammad's Chevrolet Caprice on October 24. At that point, the inferences were redundant.

In addition to the evidence referred to above, which was not objected to and which in and of itself would be dispositive in the State's favor on its non-preservation claim, Muhammad and Malvo had, on October 18, 2002, called Father William Sullivan in Ashland, Virginia, and told him to inform the police that the ballistics evidence from the Montgomery, Alabama, shootings would show that the same gun was being used in the sniper shootings in the Washington, D.C. area. We agree with the State that this contention is not preserved.

### No Merit to the Contention, Even If Preserved

■ Even if, however, this contention were, *arguendo*, preserved for appellate review, it would still not fare well on the merits. In addition to Maryland Rule 5–804 itself, the law that is absolutely dispositive on this issue is the opinion of the Court of Appeals in *State v. Breeden*, 333 Md. 212, 634 A.2d 464 (1993). Its analysis began by quoting with approval from the opinion of the Supreme Court in *Barber v. Page*, 390 U.S. 719, 722, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968):

> "[T]here has traditionally been *an exception* to the confrontation requirement *where a witness is unavailable and has given testimony at previous judicial proceedings against the same defendant* which was *subject to cross-examination* by that defendant."

333 Md. at 220, 634 A.2d 464 (emphasis supplied).

*Breeden* went on to discuss what is involved in proving unavailability.

In a nutshell, the "unavailability" of a material witness includes one who is absent from a trial and the proponent of the statement of the witness has been unable to procure the

witness's attendance by process or other reasonable means. *"Other reasonable means" require efforts in good faith and due diligence to procure attendance.*

*Id.* at 222, 634 A.2d 464 (emphasis supplied).

 Although the State bears the initial burden of showing diligence and good faith in its effort to obtain the missing witness, *id.* at 221, 634 A.2d 464, the trial judge's ultimate determination that the witness is, indeed, unavailable and that the rule has therefore been satisfied is subject to review by the abuse of discretion standard. *Id.* at 215–16, 634 A.2d 464; *Cross v. State,* 144 Md.App. 77, 88, 796 A.2d 145, *cert. denied,* 369 Md. 180, 798 A.2d 552 (2002).

Muhammad now suggests, for the first time on appeal, that additional steps might have been taken to procure the attendance of Dr. Ward. The Supreme Court reminded us, however, in *Ohio v. Roberts,* 448 U.S. 56, 75, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), "One, in hindsight, may always think of other things," as it held that the prosecution did not breach its duty of good-faith even though additional steps might have been taken to locate missing witnesses. In *Coleman v. State,* 49 Md.App. 210, 226–27, 431 A.2d 696 (1981), this Court spoke to the same effect.

*Although* it is undeniable that *those additional sources of information* suggested *may have proved fruitful* and perhaps should have been pursued for the sake of completeness, we cannot say that their omission was fatal under the circumstances. We think that *the efforts actually undertaken by the State* to locate [the witness] for trial *demonstrated diligence and good faith* on its part sufficient for the trial judge to properly conclude that [he] was "unavailable."

(Emphasis supplied).

We hold that Judge Ryan did not abuse his discretion in ruling that the State could use the prior recorded testimony of Dr. Ward.

## Harmless Error in Any Event

Even if, *arguendo*, Judge Ryan had been in error in permitting the State to introduce the prior recorded testimony of Dr. Ward, we cannot imagine any error that could have been more harmless than this. Once the autopsy report itself was in evidence and once the ATF firearms examiner had given his ballistics report, Dr. Ward's prior testimony from Virginia added absolutely nothing to the State's case. We are not merely persuaded that such an assumed error would have been harmless beyond a reasonable doubt, we are so persuaded to a mathematical certainty.

## Contention V:

## Removal In a Non–Capital Case

Muhammad has reveled in being a celebrity, except when it comes to his fifth contention. He claims that Judge Ryan committed error when he failed to remove the trial from Montgomery County. Because this was not a capital case, there was no automatic right of removal. Maryland Constitution, Article IV, § 8(b); Maryland Rule 4–254(b). In terms of when removal is called for in a non-capital case, the constitutional provision of Article IV, § 8(c) is fully implemented by Maryland Rule 4–254(b)(2), which provides in pertinent part:

> Non-capital cases. When a defendant is not eligible for the death penalty and either party files a suggestion under oath that the party cannot have a fair and impartial trial in the court in which the action is pending, the court shall order that the action be transferred for trial to another court having jurisdiction only if the court is satisfied that the suggestion is true or that there is reasonable ground for it.

On April 28, 2006, Muhammad requested that his trial be removed to another county for trial. Judge Ryan denied the request.[6] The standard by which we review such a decision is

---

6. We are not considering Muhammad's subsequent motion of May 4 asking Judge Ryan to reconsider his ruling of April 28. If Judge Ryan

clear. In *Garland v. State*, 34 Md.App. 258, 260, 367 A.2d 30 (1976), this Court stated:

> This case involved non-capital charges and therefore *the decision on removal rested in the sound discretion of the trial judge* and will not be reversed absent a showing that that discretion was abused.

(Emphasis supplied). See also *Pantazes v. State*, 376 Md. 661, 675, 831 A.2d 432 (2003); *Shreffler v. Morris*, 262 Md. 161, 170, 277 A.2d 62 (1971); *Smith v. State*, 51 Md.App. 408, 415, 443 A.2d 985, *cert. denied*, 293 Md. 618 (1982); *Simms v. State*, 49 Md.App. 515, 518, 433 A.2d 1199 (1981).

### The Threshold of Preservation

■ The State argues that the merits of removal are not properly before us in that the defense waived any entitlement to seek removal. We agree. Muhammad's request of April 28 cannot be viewed in a vacuum. It had a very significant prehistory. Until he was permitted to discharge his counsel on March 29, 2006, Muhammad was represented by two very able attorneys. By agreement of the court and both parties, November 7, 2005 was set as the "filing date for all motions." No request for removal was forthcoming. Judge Ryan held an omnibus hearing on March 6, 2006, to dispose of all pending pretrial motions. Defense counsel confirmed at that time that the defense would not be requesting a removal of the case.

> MS. WINFREE [Prosecuting Attorney]: The last issue, is it the last one, is that *we have been advised by the Defense that there will not be a motion for change of venue.*
>
> THE COURT: Okay.
>
> MS. WINFREE: Just so for our planning purposes.
>
> THE COURT: We agreed with that.

(Emphasis supplied).

One of Muhammad's failings as a *pro se* attorney was his difficulty in appreciating that the day on which he became his

---

was not in error on April 28, he was not in error for declining to reconsider that ruling on May 4.

own attorney, March 29, 2006, was not Day One of the proceedings. On that day he simply became the successor to other attorneys who had represented him before. There was a significant, and binding, procedural history to the case before he came to represent himself, and he could not ignore that procedural history.

At a subsequent status conference on March 31, Muhammad placed his stamp of approval on actions earlier agreed to by his former lawyers and the State. Pursuant to that agreement, letters were sent to 1000 prospective jurors, asking them to respond in writing if they had legitimate reasons that would prevent them from serving on what could be a five-week trial. Counsel for both parties surveyed the responses, which were then submitted to the Jury Commissioner.

When Muhammad was permitted to discharge his former counsel on March 29, he requested the appointment of standby counsel. As of April 24, three attorneys had agreed to serve in that capacity. Muhammad was introduced to his three standby attorneys on that day. With them present and with the assistance of the Jury Commissioner, Judge Ryan explained to Muhammad the jury selection process and discussed with him the proposed voir dire questions that would be asked. At that point, the trial was scheduled to begin one week later, on Monday, May 1. Everything appeared to be moving along on schedule.

It was at the status conference on Friday, April 28, with trial scheduled to begin on Monday, that Muhammad made known his unanticipated change of heart with respect to removal. Judge Ryan's basic reason for denying Muhammad's eleventh-hour request was that it was untimely, as indeed it was.

THE COURT: Well, one it is untimely. Two, Mr. Muhammad, earlier in this proceeding, I forget which one, but Mr. DeWolfe and Mr. Shefferman, one of them specifically stated on this record that there wasn't going to be a request for removal. But that's okay, and now you're asking for it

and I understand that, but I'm going to deny your request to remove the case.

It is a least debatable whether Muhammad's response, "I understand what you're saying, Your Honor. Your Honor, is it possible we could make the motion part of the record?" adequately preserved this issue for appellate review. We will, however, treat it as adequate preservation. We hold that Judge Ryan did not abuse his discretion in ruling as he did.

## Hypothetically, The Merits

If the merits were before us, the appellant would fare no better. After denying Muhammad's motion as untimely, Judge Ryan presaged the screening process that would follow:

> I believe we're going to find, we're going to find jurors who will be fair and impartial to try the case. I know there's been a lot of publicity, and we're going to go into that as when we start questioning the individual jurors, what they know and what they believe and have they formed an opinion that is unchangeable or not. This is a big community. If this was a smaller community, you would be more likely to have your case removed, but there's almost a million people who live in this community, and we're going to get a lot of people from different backgrounds. We're going to find people in this county who can be fair and impartial and will be fair and impartial who will base their decision in your case solely upon the evidence they hear in the courtroom and without regard to what they've read about it, heard about it, seen. We're going to find impartial people.

The very thorough voir dire examination of the prospective jurors took four trial days. After the jury was selected and the case had begun, Judge Ryan took up Muhammad's earlier motion that he reconsider his ruling on removal, along with another motion to dismiss the jury as tainted. He observed with respect to the jurors who had ultimately been chosen to sit:

I believe each of the jurors was questioned carefully. Each juror has told us, and each juror was under oath, that they would be able to decide this case based only on the evidence received in the courtroom without regard to whatever they heard or read about in this case outside of the courtroom. And I believe them.

At the end of the four-day selection process, Muhammad accepted the jury panel. At that point, he still had peremptory strikes available, but he expressly confirmed that he had no wish to exercise those strikes. Asked if he was satisfied with the jury as empaneled, he replied, "Yes, Your Honor." Cf. *Gilchrist v. State*, 340 Md. 606, 617, 667 A.2d 876 (1995); *Berry v. State*, 155 Md.App. 144, 159, 843 A.2d 93 (2004). He then accepted four alternates without exercising any of his four remaining strikes. The jury was then sworn.

Muhammad makes no argument that any of the jurors who heard his case was not capable of rendering a fair and impartial judgment on the evidence. His argument, instead, is an undifferentiated jeremiad about the pretrial publicity in this case generally. There had, indeed, been massive publicity about the October, 2002, crime spree, but three and one-half years had gone by.

Muhammad also conveniently ignores the fact that the massive press, television, and radio coverage of the crime spree and its aftermath was nationwide. That includes all parts of Maryland, and, had a removal been granted, it would have to have been to some place in Maryland. Ironically, Muhammad's argument refers to "the numerous articles from the *Washington Post* and *Baltimore Sun.*" After eliminating those areas covered by the *Post* and the *Sun,* what part of Maryland is left?

With respect to widespread press coverage, moreover, *Simms v. State*, 49 Md.App. 515, 520, 433 A.2d 1199 (1981), quotes with approval from the decision of the Supreme Court in *Irvin v. Dowd*, 366 U.S. 717, 722–23, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961).

> *It is not required,* however, *that the jurors be totally ignorant of the facts and issues involved.* In these days of swift, widespread and diverse methods of communication, *an important case can be expected to arouse the interest of the public* in the vicinity, and *scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion* as to the merits of the case. This is particularly true in criminal cases. *To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused,* without more, *is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can* lay aside his impression or opinion and *render* a *verdict based on the evidence presented in court.*

(Emphasis supplied).

The only particularization of the inadequacy of the process that Muhammad provides is to point to a single prospective juror, No. 116, who was not stricken for cause notwithstanding the fact that she at one point expressed "grave reservations" about whether she could be fair and impartial. Although her ultimate conclusion was that she could be fair and impartial, that prospective juror did not sit as a juror or as an alternate and Muhammad did not have to use one of his peremptory strikes to remove her.

Even if, *arguendo,* Muhammad's motion for a removal of his trial had been timely filed, he failed to make a case for it on the merits.

### Hypothetically, Harmless Error

Even if, *arguendo,* there had been error in denying Muhammad's motion to remove his trial, we are persuaded beyond reasonable doubt that it would have been harmless. The result would have been the same wherever in Maryland this case had been tried. The problem of pretrial publicity was universal from Oakland to Snow Hill, and no jurisdiction could have handled that problem more deftly than did Montgomery County.

## Contention VI:

## Probing a Venire Panel

Muhammad's sixth contention is that Judge Ryan erroneously declined to question specifically three members of a venire panel about a potentially damaging conversation overheard and reported by one member of the panel. The stage for this contention must be set. The prospective jurors were divided into three contingents for voir dire processing. Jurors 1 through 100 were to remain in the court house on the first day of trial, May 1. Jurors 101 through 250 were to return to the court house on the following day, May 2. Jurors 251 through 403 were to report on May 3. The present contention concerns only the jurors in the first contingent, those who remained in the court house on May 1.

On each of the three days of voir dire, one-half of the reporting jurors would remain in the fourth floor jury room while the other half would report to the courtroom to be examined. On the first day, Prospective Juror #50 was called to the bench and, at the conclusion of her voir dire, reported the following to Judge Ryan:

JUROR NO. 50: When I was in the 4th Floor room, there was a group of four people who I heard in conversation. They were talking about this case and the two Virginia cases, and [someone] said something along the lines of, "I don't know why we're here, twenty minutes and guilty, let's get this over with." And, I just was concerned to hear that conversation and wanted to bring it to the Court's attention. I don't know who—

THE COURT: Do you know—you don't know their numbers.

JUROR NO. 50: I know one of them, who's actually in the room out there, was No. 59. I don't know what she said in that conversation, but she was in that group, and the other three women were not in the group that was called up with us. So, they haven't been up here yet. So, I don't know what numbers they were.

At Muhammad's suggestion, Judge Ryan then called Prospective Juror # 59 out of order.

THE COURT: Okay. So, you have not formed an opinion.

JUROR NO. 59: (No response.)

THE COURT: That's a no.

JUROR NO. 59: No. I haven't heard all the evidence, I mean, I've seen things on television, but—

THE COURT: Now, ma'am, a previous juror who came into the courtroom told us that you were overheard upstairs on the fourth floor talking about this case.

JUROR NO. 59: Oh.

THE COURT: Is that correct?

JUROR NO. 59: It was a bunch of people talking.

THE COURT: And, what were their numbers? Do you know?

JUROR NO. 59: I don't know their numbers.

THE COURT: And, that there was some discussion about "Why is this case even being tried? It's open and shut. Take twenty minutes, it's over."

JUROR NO. 59: No, I didn't say that.

THE COURT: No. I'm not saying you did, but that was the—

JUROR NO. 59: Oh.

THE COURT: That was the nature of the discussion. Did you hear that?

JUROR NO. 59: Yes.

THE COURT: And, would that conversation affect you and your ability to be impartial in this case?

JUROR NO. 59: Yes, I'd be very impartial.

THE COURT: And, you're telling me you weren't part of that conversation, but you heard it.

JUROR NO. 59: I heard it.

Judge Ryan asked Prospective Juror # 59, "Do you believe that the defendant should not be found guilty of these charges

unless the prosecution proves his guilt beyond a reasonable doubt?" The prospective juror responded, "Well, maybe—I don't know with all that I've heard." Judge Ryan then struck Prospective Juror # 59 for cause.

The issue then became that of what to do about possible further contamination. Muhammad asked that Prospective Juror # 59 be held in the courtroom so that she could identify the faces of those who had participated in that conversation even if she did not know their numbers. Judge Ryan declined to conduct that sort of an investigation, insisting that he would conduct an extensive examination of each prospective juror individually in order to search out possible bias. Judge Ryan stated, "I'm going to rely on the people to tell me the truth, and I have to do that. I'm not going to stop and do an investigation of this. No, sir."

Judge Ryan declined to grant Muhammad's motion to strike all of the jurors who had reported on May 1. He stated that all prospective jurors would be asked "pointed questions about what they've heard by talking and listening and reading." Judge Ryan continued with the voir dire. The next ten prospective jurors after Prospective Juror # 59 were struck for cause.

In advance of the voir dire examination, cards had been distributed to the prospective jurors posing a number of questions. The prospective jurors checked boxes indicating "yes" or "no." The cards were collected and were in the hands of the judge as each prospective juror was summoned to the bench for individual questioning. At one point Muhammad moved to have Judge Ryan strike "in advance" any prospective juror who had acknowledged a "preconceived" opinion regarding his guilt. Judge Ryan declined to do so, explaining, "It's why we have the individual voir dire. So we can talk to people and figure out what they really mean."

Muhammad's literal contention is that Judge Ryan erroneously refused to question the respective jurors about the overhead conversation, a fact that he alleges would reveal cause for disqualification. Muhammad, however, never re-

quested that all members of the May 1 venire panel be so questioned. Near the end of the May 1 voir dire, Muhammad's literal request was that prospective jurors # 65, # 65A, and # 72 be so questioned. The contention that Muhammad now raises, therefore, is only preserved for appellate review with respect to prospective jurors # 65, # 65 A., and # 72. Maryland Rule 8 –131(a); *Taylor v. State*, 381 Md. 602, 612–16, 626–27, 851 A.2d 551 (2004); *State v. Brown*, 324 Md. 532, 547–48, 597 A.2d 978 (1991). Judge Ryan declined to ask these three jurors specifically, about that conversation, but examined them thoroughly about their ability to be fair and impartial. The examination of Prospective Juror # 65 is representative of the three inquiries.

THE COURT: Okay. Now, let me ask you another question, you've also told us that you have formed an opinion—

JUROR NO. 65: Yes.

THE COURT: About the guilt or innocence o f Mr. Muhammad. Is that correct?

JUROR NO. 65: Yes.

THE COURT: And, is that based on what you've read about or heard about?

JUROR NO. 65: Yes.

THE COURT: Do you have any personal knowledge of any of the facts in this case?

JUROR NO. 65: No.

THE COURT: So, it's based on what you know about it or heard about it or talked about?

JUROR NO. 65: Right.

THE COURT: Well, most everyone who's come in has said the same thing. They've heard about it.

JUROR NO. 65: Right.

THE COURT: So, what we're asking people is this, can you set that aside and can you be open-minded, impartial and not make a decision until you hear the evidence presented in the courtroom in this case? Can you do—

JUROR NO. 65: I probably—I probably can.

THE COURT: You can?

JUROR NO. 65: Um-hum.

THE COURT: And, you understand that the prosecution has the burden of proof. They have to prove guilt beyond a reasonable doubt.

JUROR NO. 65: Yes.

THE COURT: Excuse me. And, the defendant cannot be found guilty unless the evidence is beyond a reasonable doubt—

JUROR NO. 65: Right.

THE COURT: As a matter of fact, if it isn't beyond a reasonable doubt, the defendant would be found not guilty.

JUROR NO. 65: Um-hum.

THE COURT: Understand that?

JUROR NO. 65: I do.

THE COURT: And, also that a defendant, such as Mr. Muhammad, is presumed to be innocent—

JUROR NO. 65: Um-hum.

THE COURT: Of the charges placed against him.

JUROR NO. 65: Right.

THE COURT: And that this presumption remains with him through out every stage of the case until it's overcome, if it is overcome, by the prosecution's proof.

JUROR NO. 65: Right.

THE COURT: And that the defendant has no obligation to prove his innocence. Do you understand that?

JUROR NO. 65: Right.

THE COURT: And, you believe that an innocent person can be charged with a crime, don't you?

JUROR NO. 65: I do, I do.

The examination of Prospective Juror # 65A was essentially indistinguishable. Prospective Juror # 72 was questioned in a similar manner. When asked whether he had talked about the case generally with other members of the venire, he replied, "I

have heard some people talking. In conversations I've had with other prospective jurors, we stayed off the subject of any particulars about the case."

We see no error in Judge Ryan's declining to question those three prospective jurors more specifically about the reported conversation. "[T]he voir dire process is designed to ferret out grounds for juror disqualification, and give substance to the constitutional guarantees to criminal defendants of a fair and impartial jury trial." *Owens v. State,* 170 Md.App. 35, 71–72, 906 A.2d 989 (2006), affirmed, 399 Md. 388, 924 A.2d 1072 (2007). Except for certain mandatory questions not at issue here, decisions about the extent of the voir dire procedure, as well as specific questions to be asked on voir dire, fall squarely within the discretionary range of the trial judge. *Stewart v. State,* 399 Md. 146, 159–61, 923 A.2d 44 (2007); *State v. Logan,* 394 Md. 378, 396, 906 A.2d 374 (2006); *Curtin v. State,* 393 Md. 593, 599–603, 903 A.2d 922 (2006); *White v. State,* 374 Md. 232, 241, 821 A.2d 459 (2003); *Perry v. State,* 344 Md. 204, 218, 686 A.2d 274 (1996); *Boyd v. State,* 341 Md. 431, 436, 671 A.2d 33 (1996); *Davis v. State,* 333 Md. 27, 34–35, 633 A.2d 867 (1993).

The individualized screening for bias in this case was meticulously thorough. On the preliminary screening in writing, each prospective juror was given 32 questions to answer by checking "yes" or "no." Among them were the following:

[Question two]: "There's been a great deal of media attention focused on the investigation of the shootings and the arrest of the defendant and his codefendant. Has anyone in the prospective jury panel already formed an opinion about the guilt or innocence of the defendant, or about any fact or issue to be decided in this case?"

\* \* \*

[Question eight]: "During the trial I will instruct you as to the law applicable to the facts of this case. Is there any member of the prospective jury panel who would be unable to base a decision on the evidence presented in court, solely

on the evidence presented in court, as instructed by me, without any regard to pity, anger, sympathy, or any other emotion?"

\* \* \*

[Question nine]: "Is there any ... member of the prospective jury panel who would be unable to base a verdict solely on the evidence presented in the courtroom and the law instructed by me, without regard to anything else they believe they know about this case?"

\* \* \*

[Question ten]: "Is there any member of the prospective jury panel who would be unable to base their verdict solely on the evidence presented in the courtroom and the law as I tell you it is, without regard to anything you may have learned in the media about the case, or the defendant's alleged role in it?"

\* \* \*

[Question eleven]: "The defendant is presumed to be innocent of the charges placed against him. This presumption of innocence remains with the defendant throughout every stage of the trial. The presumption of innocence is not overcome unless the State proves guilt beyond a reasonable doubt. The defendant has no obligation to prove his innocence.... Is there any member of the prospective jury panel who has difficulty accepting these concepts?

\* \* \*

[Question nineteen]: "[I]'s there anyone who harbors feelings that would bias you in favor of the prosecution?"

Each prospective juror was ultimately questioned individually at the bench, in the presence of Muhammad and the prosecutors, so that his or her answers could be explored in more depth and his or her credibility evaluated. In response to the voir dire, many prospective jurors indicated that they

had formed an opinion which they could not put aside. All of those persons were struck for cause. Every prospective juror who was cleared for service, on the other hand, had declared under oath that he or she "would be able to decide this case based only on the evidence received in the courtroom without regard to whatever they had heard or read about in this case outside of the courtroom." Judge Ryan found as a fact that those jurors were qualified to serve. *Dingle v. State,* 361 Md. 1, 15–19, 759 A.2d 819 (2000). His findings in that regard were not clearly erroneous.

There is, we note, no complaint about the screening of the venire panels that appeared on May 2 and May 3. At the end of the entire voir dire process, Muhammad accepted the jury as empaneled. See cf. *Gilchrist v. State,* 340 Md. 606, 617–18, 667 A.2d 876 (1995); *Berry v. State,* 155 Md.App. 144, 159, 843 A.2d 93, *cert. denied,* 381 Md. 674–77, 851 A.2d 594–95 (2004). As noted, Muhammad had not exhausted his peremptory challenges.

On the merits, we hold that Judge Ryan did not abuse his discretion and committed no error in screening the venire panel for possible bias.

### A "Slam Dunk" of an Alternative Holding

In terms of the total absence of any possible harm, the State is holding a pat hand. Even if, purely *arguendo,* Judge Ryan was in error in not pressing prospective jurors # 65, # 65A, and # 72 more closely and more specifically about whether they overheard the conversation reported by Prospective Juror # 50, we would be convinced beyond any reasonable doubt that such hypothesized error was harmless. Prospective jurors # 65, # 65A, and # 72 did not sit on the jury that heard the case. Neither was any one of them an alternate.

### Contention VII:

### A Journey Into Immateriality

Muhammad's seventh contention comes out of deep left field. It is difficult to state the contention because it is

difficult to comprehend the contention. On the next to last day of trial, Muhammad called as a defense witness Officer Ralph Daigneau of the Prince William County, Virginia, Police Department. At the outset of the trial, the State had received the permission of the court, as an exception to the sequestration rule, to keep Officer Daigneau in the courtroom throughout the trial because he was the person who had assisted in organizing the mass of State's evidence and who could locate and produce a particular piece of evidence whenever it was called for.

On the actual merits of the case, Muhammad briefly questioned Officer Daigneau about an investigation that took place after the shooting of Dean Meyers in Virginia, on October 9, 2002. Pursuant to an anonymous tip, Officer Daigneau and others searched a residence in Virginia on October 13, 2002, and recovered a cache of guns and ammunition. It turned out, however, to be a false trail, as the residents of the searched premises were absolutely eliminated as suspects in the Dean Meyers murder.

The examination of Officer Daigneau that is now the heart of this contention, however, concerned his other role, at trial, as the custodian and the monitor of the location of the various items of physical evidence. Muhammad sought to develop, through Officer Daigneau, that the State had not complied with its discovery obligations. The allegation gets a little bit murkier. The Assistant State's Attorney had represented to the court, back on April 6, that all of the evidence had been fully available for inspection by Muhammad's then counsel and that counsel inspected or received copies of everything that was of interest to them. In a free-wheeling attack, Muhammad did not allege that his counsel had not received all the discovery that was due, but that he, personally, had not received complete discovery. In his brief, he continues to try to separate himself from his former counsel, as he argues that "what defense counsel thought important was not necessarily what Mr. Muhammad thought important to his defense."

In a rambling direct examination of Officer Daigneau, Muhammad effectively insinuated that the State had not fully complied with its discovery obligation. Muhammad's questions alone raised that specter.

Q [MUHAMMAD] Sir, to your knowledge do I have anything that the State did not give me pertaining to the sniper investigation?

Q Okay. Sir, you do know what discovery is don't you?

Q Sir, do you have any knowledge of your own personal knowledge that John Allen Muhammad['s] former attorneys gave him these videos that the prosecutor just got finished talking about about the surveillance taping and the 911 taping? Do you have any knowledge of your own personal knowledge?

Q Okay. Do you have any personal knowledge, okay, that my former attorney ever retrieved any of that evidence from the prosecutor?

Q Okay. Sir, are you aware that I asked for this specific evidence from the prosecutor and they refused to give it to me? Are you aware of that?

Judge Ryan attempted to point out to Muhammad the fact that his questioning really amounted to testifying.

THE COURT: See, here's the problem. You asked the witness isn't it true that I asked for something and I didn't get it. Now, that's not really a question.

In any event, the State, arguably overly sensitive to Muhammad's journey into immateriality, sought, in its cross-examination of Officer Daigneau, to show that it had complied with its discovery obligations. Muhammad, although he now complains about a number of questions on cross-examination, actually objected to just one of them. *Berry v. State*, 155 Md.App. 144, 172, 843 A.2d 93 (2004); *Fowlkes v. State*, 117 Md.App. 573, 588, 701 A.2d 862 (1997), *cert. denied*, 348 Md. 523, 704 A.2d 1244 (1998).

Q. And you're aware that every single piece of evidence in possession in the State has been produced and made available to the Defense in this case?

MR. MUHAMMAD: I object, Your Honor.

THE COURT: Overruled.

THE WITNESS: That's been what's represented to me, yes.

Muhammad's questions on redirect examination continued to harp on the State's discovery obligation.

Q Sir, do you have any knowledge of your own personal knowledge that John Allen Muhammad former attorneys gave him these videos that the prosecutor just got finished talking about about the surveillance taping and the 911 taping? Do you have any knowledge of your own personal knowledge?

Q Okay. Do you have any personal knowledge, okay, that my former attorney ever retrieved any of that evidence from the prosecutor?

Q Okay. Sir, are you aware that I asked for this specific evidence from the prosecutor and they refused to give it to me? Are they aware of that?

Q Okay, sir, aren't you also aware that I've asked the prosecutor for all of the 911 tapes that they have and they have not given me one? Aren't you aware of that?

Q Are you aware that I've asked the prosecutor for the 911 taping?

Q Are you aware that I've asked the prosecutor for the 911 transcripts?

At the end of Officer Daigneau's examination, Judge Ryan, who had presided over the entire discovery process pretrial, at first expressed his understandable exasperation with the very raising of the issue.

THE COURT: I'm talking. I'm trying to make sense out of what's going on here. *And no time during the time you were represented did your attorneys indicate that they had been unable to obtain discoverable information.* At the time you discharged your attorneys and decided, chose to represent yourself *I told you then that you were bound by the discovery that had been provided by the State and you*

*understood that.* And then we went through a period, a short period, of what you had and what you didn't have and your access to the computer and you wanted a printer and the CDs and it has all been provided to you. And *you stated on the record you were satisfied with what you had received.*

(Emphasis supplied).

He further concluded that although the entire issue was, indeed, immaterial, it had arguably raised some question as to prosecutorial impropriety in the minds of the jurors.

THE COURT: Okay, well, that's the end of it. And *whatever happened between you and your lawyers is between them.* But *it is important for the people who are listening to all this evidence* and have to weigh it and evaluate it *to know that there has been no funny business, that all the information that the Defense was entitled to has been provided and made available.*

. . . .

THE COURT: Okay, I'm not going to try to go any further. I mean I *believe it is important* based on the types of questions that are being asked to *tell the jury that under our System the State is required to provide information to the Defense that has been provided in complete compliance with the rules.*

(Emphasis supplied).

Accordingly, Judge Ryan, pursuant to Maryland Rule 4–325(a), instructed the jury as follows:

Now, ladies and gentlemen, you've heard some discussion in this trial about discovery and material. Under our system of rules in criminal justice, *the prosecutor has an obligation to provide information, all the information it has about the investigation in the case to the Defense.* And there are rules that require that. *And the State has complied with all of the rules of discovery. All the information that's relevant and that they are obligated to have provided was provided to the Defense.*

(Emphasis supplied). Muhammad lodged no objection to the instruction. Maryland Rule 4–325(e); *Sims v. State,* 319 Md. 540, 549, 573 A.2d 1317 (1990); *Martin v. State,* 174 Md.App. 510, 520, 922 A.2d 598 (2007).

■■■ To one limited extent we agree with Muhammad's contention as it asserts, "[w]hether or not all rules of discovery have been complied with is an issue for the judge to make pretrial. It is not an issue for the jury to pass on." That is absolutely correct, and that is why what happened on this issue is absolutely immaterial. Muhammad does not bring us a contention alleging a discovery violation. Any issues involving discovery were settled pretrial, as they should have been, by Judge Ryan. Nor does the appellant bring us a contention alleging the incompetence of counsel, based on the adequacy of communication between Muhammad and his former lawyers.

Muhammad alleges a trial error. Whether discovery requirements are complied with or are violated, however, has nothing to do with the merits of guilt or innocence and is not in any way a jury question. The only possible error in this case, but definitely not a trial error, may have been an overly indulgent error in judgment in allowing Muhammad to waste an hour of everybody's time in chasing a will-o'-the-wisp down an immaterial and dead-ended tangent. The trial was simply off the tracks for sixty minutes. For all the difference it made to them, the jurors could have left the courtroom and no damage would have been done.

Once, however, this immaterial issue of discovery was, for better or for worse, out on the table, we see no impropriety in how the State responded to it and no error in how Judge Ryan handled it. There was no error.

### It Would Not Have Made Any Difference If There Had Been

Even if, *arguendo,* there had been error in this regard, it self-evidently had no adverse influence on the verdicts of the jury. Whatever was done, rightly or wrongly, with respect to

discovery was none of the jury's business. Realistically, moreover, the jury could not care less about it. The jury does not supervise or regulate the behavior of the parties to the case. From the jury's point of view, discovery, "whatever that means," is some administrative detail that is the responsibility of somebody else and is, in any event, all settled before the jury begins its own distinct job of searching for the factual truth. This false alarm did not influence the jury's verdicts.

## Contention VIII:

### A Stealth Contention

In his eighth contention, Muhammad now claims that Judge Ryan erroneously denied him his Sixth Amendment right to confront one of his accusers when Judge Ryan declined to let him conduct a re-cross-examination of Lee Malvo. It is a stealth contention. The entire issue that the appellant now presents so prominently on appeal lay so thoroughly hidden and so deeply buried in the trial record that only the most creative of legal paleontologists could have dug it up.

At the pretrial hearing on March 6, 2006, the State prevailed on Judge Ryan to permit the introduction of "other crimes" evidence to help to prove, *inter alia*, the identity of Muhammad as one of the shooters in the Montgomery County cases on trial. As part of that "other crimes" evidence, the State did show at trial a murder in Washington, D.C.; an attempted murder in Prince George's County; a murder and an attempted murder in Montgomery, Alabama; and five murders or attempted murders in four separate Virginia counties. At the pretrial motions hearing, however, the State had received permission to introduce evidence of yet another "other crime," one occurring in Clinton, Maryland on September 5, 2002. The allegation was:

On September 5, 2002, in Clinton, Maryland, Paul J. LaRuffa ("LaRuffa") was shot and robbed outside of Margellina's Restaurant, an establishment he owns. He was shot five times with a .22 caliber revolver. His Sony laptop and a briefcase containing bank deposit bags and $3,500 in cash

was stolen. The Sony laptop was found in the Caprice with the Defendant on the day of his arrest. Additionally, six weeks after the robbery, the briefcase and empty bank deposit bags were found along with some clothing about a mile from the LaRuffa shooting; this clothing yielded Malvo's DNA.

In its discretion, however, the State, at trial, decided not to use evidence of that shooting in Clinton. During the State's direct examination of Lee Malvo, no reference to the Clinton shooting was made. It was only during the cross-examination of Malvo that Muhammad himself first raised the subject of the September 5, 2002 crime.

> [MR. MUHAMMAD:] Are you aware of who Mr. Paul LaRuffa is?
>
> [MR. MALVO:] Yes.
>
> [MR. MUHAMMAD:] Okay. *Can you tell me* what time his, what *date his computer was allegedly taken* from here?
>
> [MR. MALVO:] What date?
>
> [MR. MU HAM MAD:] Yeah, What day?
>
> [MR. MALVO:] I knew it was in early September, I cannot tell you the exact date.
>
> [MR. MUHAMMAD:] Okay. *Are you aware the date was September 5th '02?*
>
> [MR. MALVO:] I'm not aware of the day.
>
> [MR. MUHAMMAD:] Okay. Was his information known to you in your first trial?
>
> [MR. MALVO:] Yes.

(Emphasis supplied).

The subject of a computer taken from Paul LaRuffa having been introduced by Muhammad, the State pursued it briefly on its redirect examination of Malvo. As will be explained, the interest was more in the acquisition of LaRuffa's computer than in the shooting of LaRuffa. Malvo nonetheless gratuitously introduced the fact of the shooting. The State's pursuit of the matter was simply to establish that the acquisition

of LaRuffa's computer on September 5, 2002, was not by Malvo alone, but also by Muhammad.

[THE PROSECUTOR:] Now he asked you some questions about the—he asked if you aware who Paul LaRuffa is? Do you remember that?

[MR. MALVO:] Yes.

[THE PROSECUTOR:] *Can you tell us what you know about the computer that was found in the 1990 Caprice at the time of your and Mr. Muhammad's arrest?*

[MR. MALVO:] *I stole that Sony Vio from Paul La-Ruffa the night I shot him four times.*

[THE PROSECUTOR:] *The night you shot him?*

[MR. MALVO:] *Yes.*

[THE PROSECUTOR:] And that was in Prince George's County, Maryland?

[MR. MALVO:] Yes.

[THE PROSECUTOR:] If you know? It was?

[MR. MALVO:] Yes.

[THE PROSECUTOR:] *And who else was involved in the shooting and the robbery of Paul LaRuffa and the theft of that laptop computer,* Mr. Malvo?

[MR. MALVO:] *Mr. Muhammad identified and planned the entire robbery.*

[THE PROSECUTOR:] And *the computer that you stole from Mr. LaRuffa, that was the same computer that was inside the 1990 Caprice, is that correct?*

[MR. MALVO:] *Yes.*

[THE PROSECUTOR:] And *did you* ever, you *and Mr. Muhammad, at any time have any computer other than the one that you stole from Mr. LaRuffa?*

[MR. MALVO:] *None.*

(Emphasis supplied).

Muhammad now contends that the effect of the redirect examination was to accuse him, for the first time, of an

additional shooting and that he was denied his right to confront that accusation. He contends:

> Malvo's testimony on re-direct examination—that he had shot LaRuffa four times while robbing him of the laptop computer and that Mr. Muhammad had planned the entire robbery—was beyond the scope of redirect. It went far beyond merely responding to Mr. Muhammad's question about the date on which they obtained Mr. LaRuffa's computer, and instead elicited new matter that Malvo had not previously mentioned during direct- or cross-examination. *The trial court's refusal to permit recross-examination violated Mr. Muhammad's right to confront and examine witnesses against him guaranteed by the Sixth Amendment to the United States Constitution* and Article 21 of the Maryland Declaration of Rights, *and requires reversal.*

(Emphasis supplied).

Such a contention is a monumental and opportunistic afterthought. It was certainly below the radar of anybody in the courtroom at the time. Lee Malvo had been on the stand for almost two full days. His direct examination took place on May 23 and filled 246 pages of transcript. On May 24, Muhammad cross-examined Malvo for most of the day, filling another 155 pages of transcript. The redirect examination by the State, also on May 24, was recorded in 13 pages of transcript. As Judge Ryan was excusing Malvo, one brief exchange with Muhammad occurred.

> MR. MUHAMMAD: Your Honor, I have one more question.
>
> THE COURT: No, sir.

See *Pantazes v. State,* 376 Md. 661, 680, 831 A.2d 432 (2003); *Merzbacher v. State,* 346 Md. 391, 413–14, 697 A.2d 432 (1997); *Ebb v. State,* 341 Md. 578, 587, 671 A.2d 974 (1996); *Stouffer v. State,* 118 Md.App. 590, 625, 703 A.2d 861 (1997).

There was no objection lodged by Muhammad. There was no proffer made about what subject that "one more question" might have explored. The preceding redirect examination of Malvo, indeed, had touched upon a number of subjects.

Among them were the nature of the plea agreement that Malvo had reached with the State; the question of whether he had rehearsed his testimony; his having been taught by Muhammad with respect to 1) ways to get away from a shooting scene, 2) ways to choose a good site for a shooting, and 3) being trained to shoot; and the fact that he had been treated like a son by Muhammad. Also inquired into were 1) the shootings in Montgomery, Alabama; 2) the shooting of Paul La Ruffa in Clinton, Maryland, on September 5, 2002; and 3) the shooting of Dean Meyers in Virginia. Also touched upon were the subjects of Malvo's reaction to Muhammad's romantic relationship with a white woman in the State of Washington; the activities of Malvo and Muhammad at the Bull's Eye Gun Shop; Muhammad's strategy of always traveling by bus; and Malvo's conversations with Detective June Boyle. For all we know and for all Judge Ryan knew, Muhammad might have wished further to pursue any of those subjects or something else entirely.

When Judge Ryan said, "No," to Muhammad's request for, "One more question," however, there was no objection. There is nothing, therefore, preserved for appellate review. Maryland Rule 8–131(a). Quite aside from that foreclosure of further review, sufficient unto itself, there was no proffer as to what that one more question might have been or as to what the expected answer to it might have been. With no less than ten subjects having been raised on redirect examination, it is rank speculation as to which the "one more question" might have been directed if, indeed, it was to be directed at any of them.

### Even If Preserved, There Is No Merit

Even if, *arguendo*, Muhammad's present objection to not being allowed "one more question" were preserved for appellate review, we would see no merit in it. Muhammad had been permitted to conduct a full and open-ended cross-examination of Malvo. He himself had introduced the subject of the September 5, 2002, theft from Paul LaRuffa. He was

entitled at that time to explore that incident in any detail that he wished.

The State's redirect examination, moreover, was focused on LaRuffa's computer not LaRuffa himself. (The State did not even inquire as to whether LaRuffa were alive or dead.) The inquiry was as to when the computer was taken and by whom it was taken. That was the computer that was ultimately recovered from the Chevrolet Caprice on October 24, 2002. That was the computer that had a treasure trove of incriminating data in its memory. It was important for the State to establish that the computer had been in the possession of Muhammad and Malvo since September 5, 2002, in order to forefend any defense suggestion that the computer had come into the hands of Muhammad and Malvo at some later time and that some other unknown person had placed the incriminating data into it. This is the realistic reading we give to the State's redirect examination of Malvo. An entirely new subject had not been opened up by the redirect, and Judge Ryan did not abuse his discretion in closing down the examination of Malvo after two full days and 414 pages of transcript. Maryland Rule 5–611(a); *Simmons v. State*, 392 Md. 279, 296, 896 A.2d 1023 (2006). Judge Ryan, moreover, was never alerted as to what Muhammad was interested in pursuing further with his "one more question." Muhammad builds his abuse of discretion argument on pure speculation.

In the State's final argument to the jury, the name Paul LaRuffa was never mentioned and the entire incident of September 5, 2002, was never referred to. Muhammad, in his closing argument, did bring up the subject of LaRuffa and the theft of the computer, and the State, in rebuttal, made a brief response to that argument. Both Muhammad and the State, however, argued exclusively about the fact and the timing of the computer's having come into Muhammad's possession. There was no reference whatsoever to LaRuffa's ever having been shot. The appellant is attempting to make something out of nothing.

### Harmless Error In Any Event

Even if, *arguendo,* the appellant's present complaint had been preserved for appellate review and even if, *arguendo,* his re-cross-examination of Malvo had been erroneously curtailed, such a hypothesized error would have been harmless beyond a reasonable doubt. *Delaware v. Van Arsdall,* 475 U.S. 673, 684, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); *Smallwood v. State,* 320 Md. 300, 308, 577 A.2d 356 (1990); *Owens v. State,* 161 Md.App. 91, 111–12, 867 A.2d 334 (2005).

Even if we were to assume that the "one more question" might have demolished the credibility of Malvo as to the incident of September 5, 2002, and that the failure to have permitted that "one more question" left unscarred that fleeting allusion to a tenth "other crime," it made no difference whatsoever to the identification of Muhammad as the perpetrator of the six murders in Montgomery County. "Other crimes" material is, by its very nature, peripheral evidence used for the indirect purpose of giving rise to an inference. It does not go directly to a core element of the crime on trial. It creates an analogy. Nine "other crimes" had already been established in great detail by phalanxes of lay witnesses and a wealth of scientific evidence. They served to bolster an identification that would have stood even without such bolstering. It is inconceivable that the possible allusive addition of a tenth "other crime" was the pivotal factor that persuaded the jury of Muhammad's guilt. Defense Counsel's characterization of the reference to the shooting of LaRuffa as "devastating testimony" is hyperbolic. It is as if we had suddenly to revise upward, by one, the casualty reports from Antietam. One more casualty would not make the seismograph quiver, nor would the addition of a tenth "other crime" in this case.

### Contention IX:

### The Phenomenon of Cumulative Error

The appellant finally argues that the cumulative adverse effect of multiple errors might well compel a reversal even if each contributing error, standing alone, could be dismissed as

harmless. That statement of law is absolutely correct. *Williams v. State*, 342 Md. 724, 755, 679 A.2d 1106 (1996). And cf. *Bowers v. State*, 320 Md. 416, 436–37, 578 A.2d 734 (1990). The principle, however, is inapplicable to this case.

The contention is one that is increasingly voguish, and it deserves some analysis. "Cumulative error" is a phenomenon that exists only in the context of harmless error analysis. More precisely, it exists only in the context of multiple findings of harmless error. In the case of two or more findings of error, the cumulative prejudicial impact of the errors may be harmful even if each error, assessed in a vacuum, would have been deemed harmless. Where the prejudice from each of two or more errors is fractional, the fractions may add up. Each fraction of prejudice, however, is contingent on an undergirding finding of error. It is in this regard that many promiscuous claims of cumulative error go awry.

In a case involving two or more errors, the thing that may cumulate is the prejudicial effect of two or more actual findings of error, not the effect of two or more mere allegations of error. There must first be error before there is any prejudicial effect of that error to be measured. With respect to each of the appellant's contentions of individual error, we have held that there was no error. Self-evidently, there was no prejudicial impact to cumulate. Eight times nothing is still nothing. *Gilliam v. State*, 331 Md. 651, 685–86, 629 A.2d 685 (1993) ("This is more a case of the mathematical law that 20 times nothing is still nothing."); *Colvin-el v. State*, 332 Md. 144, 180, 630 A.2d 725 (1993) (where claims individually have no merit, there is no merit to the argument that the "whole exceeds the sum of its parts.").

The prejudice to a defendant that is the result of non-error is legitimate. Everything a prosecutor does is intended to prejudice the defendant. The ultimate prejudice is the conviction. It is, by definition, the prosecutor's job thus to prejudice the defendant, so long as it can be done without committing

error. There is, therefore, no such thing as a cumulative prejudicial impact of non-error.

## Conclusion

All six of the appellant's convictions for first-degree murder are hereby affirmed. Jack the Ripper has never ye t been brought to justice. The Beltway snipers have been.

**JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANT.**